# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

KOREA ADVANCED INSTITUTE OF
SCIENCE AND TECHNOLOGY

        Plaintiff,

                                    Case No. 2022-CV-00317

v.

KIP CO., LTD. f/k/a KAIST IP Co., Ltd.;
P&IB CO., LTD.;
IN GYOO KANG;
KIPB LLC f/k/a KAIST IP US LLC;
PAULINA FUNDINGCO, LLC; and
U.S. BANK NATIONAL ASSOCIATION

        Defendants.

---

## FIRST AMENDED COMPLAINT

---

Plaintiff Korea Advanced Institute for Science and Technology ("KAIST"), by and through its counsel at Gass Turek LLC, states the following allegations in support of its Amended Complaint against Defendants KIP Co., Ltd. f/k/a KAIST IP Co., Ltd. ("KIP"), P&IB Co., Ltd. ("P&IB"), In Gyoo Kang (also known as In-Kyu Kang), KIPB LLC f/k/a KAIST IP US LLC ("KIPB"), Paulina FundingCo, LLC ("Paulina"), and U.S. Bank National Association ("U.S. Bank").

### NATURE OF THIS ACTION

1.     KAIST seeks damages, a declaratory judgment pursuant to 28 U.S. Code § 2201, and injunctive relief in connection with a U.S. Bank trust fund holding proceeds from settlement of litigation involving a patent in which KAIST has a financial interest. KAIST is entitled to a significant portion of the settlement proceeds pursuant to contracts

with KIP, but KIP has improperly diverted $24 million to Paulina and may imminently divert millions more.

2.     In October 2019, KIP and KAIST entered into a revenue sharing agreement guaranteeing KAIST a specified share of the proceeds of the patent litigation. KIP did not, however, inform KAIST either before entering the agreement or in a timely manner after entering the agreement that it had an onerous deal with Paulina to finance the patent litigation in exchange for an exorbitant share of the proceeds.

3.     KAIST only learned of the deal with Paulina after Paulina compelled KIP to arbitrate the amount of settlement proceeds to be paid to Paulina. KIP has neither kept KAIST reasonably apprised of arbitral proceedings nor involved KAIST in settlement discussions with Paulina.

4.     This Court, after determining what amount is owed to KAIST, should freeze the funds so that KAIST may recover funds without any defendant circumventing this Court's decision and depriving KAIST of its right to recover.

## THE PARTIES

5.     KAIST is a national research university established by the Korean government in 1971 as the nation's first public, research-oriented science and engineering institution. KAIST's campus and principal place of business is at 291 Daehak-ro, Yuseong-gu, Daejeon 34141, Republic of Korea.

6.     KIP, formerly known as "KAIST IP Co.," is a corporation organized under the laws of the Republic of Korea with its principal place of business at A405-ho, Admin-BD, 193 Munji-ro, Yuseong-gu, Daejeon, 34051, Republic of Korea.

2

7.      P&IB is a corporation organized under the laws of the Republic of Korea and part owner of KIP. P&IB's principal place of business is 517-ho, 7, Beobwon-ro 11-gil, Songpa-gu, Seoul, Republic of Korea.

8.      In Gyoo Kang, also known as In-Kyu Kang, is the Chief Executive Officer of P&IB and part owner of KIP. He is a citizen of the Republic of Korea. His address for service of process is A405-ho, Admin-BD, 193 Munji-ro, Yuseong-gu, Daejeon, 34051, Republic of Korea..

9.      KIPB is a limited liability company organized under the laws of the State of Texas. KIPB's address registered with the Texas Comptroller of Public Accounts is 2591 Dallas Parkway, Suite 300, Frisco, Texas. KIPB's registered agent is Incorp Services, Inc., whose address is 815 Brazos St., Ste 500, Austin, TX 78701.

10.     Paulina is a limited liability company organized and existing under the laws of the State of New York. Paulina's registered agent is United Corporate Services, Inc. at 10 Bank Street, Suite 560, White Plains, NY 10606.

11.     U.S. Bank is a national association that does substantial business in Wisconsin. Its registered agent is C T Corporation System, 301 S. Bedford St., Suite 1, Madison, Wisconsin 53703.

## JURISDICTION AND VENUE

12.     Plaintiff KAIST filed this Action in the Circuit Court for Milwaukee County, Wisconsin, on March 2, 2022. *Korea Advanced Institute of Science and Technology vs. KIP CO., LTD. et al.* Case No. 2022-cv-1342.

3

13.     Defendant Paulina removed this Action to this Court on March 14, 2022. (ECF No. 1.) Paulina bears the burden to prove the jurisdiction and venue requirements are met.

14.     KAIST has not moved to remand the Action but does not waive any right to challenge jurisdiction or venue as allowed under federal statutes, Federal Rules of Civil Procedure, or any other applicable legal authority.

15.     KAIST does not waive and specifically preserves all arguments as to the existence and/or enforceability of alleged arbitration clauses upon which Paulina relied to argue this Action should be removed.

## FACTUAL BACKGROUND

### KAIST Patents FinFET Technology and Forms KIP

16.     KAIST owns Korean patent number 10-0458288 for the fin field-effect transistor (FinFET), a component manufactured mostly in the Republic of Korea used for modern nanoelectric semiconductor devices.

17.     Since FinFET technology became available in the mid-2000s, large companies such as Apple and Samsung have relied on it to manufacture their consumer electronics products.

18.     For roughly a decade after becoming aware of FinFET technology, the companies using it did so without permission from the Korean the patent holder, KAIST.

19.     In 2012, P&IB and KAIST incorporated KAIST-IP Co., Ltd. (now KIP) for the purpose of generating revenue through utilization of KAIST intellectual property.

4

20. In a Business Agreement dated July 2, 2012, KIP (referred to in the contract as KAIST-IP Co., Ltd.) agreed to "actively utilize the grant of exclusive license or assignment of rights from KAIST to focus the efforts on generating the maximum revenue possible" from intellectual property owned by KAIST.[1]

21. Article 6 of the July 2, 2012 Business Agreement (titled "Fiduciary Duty"), required KIP to "perform in in good faith on each tasks defined in this agreement, and focus the efforts on completing the tasks as quickly as possible."

22. In Article 9 of the July 2, 2012 Business Agreement (titled "Discussions"), KIP and KAIST agreed that "[m]atters not stated in this agreement shall be discussed mutually by KAIST and [KIP] under the intention of accomplishing the purpose of this agreement to find the solution."

23. The July 2, 2012 Business Agreement terminated on July 2, 2017.

**KIPB Wins the FinFET Patent Litigation**

24. In July 2016, KIP organized subsidiary KAIST IP US LLC (now known as KIPB) under the laws of the State of Texas. Jong-Ho Lee assigned his rights associated with the U.S. FinFET patent to the new LLC, which KIP wholly owns.

25. Four months after it was organized, KIPB sued several Samsung corporate entities, Global Foundries U.S. Inc., and Qualcomm Inc. in the United States District Court for the Eastern District of Texas for infringement of the U.S. FinFET patent, No. 6,885,055. (the "Infringement Lawsuit").

---

[1] Unless otherwise indicated, all the contracts referred to in this Amended Complaint are Korean-language documents. All references and quotations are to certified translations provided by GNS Co., Ltd.

5

26.     On June 15, 2018, the jury in the Infringement Lawsuit found that Samsung had willfully infringed on the FinFET patent and awarded KIPB a royalty of $400 million.

27.     On February 13, 2020 the district court in the Infringement Lawsuit found that the evidence did not support an award higher than $101,501,708 and that an enhancement of double the damages amount was appropriate under 35 U.S.C. § 284.

28.     KIPB accepted the new judgment amount of $203,003,416 on February 19, 2020, and the district court denied a new trial on damages, resulting in the entry of final judgment on February 21, 2020.

**P&IB, KIP, and KAIST Sign Management and Revenue Sharing Agreements**

29.     During the pendency of the Infringement Lawsuit, P&IB, KIP, and KAIST sought to formalize the manner in which KAIST would receive revenue from the use of FinFET intellectual property by KIP.

30.     The discussion between P&IB, KIP, and KAIST regarding revenue sharing resulted in the execution of two separate contracts on October 2, 2019.

31.     The first contract was between KAIST and P&IB and entitled "Basic Agreement for Management of KIP Co., Ltd." (the "Management Agreement"). The Management Agreement changed ownership of KIP from 65% KAIST/35% P&IB to 48.5% KAIST/48.5% P&IB/3% CEO of KIP.

32.     Article 5 of the Management Agreement requires KIP to consult with KAIST before sharing revenue generated using KAIST's intellectual property. Under Article 5, KIP has an affirmative duty to consult with KAIST without being prompted or requested to do so.

6

33. Article 5 also provides that expenses for generating revenue shall only be recognized "when there is evidence for generating the revenue." This means that the parties will only recognize expenses as valid if they are necessary to generate revenue.

34. Article 5 further provides that revenue sharing shall be performed immediately by KIP for each instance of revenue generation using KAIST's intellectual property. Under Article 5, KIP has an affirmative duty to perform revenue sharing without being prompted or requested to do so.

35. Article 6 of the Management Agreement requires KIP to affirmatively obtain KAIST's informed consent and approval before proceeding with any revenue generating activity without being prompted or requested to do so. Paragraphs 2 and 3 of Article 6 explain that KAIST shall review information relating to potential revenue generation and KIP may not move forward without KAIST's approval:

> 2. KAIST shall review the existence of existing contract, possibility of winning the lawsuit and any obstacles immediately after receiving the notification as stated in the previous Paragraph, and approval shall be notified to KIP.
> 3. KIP shall not be able to perform the task on generating revenue when KAIST did not receive the prior approval document.

36. Article 10 of the Management Agreement states that an "[a]greement on the revenue sharing related to the FinFET patent litigation currently in progress shall be prepared with the separate agreement."

37. The agreement to which Article 10 refers is the second—"separate"—contract dated October 2, 2019: the Revenue Sharing Agreement Utilizing the FinFET Patent between KAIST, KIP, and KIPB (the "Revenue Sharing Agreement").

7

38.     The Management Agreement and the Revenue Sharing Agreement are separate agreements. The Management Agreement does not explicitly or implicitly incorporate any of the terms of the Revenue Sharing Agreement. The Revenue Sharing Agreement does not explicitly or implicitly incorporate any of the terms of the Management Agreement.

39.     The Revenue Sharing Agreement requires KIP to "deposit in cash on the amount for revenue sharing to KAIST through the KAIST bank account . . . within thirty (30) days from receiving the revenue amount from the licensee."

40.     The Revenue Sharing Agreement provides for the deduction of expenses from the revenue amount but does not automatically extend the 30-day payment timeline if expenses are disputed.

41.     At the time KAIST and KIP executed the Management Agreement and the Revenue Sharing Agreement, KAIST was not reasonably informed regarding the contract between KIP and Paulina. KAIST had no reason to suspect that KIP may deprive KAIST of its rightful share of revenue, using a contract with Paulina (discussed below) as an excuse to do so.

42.     Upon information and belief, KIP or KIPB deposited $21 million into a U.S. Bank trust account held in Milwaukee (the "Trust Account") and then paid the total $21 million in trust to Paulina without KAIST's consent. Further, KIP, without KAIST's consent, transferred other funds into the Trust Account such that $23 million in proceeds from the Infringement Lawsuit remain held in trust by U.S. Bank in Milwaukee.

8

**KAIST Learns of KIP Contract with Paulina and Related Arbitration**

43.     In late 2020, KAIST became aware of a contract between KIP and Paulina pursuant to which Paulina would provide up to $6,000,000 in funding for the Patent Litigation and receive a 350% return on the investment if the Patent Litigation was successful.

44.     KIP and Paulina executed this "Prepaid Forward Purchase Agreement" (the "PFPA") on or around July 29, 2016.[2] KAIST was not consulted and was unaware of the existence of the PFPA at the time it was executed.

45.     In or around December 2020, after KAIST requested payment under the Revenue Sharing Agreement, KIP replied via a document that informed KAIST that KIP could not pay because of the PFPA and that informed KAIST Paulina had initiated arbitration proceedings against KIP, KIPB, Jong-Ho Lee, and P&IB. KAIST learned that Paulina filed a Demand for Arbitration and Statement of Claim with the International Arbitration Tribunal of the International Centre for Dispute Resolution on August 31, 2020 based upon the PFPA (the "Arbitration"). KAIST was not consulted regarding and was unaware of any details of the Arbitration before December 2020.

46.     Paulina further filed an Emergency Relief Application requesting an order to place the proceeds of the Infringement Lawsuit in trust pending completion of arbitration.

47.     In an Award of the Emergency Arbitrator dated September 8, 2020, an emergency arbitrator appointed by the International Arbitration Tribunal of the

---

[2] The PFPA was drafted in English.

9

International Centre for Dispute Resolution ordered KIP and KIPB to deposit $21 million into a trust account pending arbitration.

48.     In response to the arbitrator's order, KIP or KIPB deposited $21 million into a U.S. Bank trust account held in Milwaukee (the "Trust Account"). KIP later paid the total $21 million in trust to Paulina without KAIST's consent.

49.     Upon information and belief, KIP transferred other funds into the Trust Account without KAIST's consent, such that $23 million in proceeds from the Infringement Lawsuit remain held in trust by U.S. Bank in Milwaukee.

50.     Upon information and belief, KIP directed the transfer of a total of $24 million to Paulina in 2021 without KAIST's consent.

51.     Upon information and belief, the final hearing in the Arbitration took place in early March 2022, the arbitrator requested further briefing, and a decision is forthcoming.

52.     Upon information and belief, KIP and Paulina are engaged in settlement discussions regarding how to apportion the settlement proceeds held in trust. Despite having a fiduciary duty to KAIST and the duty to obtain KAIST's approval for revenue generation matters, KIP has not involved KAIST in discussions with Paulina.

53.     If KIP and Paulina were to reach a settlement, it would result in disbursement of the Trust funds without KAIST's involvement or input and KAIST would as a result lose its rightful share of the Trust Account.

54.     Any such disbursement without KAIST's approval would be in material breach of the Management Agreement.

55. Upon information and belief, no party could appeal the final Arbitration award in the absence of exceedingly rare circumstances such as an arbitrator's corruption, fraud, or abuse of power.

## FIRST CAUSE OF ACTION
### Breach of Business Agreement
### (Against KIP)

56. KAIST incorporates by reference each of the allegations contained in the foregoing paragraphs as if set forth fully herein.

57. KAIST and KIP (f/k/a KAIST-IP) entered into a valid and enforceable Business Agreement dated July 2, 2012.

58. Pursuant to that agreement, matters not stated in the agreement were to be discussed mutually by KAIST and KIP with the intention of accomplishing the revenue-maximization goal of the agreement.

59. Funding for patent infringement litigation and litigation financing were matters not stated in the agreement but material to the contract because they are closely related to the amount of revenue KAIST would receive generated by its intellectual property.

60. KIP's failure to discuss litigation funding with KAIST and failure to disclose the Paulina agreement were breaches of the Business Agreement.

61. KAIST incurred damages as a result of KIP's breach because the breach led to a significant reduction in the amount of revenue KAIST will receive from the Infringement Lawsuit.

## SECOND CAUSE OF ACTION
## Breach of Management Agreement
## (Against P&IB)

62.     KAIST incorporates by reference each of the allegations contained in the foregoing paragraphs as if set forth fully herein.

63.     KAIST and P&IB entered into a valid and enforceable Basic Agreement for Management of KIP Co., Ltd. dated October 2, 2019.

64.     The Management Agreement requires KIP to obtain KAIST's informed consent and approval before proceeding with any revenue generating activity. Paragraphs 2 and 3 of Article 6 explain that KAIST shall review information relating to potential revenue generation and KIP may not move forward without KAIST's approval.

65.     By directing KIP to distribute settlement proceeds to Paulina and to engage in settlement negotiations with Paulina without informing KAIST in a timely manner or involving KAIST in any meaningful way, P&IB breached the Management Agreement.

66.     KAIST has suffered damages as a result of P&IB's breach in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
## Breach of Revenue Sharing Agreement
## (Against KIP and KIPB)

67.     KAIST incorporates by reference each of the allegations contained in the foregoing paragraphs as if set forth fully herein.

68.     KAIST, KIP, and KIPB entered into a valid and enforceable Revenue Sharing Agreement Utilizing the FinFET Patent dated October 2, 2019.

12

69.     The Revenue Sharing Agreement requires KIP to "deposit in cash on the amount for revenue sharing to KAIST through the KAIST bank account . . . within thirty (30) days from receiving the revenue amount from the licensee."

70.     KIP breached the Revenue Sharing Agreement by failing to deposit the contractually required amount of revenue from the Infringement Lawsuit after final judgment.

71.     There are no special circumstances preventing KIP from fulfilling its contractual obligation to transfer the agreed-upon share of revenue to KAIST. The Arbitration does not constitute "special circumstances" as contemplated by the Revenue Sharing Agreement.

72.     The Revenue Sharing Agreement further provides that all revenue generated from enforcement or licensing of either the U.S. or the Korean FinFET patent is to be split evenly, with 50% designated a license fee for the U.S. patent and 50% designated a license fee for the Korean patent.

73.     The Revenue Sharing Agreement also states that costs associated with enforcement of each patent are to be subtracted from the license fee associated with the patent being enforced. So costs associated with enforcement of the U.S. patent (such as fees owed to Paulina) may only be deducted from the U.S. license fee.

74.     KIP breached the Revenue Sharing Agreement by directing the disbursement of $21 million to Paulina taken from a $30 million payment designated as a license fee for the Korean patent under the contract. The $21 million payment to Paulina was associated

13

solely with enforcement of the U.S. patent and therefore was required to be deducted only from U.S. license fees.

75.    KAIST has suffered damages caused by KIP's breaches in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### Breach of Duty of Good Faith and Fair Dealing
### (Against P&IB and KIP)

76.    KAIST incorporates by reference each of the allegations contained in the foregoing paragraphs as if set forth fully herein.

77.    P&IB and KIP have at all times relevant had a duty to deal in good faith and fairly with KAIST under the Business Agreement, the Management Agreement, and the Revenue Sharing Agreement.

78.    By deliberately avoiding transparency with KAIST regarding a litigation financing arrangement with Paulina pursuant to which millions of dollars in settlement proceeds have been and will be diverted to Paulina instead of going to KAIST and by failing to involve KAIST in any settlement discussions with Paulina or arbitration strategy discussions, P&IB and KIP have breached the duty of good faith and fair dealing.

79.    KAIST has suffered damages caused by P&IB's and KIP's breaches in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (Against KIP, P&IB, and In Gyoo Kang)

80.    KAIST incorporates by reference each of the allegations contained in the foregoing paragraphs as if set forth fully herein.

14

81.     KIP, P&IB, and In Gyoo Kang each had a fiduciary duty to KAIST arising out of contract or a combined controlling interest in KIP or both.

82.     By deliberately avoiding transparency with KAIST regarding a litigation financing arrangement with Paulina pursuant to which millions of dollars in settlement proceeds have been and will be diverted to Paulina instead of going to KAIST and by failing to involve KAIST in any settlement discussions with Paulina or arbitration strategy discussions, KIP, P&IB, and In Gyoo Kang have breached their fiduciary duties to KAIST.

83.     KAIST has suffered damages caused by KIP's, P&IB's, and In Gyoo Kang's breaches in an amount to be determined at trial.

<div align="center">

**SIXTH CAUSE OF ACTION**
**Unjust Enrichment**
**(Against Paulina)**

</div>

84.     KAIST incorporates by reference each of the allegations contained in the foregoing paragraphs as if set forth fully herein.

85.     Paulina has received and will receive a benefit: Paulina enriched itself by receiving funds from settlement funds that were contractually owed to KAIST, and Paulina may further enrich itself by receiving more settlement funds that are contractually owed to KAIST.

86.     Paulina knows and appreciates the benefit conferred and to be conferred.

87.     The benefits are traceable to the Samsung settlement proceeds.

88.     Paulina's benefit was at KAIST's expense: KAIST has been impoverished and may be impoverished as a result of Paulina's past and future enrichment respectively. Such impoverishment constitutes a loss to KAIST.

<div align="center">15</div>

89.     Paulina has no justification for the enrichment and impoverishment. Paulina has no legal ground to retain funds contractually owed to KAIST.

90.     It would be inequitable and unjust for Paulina to retain the benefit.

91.     Equity demands that a constructive trust be placed over the Trust Account which contains a portion of the settlement proceeds that are owed to KAIST.

## SEVENTH CAUSE OF ACTION
### Tortious Interference with the Performance of a Contract
### (Against Paulina)

92.     KAIST incorporates by reference each of the allegations contained in the foregoing paragraphs as if set forth fully herein.

93.     The Management Agreement and the Revenue Sharing Agreement are valid enforceable contracts.

94.     Paulina is aware of the contractual relationships and has access to the original as well as certified translations of the contracts.

95.     Paulina, by seeking to recover funds contractually owed to KAIST and causing them to remain frozen in the Trust Account, is intentionally inducing KIP to breach the contracts and rendering KIP's performance under the contracts impossible.

96.     Such conduct to breach the contracts is wrongful, unjustified, and improper.

97.     As a result of Paulina's wrongful, unjustified, and improper conduct, KIP has breached its contracts with KAIST.

98.     As a result of KIP's breaches of contracts with KAIST, KAIST has suffered and continues to suffer damages in an amount to be determined at trial.

16

**WHEREFORE**, Plaintiff KAIST respectfully requests that this Court grant the following relief:

A. A declaration, pursuant to 28 U.S. Code § 2201 that (1) the generation of revenue under the Management Agreement includes any acts or omissions related to any monies generated under the Management Agreement until the time KAIST and KIP both have received their respective contractual shares of such monies; (2) KIP must obtain KAIST's informed consent and approval before proceeding with generation of revenue; (3) KIP may not cause or consent to the disbursement of funds from the Trust Account without KAIST's informed consent and approval; and (4) KAIST is legally entitled to the funds in the Trust Account.

B. A permanent injunction preventing U.S. Bank from distributing any Infringement Lawsuit settlement funds it holds in trust until KAIST has collected its judgment in this action, and, if KAIST's ability to collect is disputed, such disputes have been resolved in courts of competent jurisdiction.

C. A permanent injunction ordering as follows:

    a. KIP is required to immediately deposit the amount of settlement proceeds from the Infringement Lawsuit dictated by the Revenue Sharing Agreement into the KAIST deposit account specified in the Revenue Sharing Agreement;

17

b. KIP may not enter into a settlement agreement with Paulina that will affect the amount of revenue KAIST receives from the Infringement Lawsuit without obtaining KAIST's prior approval;

c. KIP must provide KAIST with all documents and information relevant to the Arbitration;

d. KIP must keep providing KAIST with all such documents and information for the duration of the Arbitration;

e. KIP must consult with KAIST on strategy and decisions related to the Arbitration; and

f. KIP may not proceed with any revenue generating activity under the Management Agreement without KAIST's informed consent and approval.

D. The imposition in equity of a constructive trust over the Trust Account for the benefit of KAIST.

E. Judgment in favor of KAIST on each of its legal claims in an amount to be determined at trial;

F. Judgment awarding KAIST its costs and expenses incurred in this proceeding, including attorneys' fees and costs, as allowed by law; and

G. Any further relief that this Court shall deem just and proper.


**JURY DEMAND**

KAIST demands a trial by jury on all matters and issues triable by jury.

18

Dated this 20th day of April 2022.

<div style="margin-left: 40%">

GASS TUREK LLC

*s/Daniel A. Manna*
Daniel A. Manna, SBN 1071827
Jerome C. Mohsen, SBN 1097525
241 N. Broadway, Suite 300
Milwaukee, Wisconsin 53202
Tel: 414-223-3300
Fax: 414-224-6116
manna@gassturek.com
mohsen@gassturek.com

*Attorneys for Plaintiff Korea Advanced Institute*
*Of Science and Technology*

</div>