# Exhibit B

# Unpublished Cited Opinions

348 Wis.2d 763

Unpublished Disposition

See Rules of Appellate Procedure, Rule 809.23(3), regarding citation of unpublished opinions. Unpublished opinions issued before July 1, 2009, are of no precedential value and may not be cited except in limited instances. Unpublished opinions issued on or after July 1, 2009 may be cited for persuasive value.

NOTE: THIS OPINION WILL NOT APPEAR IN A PRINTED VOLUME. THE DISPOSITION WILL APPEAR IN A REPORTER TABLE.

Court of Appeals of Wisconsin.

Stephen FISCHER and John Fischer, Plaintiffs–Appellants,

v.

James E. RENNER and James and Susan Renner Living Trust, dated October 30, 2003, Defendants–Respondents.

No. 2012AP1336.
|
May 29, 2013.

Appeal from an order of the circuit court for Waukesha County: J. Mac Davis, Judge. *Affirmed.*

Before BROWN, C.J., NEUBAUER, P.J., and GUNDRUM, J.

**Opinion**

¶ 1 NEUBAUER, P.J.

 *\*1* We affirm the circuit court's grant of summary judgment in favor of a guarantor of business debt who was sued by investors in the business after the business went under. The investors claimed unjust enrichment because they had provided a cash infusion to the business that incidentally conferred a benefit on the guarantor by relieving him of his duty to pay off debt when the business failed. Even liberally construing the concept of a benefit conferred so as to include the alleged benefit here, there are no facts to show that the result was unjust. Due to their respective interests, the cash investors paid first on the debt load. This alone does not allow the cash investors to look to the guarantor to recoup their losses under an unjust enrichment theory. We affirm.

**BACKGROUND**

¶ 2 This case is about an investment in a car dealership business that failed. James Renner transferred ownership in his Mitsubishi dealership to his sons Joseph Renner II and Thomas Renner in 2002 and 2003. Joseph and Thomas also bought a second dealership—the Kia dealership—in 2003. James was a personal guarantor of the operations line of credit of the Mitsubishi dealership with Mitsubishi Motors Credit. The James and Susan Renner Living Trust (sometimes referred to collectively with James Renner as "James") pledged real property as security for the business lines of credit with Ridgestone Bank.

¶ 3 In March 2006, Stephen and John Fischer, along with Joseph and Thomas, formed Car Guys LLC, which was created as an umbrella ownership entity of Renner Imports, Inc. (the Mitsubishi dealership) and Renner Automotive LLC (the Kia dealership). The Fischers bought into Car Guys, investing $528,937.50 for a 44.681 percent interest. As part of that transaction, the Fischers took on liability for their pro rata share of Car Guys' debt.

¶ 4 In May 2007, creditors seized the assets of Car Guys, thus shutting down the dealerships, due to defaults on loans. In early 2008, Ridgestone Bank obtained a judgment against Car Guys and Joseph and Thomas for $1,614,022.22. Business assets and personal assets of Joseph and Thomas were liquidated to satisfy the judgment.

¶ 5 In 2009, the Fischers sued Joseph and Thomas for fraud, alleging that Joseph and Thomas had misrepresented the financial health of the dealerships in order to induce the Fischers to invest in Car Guys. The Fischers settled with Joseph and Thomas for a total of $390,000 and executed a general release. The Fischers threatened to include James in this fraud suit, but did not.

¶ 6 In late 2010, the Fischers sued James, alleging unjust enrichment. The Fischers' theory depended on James's personal guarantee of certain Car Guys' debt and the Trust's pledge of certain real estate as security on certain Car Guys' debt. The Fischers claimed that when the dealerships failed financially, corporate assets were used to pay debt and because of this James did not have to pay the debt, which benefited him by $528,937.50, the amount invested by the Fischers. Retention of this benefit is unjust, the Fischers

urged, because the debts were obligations of James, not the Fischers.

**\*2** ¶ 7 The circuit court granted summary judgment to James, reasoning that: (1) the Fischers released James when they released Joseph and Thomas; (2) James was a necessary party to, and not included in, the lawsuit against Joseph and Thomas; and (3) James did not unjustly retain any benefit from the Fischers. This appeal follows. We affirm. As the circuit court aptly put it, "unjust enrichment cannot be found from this set of facts because of the remoteness, the separation, the organizational and legal barriers involved." Additional facts are discussed as necessary.

## DISCUSSION

### Standard of Review

¶ 8 We review a motion for summary judgment de novo, using the same methodology as the circuit court. *Yahnke v. Carson,* 2000 WI 74, ¶ 10, 236 Wis.2d 257, 613 N.W.2d 102. Summary judgment shall be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2). The purpose of summary judgment is to determine whether there exist any material facts in dispute and thus avoid a trial when there is nothing to try." *Yahnke,* 236 Wis.2d 257, ¶ 10, 613 N.W.2d 102.

### Unjust Enrichment

¶ 9 To establish a claim for unjust enrichment, the plaintiff must prove three elements: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant knew of the benefit; and (3) the defendant retained the benefit, and it was inequitable for the defendant to do so without payment. *Puttkammer v. Minth,* 83 Wis.2d 686, 689, 266 N.W.2d 361 (1978). Unjust enrichment is an equitable doctrine, a "broad and flexible remedy." 66 AM.JUR. 2d *Restitution and Implied Contracts* § 2 (2011).

¶ 10 The Fischers contend that there are material facts in dispute requiring a trial. They point to their allegations that James was aware of the financial troubles of the dealerships and the desire for new investors. They argue that whether the benefit to James was unjust "by its very nature, is a question of fact and inappropriate for summary judgment since it requires a weighing of the facts by the trier of fact to determine the right thing to do (weighing the 'equities')." We disagree. The Fischers were investors in a business venture that had some debt guaranteed by James. There is nothing unusual about this business scenario. This investor/guarantor circumstance does not provide the basis for an unjust enrichment claim between two parties with no contractual relationship and no facts to show that a benefit was unjustly conferred.

**\*3** ¶ 11 To shed light on the application of unjust enrichment, we first look to *Puttkammer,* in which a contractor sued the owner of a supper club after making improvements to the building pursuant to a contract with the lessee of the club. *Puttkammer,* 83 Wis.2d at 687–88, 266 N.W.2d 361. As our supreme court explained

> Even where a person has received a benefit from another, he is liable to pay therefor only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it. The mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor....

*Id.* at 690, 266 N.W.2d 361 (quoting RESTATEMENT OF RESTITUTION § 1 cmt. c (1937)). Regarding the improvements to the supper club, the court held that the owner's knowledge of or acquiescence in the performance of the work did not make the owner liable for the cost. *Id.* at 693, 266 N.W.2d 361. "The unjust enrichment or restitution claim is asserted by one who did the work, and produced an incidental gain to the owner, by merely performing his contract with another and is now dissatisfied because the return promised under the contract is not forthcoming." *Id.*

¶ 12 In *United States v. Goforth,* 465 F.3d 730 (6th Cir.2006), there was no recovery for the government under unjust enrichment when a widow's loans to her late husband's defunct company were repaid while the government's

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

judgment against the company remained unsatisfied. *Id.* at 732–33. Sheila Gilley had loaned her husband's home health care company money and put up a certificate of deposit as collateral for a loan to the company. *Id.* at 732. When the company's assets were sold, the bank loan was paid off, the bank released Gilley's CD to her, and her loan was repaid. *Id.* at 732–33. The government claimed that Gilley had been unjustly enriched, because these assets should have been used to satisfy the government's judgment against the company for misuse of Medicare reimbursement funds. *Id.* at 732. The Sixth Circuit Court of Appeals held that the government did not have an unjust enrichment case against Gilley because "the government conferred no benefit, directly or indirectly, on Sheila Gilley." *Id.* at 734.

It is undisputed that the CD was at all times Sheila Gilley's property and, upon repayment of the South Holland Bank loan, the encumbrance incurred through its collateralization was simply released. Sheila Gilley was left with nothing more than what she owned in the first place....

**\*4** In analogous circumstances, courts have found that the theory of unjust enrichment may not be used to allow a stranger to a loan contract or promissory note to seek funds repaid pursuant to such an agreement.

*Id.* The court went on to discuss an unpublished Seventh Circuit case involving two entities that issued performance bonds to a construction company. *Id.* The company used funds from one to repay creditors on other projects that were bonded by the other. *Id.* at 734–35. The unpaid bond issuer did not have a case for unjust enrichment against the other bond issuer.

[B]ecause the defendants' "benefit"—not having to perform on their bonds—was a consequence of the repayments to creditors that the construction company was contractually required to make, such benefit was not unjust and did not violate "fundamental principles of justice, equity, and good conscience."

*Id.* at 735 (citing *National Am. Ins. Co. v. Indiana Lumbermens Mut. Ins. Co.,* No. 99–2637, 2000 WL 975176 (7th Cir. July 11, 2000)).

¶ 13 The Fischers did not confer an unjust benefit on James when they invested money in Car Guys, money that ultimately eased James's obligations as guarantor on

dealership debt. The Fischers invested in Car Guys, and Car Guys was contractually liable for the dealerships' debt. James guaranteed the dealerships' debt. James promised to pay if the dealerships could not. A guarantor's obligation is secondary to that of the primary debtor. *Continental Bank & Trust Co. v. Akwa,* 58 Wis.2d 376, 388, 206 N.W.2d 174 (1973). The guarantor promises to pay if the primary debtor cannot. *Id.* Similarly, one who pledges property as security, as the Trust did, does so "in order to assure the payment ... of ... debt, by furnishing the creditor with a resource to be used in case of failure in the principal obligation." BLACK'S LAW DICTIONARY 1355 (6th ed.1990). "Where the obligors' respective duties coincide in such a way that performance by the claimant obviates the need for performance by the defendant, but without permitting the conclusion that—inter se—the liability in question is primarily the responsibility of the defendant, restitution will be denied." RESTATEMENT OF RESTITUTION AND UNJUST ENRICHMENT § 24 cmt. g at 356–57 (2011).

¶ 14 Here, the arrangement involves the contractual obligations of investors vis-à-vis an unrelated guarantor. There is nothing about their respective contractual obligations for the company's debt that is inherently unjust or unfair. While the Fishers' cash infusion that was used to pay the company's primary debt obligations may have resulted in an incidental benefit to the secondary obligor, that outcome was contractually established.

**\*5** ¶ 15 To the extent that the Fischers' contractual obligations were fraudulently obtained, the only identified wrongdoers are Thomas and Joseph, from whom they have recovered. There are no facts to show that James made any misrepresentations or otherwise induced the Fischers to invest in Car Guys; indeed, there are no facts to show that the Fischers had any communications with James. And, there are no facts to show that James had knowledge of any of the alleged wrongful conduct of Joseph or Thomas. At the time of the Fischers' investment, James was not an owner of Car Guys or the car dealerships, and he received none of the money the Fischers invested in Car Guys. And, ultimately, James's knowledge of the benefit as a result of the Fischers' investment is immaterial. Knowledge of, and acquiescence in, the benefit conferred is only one element of unjust enrichment. *Puttkammer,* 83 Wis.2d at 689, 266 N.W.2d 361. The mere fact that there may have been incidental benefit to James, and that James may have known about it, does not require James as a guarantor to make

Case 2:22-cv-00317-WED   Filed 06/03/22   Page 4 of 26   Document 35-2

restitution to the investors of Car Guys; the incidental benefit does not violate fundamental principles of justice, equity, and good conscience.

¶ 16 Finally, we briefly note that the Fischers' attempt to liken this to two innocent parties, the latter a holder of stolen goods, is wholly inapt. The Fischers point to no case where the stolen goods analogy applies when, as here, the parties' financial obligations regarding the money at issue are contractually defined.

¶ 17 The Fischers' attempt to hold James liable for their investment loss fails as a matter of law. Unjust enrichment does not operate to make a third party the insurer of a failed business venture. *See id.* at 693, 266 N.W.2d 361. Under the facts submitted on summary judgment, there is nothing unfair about any incidental benefit conferred on James by the Fischers' investment in Car Guys. James is entitled to judgment as a matter of law. *See Transportation Ins. Co. v. Hunzinger Constr. Co.,* 179 Wis.2d 281, 291–92, 507 N.W.2d 136 (Ct.App.1993) (citing *Celotex Corp. v. Catrett,* 477

U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)) (moving party is entitled to judgment as a matter of law when nonmoving party fails to make a sufficient showing on an essential element of his or her case with respect to which he or she has the burden of proof).[1]

[1]    We need not address the Fischers' alternative arguments regarding the bases for the circuit court's decision because we have concluded that, as a matter of law, the Fischers have failed to present a viable case for unjust enrichment. *See Sweet v. Berge,* 113 Wis.2d 61, 67, 334 N.W.2d 559 (Ct.App.1983).

Order affirmed.

**\*6** Not recommended for publication in the official reports.

**All Citations**

348 Wis.2d 763, 833 N.W.2d 873 (Table), 2013 WL 2319487, 2013 WI App 84

---

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:22-cv-00317-WED   Filed 06/03/22   Page 5 of 26   Document 35-2

MB Financial Bank, N.A. v. Kartel Plastics, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 7201875

KeyCite Yellow Flag - Negative Treatment

Distinguished by  Himelsein v. LS1 LLC,   C.D.Cal.,   December 10, 2018

2017 WL 7201875
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

MB FINANCIAL BANK, N.A., Plaintiff,

v.

KARTEL PLASTICS, INC., et al., Defendants.

Case No. ED CV 17-24-RGK (SPx)
|
Signed 03/09/2017

**Attorneys and Law Firms**

Kathleen M. Wood, Peter Edward Schnaitman, Connon Wood
LLP, Pasadena, CA, for Plaintiff.

Andrew J. Knez, Fred J. Knez, Knez Law Group LLP,
Riverside, CA, for Defendants.

**MEMORANDUM AND ORDER GRANTING
APPLICATION FOR WRIT OF POSSESSION**

SHERI PYM, United States Magistrate Judge

## I.

## INTRODUCTION

 *1  On February 7, 2017, plaintiff MB Financial Bank,
N.A. ("MB") filed an application for writ of possession
against defendant Kartel Plastics, Inc. ("Kartel") and
noticed a hearing on the application for March 7, 2017.
Plaintiff seeks the possession of identified collateral,
consisting of resins, molds, tooling, and other related
equipment for manufacturing plastic milk crates (collectively,
the "Collateral"), currently located at defendant's Colton,
California processing facility. Plaintiff alleges it holds
a perfected senior security interest in the Collateral,
which is owned by International Precision Components
Corporation ("IPCC"), pursuant to financing agreements
between plaintiff and IPCC. Plaintiff alleges IPCC is in
default on its obligations under those financing agreements,
and claims defendant now wrongfully retains possession of

the Collateral despite plaintiff's contractual rights to repossess
the Collateral.

Plaintiff's application is supported by: the declarations of
James M. Sisk, plaintiff's Senior Vice President and Division
Manager; Christian Stolzman, IPCC's Dairy/Bakery Division
Manager; Kathleen M. Wood, counsel for plaintiff; and
attached exhibits. Defendant did not file an opposition to the
application (which opposition was due on February 14, 2017,
although on February 16, 2017 defendant filed an answer and
counterclaims to the underlying complaint in this action. On
February 27, 2017, counsel for defendant filed a motion to
withdraw as counsel of record, and noticed a hearing for April
3, 2017. The motion to withdraw remains pending.

The court held a hearing on the instant application on March
7, 2017. Counsel for plaintiff and defendant appeared at
the hearing. After considering the parties' written and oral
arguments, and for the reasons discussed below, the court
grants plaintiff's application for writ of possession.

## II.

## BACKGROUND

Plaintiff MB, a Maryland corporation with a principal place
of business in Rosemont, Illinois, is a subsidiary of MB
Financial Bank, Inc. Declaration of James M. Sisk ("Sisk
Decl."), docket no. 16-2 ¶ 2. IPCC, an Illinois corporation
with a principal place of business in Lake Forest, Illinois,
is a manufacturer of injection molding plastic products
for the industrial packaging, food, and dairy industries,
among others. Declaration of Christian Stolzman ("Stolzman
Decl."), docket no. 16-3 ¶ 4; Sisk Decl. ¶ 4.

To save shipping costs, IPCC sometimes sends raw materials
to processors, such as defendant Kartel, located closer to
IPCC customers. Sisk Decl. ¶ 4. In 2014, IPCC entered into
an oral agreement with defendant whereby IPCC would pay
defendant a flat, fixed fee to produce milk crates at defendant's
Colton, California processing facility for an IPCC customer
in California. Stolzman Decl. ¶ 6. IPCC supplied defendant
with the tooling, molds, resin, color, and other materials to
manufacture these crates. *Id.* IPCC also provided defendant
with its own trailers, where defendant would load and store
the finished milk crates until an IPCC shipping agent picked
up the trailers for delivery. *Id.*

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

1

MB Financial Bank, N.A. v. Kartel Plastics, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 7201875

**\*2** In July 2015, IPCC and plaintiff entered into a series of financing agreements to provide IPCC a line of credit for its operations. To secure the financing, IPCC granted plaintiff a security interest in IPCC's tangible and intangible property, whether currently owned or later acquired. Sisk Decl. ¶ 5. Plaintiff filed a Uniform Commercial Code ("UCC") financing statement and subsequent amendment with the Illinois Secretary of State to perfect this security interest in IPCC's property. *Id.*, Ex. A.

The financing agreements between IPCC and plaintiff replaced IPCC's previous financing agreements with another lender, PNC Bank. *See* Stolzman Decl. ¶¶ 7-8. In their respective declarations, both Sisk and Wood state they performed UCC title searches as recently as January 2017 confirming all prior security interests held by PNC Bank were terminated when plaintiff filed its security interest in Illinois. [1] Sisk Decl. ¶ 7; Declaration of Kathleen M. Wood ("Wood Decl."), docket no. 16-4 ¶ 3.

[1]     Plaintiff filed a Request for Judicial Notice accompanying the instant application. Docket no. 16-5 ("RJN"). There, plaintiff asks the court to take judicial notice of certified copies of plaintiff's UCC financing statement and subsequent amendment perfecting its security interest in IPCC's assets as collateral to the parties' financing agreements. RJN at 2. In her declaration supporting the application, plaintiff's counsel Kathleen Wood states plaintiff also attached "the UCC search history for any and all unlapsed security interests pertaining to IPCC from the Illinois Secretary of State" to its Request for Judicial Notice. Wood Decl. ¶ 3. Plaintiff's memorandum in support of the application contains a similar statement. Docket no. 16-1 ("App.") at 10 n.5. However, plaintiff's Request for Judicial Notice appears to inadvertently omit the first exhibit for which judicial notice is sought, and instead attaches the UCC financing statement and subsequent amendment as Exhibits 1 and 2, respectively, with no corresponding "UCC search history" included. Following the March 7, 2017 hearing, plaintiff filed a supplement to its Request for Judicial Notice attaching the omitted UCC search history. Docket no. 25. The court takes judicial notice of the UCC financing statement and subsequent amendment plaintiff filed with the Illinois Secretary of State, in addition to the UCC

search history plaintiff provided on March 7, 2017. *See* Fed. R. Evid. 201(b).

In keeping with its regular practice, plaintiff requires any processor working with IPCC to acknowledge plaintiff's security interest in IPCC's property and to agree to certain obligations, including releasing any collateral to plaintiff in the event of IPCC's default. Sisk Decl. ¶ 6. In July 2015, plaintiff, defendant, and IPCC signed a letter ("Processor's Letter") acknowledging that all of the property IPCC provided to defendant, including the Collateral identified in the instant application, was collateral to plaintiff's financing agreements with IPCC. *Id.* ¶ 7, Ex. B; Stolzman Decl. ¶ 7. In the Processor's Letter, defendant agrees to an "express and irrevocable waiver and discharge of any rights, claims, or interests" it may have in "the Collateral which now or hereafter may be located" at defendant's processing facility. Sisk Decl. ¶ 8, Ex. B at 1.

IPCC Manager Stolzman states "IPCC has been notified that it is in a default of its obligations to MB." Stolzman Decl. ¶ 11. According to plaintiff, IPCC has been in default to plaintiff since October 2016. Sisk Decl. ¶ 9. After IPCC noticed a discrepancy between the amount of raw materials it sent to defendant and the amount of milk crates defendant subsequently produced, Stolzman made an unannounced visit to defendant's facility on November 9, 2016 to inspect IPCC's property there. Stolzman Decl. ¶ 9. Stolzman found defendant had only 3,200 pounds of resin from IPCC's shipments, when, according to Stolzman, it should have had an estimated 330,000 pounds. *Id.*

**\*3** After this inspection, IPCC informed defendant it was ending its agreement with defendant and requested to make arrangements to take back its property from the Colton facility. *Id.* Stolzman declares defendant allowed IPCC to recover its trailers from defendant's facility, but defendant has refused to release the remaining Collateral, which IPCC estimates is valued at more than $500,000. *Id.* ¶ 10. On November 21, 2016, plaintiff sent an email to Kartel owner Michel Buchbut, informing Buchbut that IPCC was in default of its obligations to plaintiff, that defendant was in breach of the Processor's Letter by refusing to relinquish the Collateral to either IPCC or plaintiff, and demanding that defendant immediately release the Collateral. Sisk Decl. ¶ 9, Ex. C. According to plaintiff, defendant failed to reply to the November 21, 2016 letter. *Id.* ¶ 9.

Plaintiff sent defendant a similar letter on December 22, 2016. Wood Decl. ¶ 4, Ex. A. Defendant replied to the

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

MB Financial Bank, N.A. v. Kartel Plastics, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 7201875

December 22, 2016 letter, and claimed it would not release the Collateral because PNC Bank still held a security interest in the Collateral. *Id.* ¶ 5, Ex. B. Plaintiff forwarded to defendant the UCC search materials plaintiff argues demonstrate that plaintiff's security interest is the only existing interest in the Collateral. *Id.*, Ex. C. Counsel for both parties corresponded to arrange another inspection of defendant's facility, but according to plaintiff, defendant has not reviewed the UCC search materials plaintiff sent and no inspection has taken place because of defendant's counsel's work schedule and an unexpected death in Michel Buchbut's family. *Id.* ¶¶ 5-9, Exs. C-H.

After failing to hear back from defendant in a timely manner, plaintiff filed the underlying complaint in this action on January 6, 2017, bringing a claim for writ of possession and claiming, inter alia, breach of contract and conversion. That same day, defendant filed a complaint against plaintiff and IPCC in San Bernardino County Superior Court, claiming, inter alia, breach of contract and rescission of the Processor's Letter. RJN, Ex. 3.

Plaintiff filed the present application for writ of possession on February 7, 2017, seeking to repossess the Collateral from defendant. Plaintiff attaches certified copies of the UCC financing statement and subsequent amendment filed with the Illinois Secretary of State; the November 21 and December 22, 2016 demand letters issued to defendant; the Processor's Letter between plaintiff, defendant, and IPCC; defendant's January 6, 2017 complaint against plaintiff and IPCC filed in San Bernardino County Superior Court; and relevant correspondence between counsel for plaintiff and defendant. *See* Sisk Decl., Exs. A-C; Wood Decl., Exs. A-I. Finally, plaintiff attaches a list IPCC created of the inventory it believes is still in defendant's possession, and claims the value of this inventory "is in excess of $500,000." Stolzman Decl. ¶ 10, Ex. C.

### III.

### DISCUSSION

#### A. Applicable Possession Law

[Federal Rule of Civil Procedure 64](#) provides for prejudgment possession, and other prejudgment remedies, as follows:

(a) At the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment. But a federal statute governs to the extent it applies.

(b) The remedies available under this rule include the following—however designated and regardless of whether state procedure requires an independent action: arrest; attachment; garnishment; replevin; sequestration; and other corresponding or equivalent remedies.

[Fed. R. Civ. P. 64. Rule 64](#) codifies "long-settled federal law providing that in all cases in federal court, whether or not removed from state court, state law is incorporated to determine the availability of prejudgment remedies for the seizure of person or property to secure satisfaction of the judgment ultimately entered." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto. Truck Drivers, Local No. 70 of Alameda Co.*, 415 U.S. 423, 436 n.10, 94 S. Ct. 1113, 39 L.Ed. 2d 435 (1974); *accord U.S. v. Van Cauwenberghe*, 934 F.2d 1048, 1063-64 n.13 (9th Cir. 1991).

**\*4** California law provides for the return of property to creditors via a writ of possession, and the procedures and grounds for obtaining orders permitting prejudgment possession are governed by [California Code of Civil Procedure §§ 512.010-512.120](#). *See* [Cal. Civ. Proc. Code § 512.010(a)](#) ("Upon the filing of the complaint or at any time thereafter, the plaintiff may apply pursuant to this chapter for a writ of possession by filing a written application for the writ with the court in which the action is brought."). The application must include:

(1) A showing of the basis of the plaintiff's claim and that the plaintiff is entitled to possession of the property claimed. If the basis of the plaintiff's claim is a written instrument, a copy of the instrument shall be attached.

(2) A showing that the property is wrongfully detained by the defendant, of the manner in which the defendant came into possession of the property, and, according to the best knowledge, information, and belief of the plaintiff, of the reason for the detention.

(3) A particular description of the property and a statement of its value.

(4) A statement, according to the best knowledge, information, and belief of the plaintiff, of the location of the property and, if the property, or some part of it, is within a private place which may have to be entered to

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   3

MB Financial Bank, N.A. v. Kartel Plastics, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 7201875

take possession, a showing that there is probable cause to believe that such property is located there.

(5) A statement that the property has not been taken for a tax, assessment, or fine, pursuant to a statute; or seized under an execution against the property of the plaintiff; or, if so seized, that it is by statute exempt from such seizure.

Cal. Civ. Proc. Code § 512.010(b). The usual method of obtaining a writ of possession is by order following a noticed hearing. *See* Cal. Civ. Proc. Code § 512.020(a) ("Except as otherwise provided in this section, no writ shall be issued under this chapter except after a hearing on a noticed motion."). Section 512.060 provides that a writ of possession shall issue if (1) the plaintiff has established the probable validity of the plaintiff's claim to possession of the property and (2) the undertaking requirements of § 515.010 are satisfied. Cal. Civ. Proc. Code § 512.060(a). The statute further provides: "No writ directing the levying officer to enter a private place to take possession of any property shall be issued unless the plaintiff has established that there is probable cause to believe that the property is located there." Cal. Civ. Proc. Code § 512.060(b). "A claim has 'probable validity' where it is more likely than not that the plaintiff will obtain a judgment against the defendant on that claim." Cal. Civ. Proc. Code § 511.090.

A writ of possession may be issued ex parte if there is probable cause that, inter alia: "The defendant acquired possession of the property in the ordinary course of his trade or business for commercial purposes and: (i) The property is not necessary for the support of the defendant or his family; and (ii) There is an immediate danger that the property will become unavailable to levy by reason of being transferred, concealed, or removed from the state or will become substantially impaired in value by acts of destruction or by failure to take care of the property in a reasonable manner; and (iii) The ex parte issuance of a writ of possession is necessary to protect the property." Cal. Civ. Proc. Code § 512.020(b)(3).

On January 26, 2017, plaintiff initially filed an ex parte application for a temporary restraining order in aid of its application for writ of possession. Docket no. 11. On February 1, 2017, the court denied plaintiff's application because plaintiff "has not satisfied the requisite burden of showing either an emergency or irreparable injury." Docket no. 15 at 1. Plaintiff then filed the instant application on February 7, 2017.

## B. Requirements Under California Code of Civil Procedure § 512.010

**\*5** The court first considers whether plaintiff has complied with the requirements of, and made a sufficient showing under, California Code of Civil Procedure §§ 512.010 and 512.060 for the issuance of a writ of possession.

### 1. Basis of Plaintiff's Claim and Showing That Property Is Wrongfully Detained

Plaintiff's claims are set forth in the complaint filed on January 6, 2017 and in the instant application. In support of these claims, plaintiff submits the declarations of James M. Sisk, Christian Stolzman, and Kathleen M. Wood. Docket nos. 16-2, 16-3, 16-4. Sisk declares that he is plaintiff's principal contact for IPCC, has been working with IPCC since approximately June 2015, and is aware of and has access to all of the business records regarding this lending relationship. Sisk Decl. ¶ 3.

Section 512.010(b)(1) states that if the basis of plaintiff's claim is a written instrument, "a copy of the instrument shall be attached." Here, plaintiff attaches the UCC financing statement and subsequent amendment filed with the Illinois Secretary of State, as well as the Processor's Letter executed by plaintiff, defendant, and IPCC, but has not attached a copy of the written instruments detailing the underlying financing agreements between plaintiff and IPCC. Plaintiff also includes Stolzman's declaration, which indicates IPCC is in default to plaintiff on the underlying financing agreements. Stolzman Decl. ¶ 11.

Despite lacking complete documentary evidence, it appears undisputed between plaintiff and IPCC that IPCC is in default of its obligations to plaintiff. Moreover, IPCC does not dispute plaintiff's claim that it is entitled to seek possession of IPCC's collateral, including the Collateral identified in the instant application, as a result of IPCC's default. In addition, the Processor's Letter explicitly states defendant is receiving IPCC's property that is collateral to financing agreements between IPCC and plaintiff, and that in the event of IPCC's default to plaintiff, plaintiff "may remove the Collateral or any part thereof from [defendant's processing facility] ... without objection, delay, hindrance or interference by [defendant]," and that defendant "shall make no claim or demand against the Collateral or [plaintiff]." Sisk Decl., Ex. B at 2.

Thus, the court finds plaintiff has made a sufficient showing, at least for purposes of this application for writ of possession,

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   4

MB Financial Bank, N.A. v. Kartel Plastics, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 7201875

that the Collateral plaintiff seeks is collateral for plaintiff's loans to IPCC, that defendant came into possession of the Collateral, that plaintiff is entitled to possession of the Collateral in the event of IPCC's default to plaintiff, and that defendant is wrongfully detaining the Collateral following IPCC's subsequent default. *See* Cal. Civ. Proc. Code §§ 512.010(b)(1)-(2).

### 2. **Particular Description of Property and Statement of Value**

Although plaintiff has established the probable validity of its claim to possession of the Collateral, it is a closer call as to whether plaintiff has sufficiently described the Collateral and provided an adequate statement of its value, for purposes of California Code of Civil Procedure § 512.010(b)(3). As noted above, plaintiff attaches a list created by IPCC of the inventory IPCC believes is still in defendant's possession, and claims the value of this inventory "is in excess of $500,000." Stolzman Decl. ¶ 10, Ex. C. Both Stolzman and Sisk describe the Collateral generally as consisting of IPCC's tools, molds, machines, resins, color, and trailers used for manufacturing plastic milk crates. *Id.* ¶ 9; Sisk Decl. ¶ 4. The attached inventory list contains serial numbers for only some of the goods allegedly stored at defendant's facility, and no corresponding value amount for each good. Stolzman Decl. ¶ 10, Ex. C. Nonetheless, the list is specific to the extent it describes particular items, including their dimensions (e.g., "mounting plates for mold, approx. 75" x 43"" and "Incoe screen filter, 12" x 6" diameter"). *Id.*

 **\*6** At the March 7, 2017 hearing, plaintiff argued it cannot more specifically identify which items of IPCC's property comprising the Collateral are located at defendant's facility, because the parties have not been able to conduct another inspection of the facility following Stolzman's unannounced inspection in November 2016. The court appreciates plaintiff's difficulty in compiling a more particular list of goods comprising the Collateral in light of the difficulties in communication between the parties in the past months. *See* Wood Decl. ¶¶ 6-10. Nonetheless, without more, the court questions whether a levying officer executing the writ could distinguish between the goods at defendant's facility that belong to IPCC and goods belonging to other customers of defendant, if any.

In contrast, other California district courts have granted applications for writs of possession based on more substantial evidentiary showings. For example, in *Ascentium*, the court found the plaintiff established a sufficiently particular

description of the property and statement of its value by providing identification numbers for the trailers it sought in its application, which matched the identification numbers given in sales slips attached to corresponding financing agreements. *See* *Ascentium*, 2016 WL 2595189, at \*3. There, the plaintiff also set forth in a declaration that plaintiff retained an appraiser to assess the value of the trailers at issue, thereby establishing an estimated market value of the trailers depending on their current condition, despite plaintiff's inability to access the trailers because the defendant refused to relinquish them. *Id.* at 2, 3. Here, plaintiff has made no equivalent showing despite similar limitations regarding its access to the Collateral. At the same time, the court recognizes that some of the Collateral here, which includes foil rolls and a filter, may not even have unique identification numbers the way trailers and vehicles do.

At the March 7, 2017 hearing, plaintiff argued that if the court grants its application, a representative for IPCC could accompany the levying officer to defendant's facility in order to identify its property during the execution of the writ. In addition, plaintiff correctly pointed out that, under the Processor's Letter, defendant must provide plaintiff with a copy of all receipts and other documents evidencing the Collateral at defendant's processing facility upon plaintiff's request. *See* Sisk Decl., Ex. B at 1. The court notes at least one other California district court has explicitly ordered representatives for the plaintiff, in addition to representatives for a third party substitute custodian, to accompany the levying officer to the defendant's premises for this purpose. *See* *Ford Motor Credit Co. v. Sebastopol Ford, Inc.*, 2007 WL 1545187, at \*2-3 (N.D. Cal. May 25, 2007).

While plaintiff has not set forth a description of the Collateral that is sufficiently particular to allow a levying officer to execute a writ of possession for the property without assistance, plaintiff has otherwise met its burden of establishing the probable validity of its claim to possession of the Collateral. Moreover, neither the parties nor IPCC have indicated assistance from an IPCC representative during the execution of the writ would be ineffective in identifying IPCC's property and plaintiff's Collateral. Indeed, defendant has not even opposed this application. On balance, the court finds the presence of a representative for IPCC is necessary to ensure the scope of the Collateral is properly identified in the event of execution of the writ of possession, but that with such assistance the Collateral is sufficiently described.

### 3. **Probable Cause Regarding Location**

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   5

MB Financial Bank, N.A. v. Kartel Plastics, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 7201875

Stolzman claims the Collateral is located at defendant's processing facility, and the Processor's Letter, signed by Buchbut as defendant's owner, states that facility is located at 1495 N. 8th Street in Colton, California. Stolzman Decl. ¶¶ 9-10; Sisk Decl., Ex. B. Stolzman personally observed the Collateral during a visit to the facility in November 2016. Stolzman Decl. ¶ 9. Based on these facts, the court finds plaintiff has shown probable cause to believe the Collateral is located at the aforementioned address.

**4. Statement That Collateral Has Not Been Seized**

*7 In addition, Stolzman states in his declaration that to the best of his knowledge, the Collateral has not been taken for a tax, assessment, or fine pursuant to statute, nor has it been seized under an execution against plaintiff's property, as required by California Code of Civil Procedure § 512.010(b)(4). *Id.* ¶ 15.

**C. Requirements Under California Code of Civil Procedure § 512.060**

As outlined above, California Code of Civil Procedure § 512.060 sets forth additional requirements before the writ may issue. Other California district courts have recognized that two of the three requirements under this section are duplicative of requirements under § 512.010—plaintiff's establishment of the probable validity of plaintiff's claim to possession of the property and plaintiff's showing of probable cause that the property at issue is located at the private place to be entered to seize the property. Cal. Civ. Proc. Code § 512.060(a)(1), (b); *4Wall Las Vegas, Inc. v. Triebwasser*, 2013 WL 930620, at *6 (E.D. Cal. Mar. 8, 2013); *Ascentium*, 2016 WL 2595189, at *4. As just discussed, plaintiff has already established the probable validity of its claim to possession of the Collateral, as well as probable cause that the Collateral is located at the aforementioned address of defendant's processing facility.

Therefore, the only issue remaining is whether the undertaking requirements of California Code of Civil Procedure § 515.010 have been satisfied. *See* Cal. Civ. Proc. Code § 512.060(a)(2). Section 515.010 generally requires plaintiff to file an undertaking in an amount of not less than twice the value of the defendant's interest in the property, before a court may issue a writ of possession. Cal. Civ. Proc. Code § 515.010(a). But if the court finds the defendant has no interest in the property, then "the court shall waive the requirement of the plaintiff's undertaking." Cal. Civ. Proc. Code § 515.010(b).

The California Code of Civil Procedure also allows a defendant to file an undertaking to prevent the plaintiff from taking possession of property pursuant to a writ of possession or to regain possession of property so taken. Cal. Civ. Proc. Code § 515.020(a). Consequently, where the court finds the defendant has no interest in the property and so waives the requirement of the plaintiff's undertaking, the court "shall include in the order for issuance of the writ the amount of the defendant's undertaking sufficient to satisfy the requirements of subdivision (b) of Section 515.020." Cal. Civ. Proc. Code § 515.010(b). Such undertaking by a defendant "shall state that, if the plaintiff recovers judgment on the action, the defendant shall pay all costs awarded to the plaintiff and all damages that the plaintiff may sustain by reason of the loss of possession of the property," including "all damages proximately caused by the plaintiff's failure to gain or retain possession." Cal. Civ. Proc. Code § 515.020(b).

Here, plaintiff argues it need not file an undertaking because defendant has no interest in the Collateral, as the Processor's Letter and other evidence demonstrates IPCC is the sole owner of the Collateral and "validly assigned its rights in that Collateral to MB, who perfected its interest." App. at 16. The court agrees the Processor's Letter shows the Collateral effectively belongs to plaintiff as the security for IPCC's defaulted obligations, and does not belong to defendant. *See* Sisk Decl., Ex. B. As such, defendant has no interest in the Collateral because the parties' agreement with IPCC provides defendant must return the Collateral to plaintiff in the event of IPCC's default. The court therefore waives the requirement of plaintiff's undertaking.

**D. Levy of the Writ of Possession**

*8 Although the court's order directs the Clerk of Court to presently issue a writ of possession, the court finds it appropriate to stay levy of the writ of possession for a period of seven calendar days from the date of filing of this order, to allow defendant to either provide the required undertaking or turn over the Collateral to plaintiff without the assistance of a levying officer. Upon expiration of the seven-day period, the writ of possession may be levied or executed without further delay.

**IV.**

Case 2:22-cv-00317-WED Filed 06/03/22 Page 11 of 26 Document 35-2

MB Financial Bank, N.A. v. Kartel Plastics, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 7201875

## CONCLUSION

Accordingly, IT IS HEREBY ORDERED:

1. Plaintiff's application for a writ of possession under California Code of Civil Procedure § 512.010 (docket no. 16) is GRANTED.

2. The Clerk of Court shall immediately issue a writ of possession directing the Sheriff of San Bernardino County, California (or any other sheriff or marshal within whose jurisdiction the Collateral is located), as the levying officer, to enter the following private place at any reasonable time or times, using any necessary reasonable force as authorized by California Code of Civil Procedure § 514.010(c), whether the premises are occupied or unoccupied, to take possession of the Collateral or some part thereof: 1495 N. 8th Street, Colton, California 92324. Notwithstanding the foregoing, levy of the writ of possession shall be stayed for a period of seven calendar days from the date of filing of this order, to allow defendant to either provide the required undertaking, specified below, or turn over the Collateral to plaintiff without the assistance of a levying officer. Upon expiration of the seven-day period, the writ of possession may be levied or executed without further delay.

3. The levying officer is authorized to remain on defendant's business premises at all times until all the Collateral is removed. The levying officer within whose jurisdiction the Collateral, or some part thereof, is located, is authorized to execute the writ of possession and levy on the Collateral in either of the following manners as directed by plaintiff and/or IPCC:

    a. The levying officer may seize the Collateral and retain custody of it in the manner provided by California Code of Civil Procedure §§ 514.010-514.050; or

    b. The levying officer may maintain the peace and supervise the seizure while agents, attorneys, or employees for plaintiff and/or IPCC take and maintain possession of the Collateral in the manner provided by California Code of Civil Procedure §§ 514.010-514.050.

4. Plaintiff and IPCC, by and through their agents, attorneys, or employees, shall accompany the levying officer during the service and execution of the court's writ of possession with respect to all Collateral located at 1495 N. 8th Street, Colton, California 92324.

5. The Clerk of Court is directed to attach a copy of this order to the writ of possession, pursuant to California Code of Civil Procedure § 514.020(a).

6. Plaintiff is to store the Collateral in a reasonable manner and either plaintiff or the storage facility shall carry sufficient insurance to protect the Collateral from loss prior to its sale or disposition. Consistent with California Code of Civil Procedure § 514.030, within ten days after levy of the writ of possession, plaintiff shall be permitted to dispose of the Collateral in the manner provided under the California Uniform Commercial Code, assuming, e.g., the levying officer does not receive notice of the filing of an undertaking for redelivery.

7. The court waives any filing or posting of an undertaking or bond by plaintiff, pursuant to California Code of Civil Procedure § 515.010(b). The court finds, for the purposes of this order, that the value of the Collateral is approximately $500,000. The written undertaking required by defendant for redelivery or to stay delivery shall be in the amount of $500,000, pursuant to California Code of Civil Procedure § 515.020.

**\*9** 8. Under California Code of Civil Procedure § 514.040, the levying officer must return the writ to the court within 30 days after the levy, but in no event more than 60 days after the writ is issued; that is, the levy must be completed within 60 days after the writ is issued.

9. Pursuant to California Code of Civil Procedure § 512.070, defendant is cautioned that failure to turn over possession of the Collateral to plaintiff may subject defendant to being held in contempt of court.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 7201875

---

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.  7

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by   Comcast of Illinois X, LLC. v. Hightech Electronics, Inc.,
N.D.Ill.,   July 29, 2004

221 F.3d 1339

Unpublished Disposition

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing
in the Federal Reporter. Use FI CTA7 Rule 53 for
rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Seventh Circuit.

NATIONAL AMERICAN INSURANCE COMPANY,
a Nebraska corporation, and Gulf Insurance Company,
a Missouri corporation, Plaintiffs-Appellants,

v.

INDIANA LUMBERMENS MUTUAL INSURANCE
COMPANY, an Indiana corporation, and
Security Insurance Company of Hartford, a
Connecticut corporation, Defendants-Appellees.

No. 99-2637.
|
Argued Feb. 11, 2000.
|
Decided July 11, 2000.

Appeal from the United States District Court for the Northern
District of Illinois, Eastern Division. No. 97 C 5431. Ruben
Castillo, Judge.

Before Hon. RICHARD A. POSNER, Chief Judge, Hon.
DANIEL A. MANION, Hon. MICHAEL S. KANNE, Circuit
Judges.

ORDER

**\*1** Defendants Indiana Lumbermens Mutual Insurance
Company (Lumbermens) and Security Insurance Company
of Hartford (Security) issued performance bonds for
construction projects of the R.A. Vranckaert Company. Later,
plaintiffs National American Insurance Company (National)
and Gulf Insurance Company (Gulf) also issued performance
bonds on some of Vranckaert's other projects. Vranckaert
used funds obtained for work on the later projects bonded
by the plaintiffs to pay creditors on the earlier projects

bonded by the defendants. When Vranckaert defaulted on the
subsequent projects bonded by the plaintiffs, the plaintiffs
were required to perform on these bonds. Believing that they
would never have had to perform if Vranckaert had not paid
prior debts with funds from these later projects, the plaintiffs
sued the defendants for unjust enrichment. The district
court granted summary judgment for the defendants, from which
the plaintiffs now appeal. Because National and Gulf failed
to show that any enrichment of the defendants was unjust, we
affirm.

I.

Vranckaert was an Alaskan construction company which
specialized in construction projects in inaccessible and remote
locations. Beginning in 1989, Lumbermens, Security, and
National wrote bonds as co-sureties to secure Vranckaert's
performance and the payment of materialmen and laborers
for various projects. Among the creditors protected by the
bonds were URESCO Construction Materials, Incorporated,
creditors of the Chefornak project, and Key Bank. In 1992,
URESCO, a major supplier of materials for Vranckaert's
projects, made a claim for almost $1.5 million against
Lumbermens, Security, and National, based on Vranckaert's
failure to pay for materials. Vranckaert settled the claim by
making a lump-sum payment, agreeing to make subsequent
payments, and executing a note for $550,000. Lumbermens,
Security and National guaranteed the note. [1] As to Key Bank,
Vranckaert had a $1 million line of revolving credit which
was used on some of Vranckaert's earlier projects. The record
reveals little about the Chefornak project creditors, except that
Vranckaert started making payments to them in July 1992, and
made late payments to some of these creditors in 1994.

[1]     Vranckaert made several payments on the note but
        eventually defaulted sometime after 1993. Each of
        the guarantors paid their pro rata share.

In light of Vranckaert's default on payments to URESCO,
it was readily apparent that the company was having some
financial problems. So at some point in 1992, Lumbermens
and Security ceased issuing bonds for Vranckaert. Plaintiffs
National and Gulf were apparently more daring: between June
and August 1993 they issued bonds on six of Vranckaert's
projects. For their protection, Vranckaert agreed that agents
for National and Gulf-Midwest Indemnity Corporation
and Contractors' Services and Funding Corporation-would
oversee disbursements of profits from these projects. These

Case 2:22-cv-00317-WED   Filed 06/03/22   Page 13 of 26   Document 35-2

profits were initially deposited in Vranckaert's accounts. With the approval of Midwest and Contractors' Services, Vranckaert used some of these funds to pay Chefornak creditors and to pay down the Key Bank credit line and the URESCO note. It is these payments which are at issue in this case, so it's important to point out that the neither Lumbermens nor Security ever received any of these funds. Additionally, everyone agrees that these debts were legitimate and that the payments were approved by the plaintiffs' agents. Finally, the parties agree that by satisfying Vranckaert's obligations, these payments also extinguished any recourse that the creditors had against the co-sureties Lumbermens, Security, and National.

**\*2** If things had gone smoothly for Vranckaert these payments probably would have been uncontroversial. Indeed, these disbursements probably allowed Vranckaert to operate longer than it otherwise would have. But soon after the untimely death of Robert Vranckaert in November 1993, Vranckaert Construction Company encountered serious difficulties and eventually defaulted on its obligations. These defaults required the plaintiffs to perform on bonds issued on six later projects, resulting in losses for both of them. The record does not reveal the precise extent of those losses, but when the plaintiffs sued Midwest for breach of fiduciary duty relating to the later bonds, National recovered $3,800,000, while Gulf recovered $3,130,000. Hoping to also recover from Lumbermens and Security, National and Gulf sued them for restitution under theories of unjust enrichment and breach of fiduciary duty, but this appeal only concerns the unjust enrichment claim. National and Gulf maintain that $1,926,000 in profits from the later projects was paid to Chefornak creditors, Key Bank, and URESCO. Because Lumbermens and Security would have had to answer for these valid debts as sureties, the plaintiffs contend that Lumbermens is liable for $793,893, and Security is answerable for $651,900. As a co-surety on the earlier projects, National presumably also would have benefitted from the payments to the creditors, but no mention is made of this. Applying Illinois law in this diversity case, the district court granted summary judgment for the defendants because the plaintiffs failed to create a genuine factual issue as to the unjustness of any enrichment. *National Am. Ins. Co. v. Indiana Lumbermens Mut. Ins. Co.,* No. 97-C-5431, 1999 WL 35339 (N.D.Ill. Jan. 13, 1999). National and Gulf appeal.

II.

An unjust enrichment claim presents mixed questions of law and fact. *See In re Teranis,* 128 F.3d 469, 471 (7th Cir.1997); *Commodity Futures Trading Comm'n v. Heritage Capital Advisory Servs., Ltd.,* 823 F.2d 171, 172 (7th Cir.1987); *United States ex rel. Youngstown Welding and Eng'g Co. v. Travelers Indem. Co.,* 802 F.2d 1164, 1169 (9th Cir.1986). To withstand summary judgment on an unjust enrichment claim, a plaintiff must first create a genuine issue as to whether: (1) the defendants have unjustly retained a benefit to the plaintiffs' detriment; and (2) the defendants' retention of the benefit violates fundamental principles of justice, equity, and good conscience. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 545 N.E.2d 672, 679 (Ill.1989); *State Farm Gen. Ins. Co. v. Stewart,* 681 N.E.2d 625, 633 (Ill.App.Ct.1997). We assume that there exists a factual question as to whether the defendants were enriched, since the payments in question resulted in a discharge of the defendants' obligations as sureties. *See Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir.2000); *TRW Title Ins. v. Security Union Title Ins. Co.,* 153 F.3d 822, 828-29 (7th Cir.1998); *Reich v. Continental Cas. Co.,* 33 F.3d 754, 756 (7th Cir.1994); *Douglass v. Wones,* 458 N.E.2d 514, 521 (Ill.App.Ct.1983). As to the "unjustness" of the enrichment, in cases where a third party transferred a benefit to the defendant, to show that the retention of the benefit constitutes unjust enrichment the plaintiffs must initially show that: (1) the benefit should have been given to the plaintiffs but the third party mistakenly gave it to the defendants; (2) the defendants procured it from the third party by some type of wrongful conduct; or (3) the plaintiffs for some reason have a better claim to the benefit than the defendants. *HPI Health Care,* 545 N.E.2d at 679; *State Farm Gen. Ins. Co.,* 681 N.E.2d at 633.

**\*3** National and Gulf contend that the record contains sufficient evidence to merit a trial on each of these theories. As to the first one, to show that the payments were mistakes, a plaintiff must point to some unintentional act arising from ignorance, surprise, or misplaced confidence. *In re Teranis,* 128 F.3d at 473 (Wisconsin law). The record indicates that the payments to the creditors were not mistakes. Rather, the plaintiffs, through their agents-Midwest and Contractors' Services-knew and approved of the disbursements which resulted in the discharge of the

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

defendants' suretyship. The record is also devoid of any evidence of impropriety on the part of Lumbermens and Security, thus precluding the wrongful conduct theory. Finally, nothing indicates that National and Gulf had a superior claim to the benefit received by Lumbermens and Security. Rather, National and Gulf concede that the creditors paid by Midwest and Contractors' Services had legitimate claims which Vranckaert was obligated to pay. Furthermore, Lumbermens and Security were not the only beneficiaries of Vranckaert's payments to its creditors. National and Gulf also had much to gain from these disbursements, as the payments allowed Vranckaert to continue operating, maintaining a cash flow, and thereby continuing to do business with the plaintiffs. So National and Gulf have failed to present sufficient evidence to warrant a trial under any of these theories.

Finally, even if the plaintiffs had created a factual issue under any of these three theories, we believe that their unjust enrichment claim would fail as a matter of law. Where the elements of the transactions in question do not offend equity and good conscience, plaintiffs are not entitled to relief under principles of unjust enrichment. 🚩 *Sea-Land Servs., Inc. v. Pepper Source,* 993 F.2d 1309, 1312 (7th Cir.1993). National and Gulf concede that no court has ever allowed a restitution in a case like this one. Indeed, courts have employed general principles of restitution to preclude recovery in analogous cases. *See Banque Worms v. BankAmerica Int'l,* 928 F.2d 538, 541 (2d Cir.1991) (bona fide creditor is entitled to retain unintended payments from another creditor of an insolvent

debtor); 🚩 *Season Comfort Corp. v. Ben A. Borenstein Co.,* 655 N.E.2d 1065, 1071 (Ill.App.Ct.1995); *see also* Restatement of Restitution § 14(a) (1937). These cases hold that where the enrichment was innocently conferred by a third party according to a contractual or legal obligation, the enrichment cannot be unjust. 🚩 *Season Comfort Corp.,* 655 N.E.2d at 1071 ("one is not unjustly enriched by retaining benefits involuntarily acquired which law and equity give him absolutely"); Dan B. Dobbs, *Law of Remedies* § 4.1(2) (1993) ("one who is enriched by what he is entitled to under a contract or otherwise is not unjustly enriched"). Here, the plaintiffs concede that the payments to the creditors were required by contract, and that the only benefit enjoyed by the defendants was a necessary consequence of those payments. That is, Vranckaert's performance of its duties to its creditors necessarily resulted in a benefit to the defendants. Because Vranckaert was legally required to pay its creditors (not to mention its duty to discharge Lumbermens and Security's suretyship), the enrichment of Lumbermens and Security does not violate "fundamental principles of justice, equity, and good conscience." 🚩 *State Farm Gen. Ins. Co.,* 681 N.E.2d at 633. Therefore, summary judgment also would have been proper on this ground. Affirmed.

**All Citations**

221 F.3d 1339 (Table), 2000 WL 975176

2007 WL 4522472
Only the Westlaw citation is currently available.
United States District Court, D. Colorado.

TAX SERVICES OF AMERICA, INC., Plaintiff,

v.

Linda MITCHELL, Hamidou Diarra,
and Kerry Dyles, Defendants.

No. 07–CV–00249–REB–PAC.
|
Dec. 18, 2007.

**Attorneys and Law Firms**

Philip Lance Gordon, Katie Shirley Dix, Lawrence W.
Marquess, Michael Adam Freimann, Littler Mendelson, PC,
Denver, CO, for Plaintiff.

Linda Mitchell, Aurora, CO, pro se.

Hamidou Diarra, Aurora, CO, pro se.

Derek C. Epps, Law Office of Derek C. Epps, LLC, Kristal
L. Bernert, KLB Services, LLC, Philip Lance Gordon, Littler
Mendelson, PC, Denver, CO, for Defendants.

**ORDER GRANTING PLAINTIFF'S
MOTION TO DISMISS DEFENDANT
KERRY DYLES' COUNTERCLAIMS**

BLACKBURN, District Judge.

**\*1** The matter before me is plaintiff's Motion To Dismiss
Defendant Kerry Dyles Counterclaims [# 35], filed March 29,
2007. I grant the motion.

**I. JURISDICTION**

I have subject matter jurisdiction pursuant to 28 U.S.C. §
1332 (diversity of citizenship).

**II. STANDARD OF REVIEW**

When ruling on a motion to dismiss pursuant to Fed.R.Civ.P.
12(b)(6), I must determine whether the allegations of

the complaint are sufficient to state a claim within the
meaning of Fed.R.Civ.P. 8(a). I must accept all well-pleaded
allegations of the complaint as true. *McDonald v. Kinder–
Morgan, Inc.,* 287 F.3d 992, 997 (10th Cir.2002). "However,
conclusory allegations or legal conclusions masquerading as
factual conclusions will not suffice to prevent a motion to
dismiss." *Fernandez–Montes v. Allied Pilots Association,*
987 F.2d 278, 284 (5th Cir.1993); *see also Ruiz v.
McDonnell,* 299 F.3d 1173, 1181 (10th Cir.2002) ("All well-
pleaded facts, as distinguished from conclusory allegations,
must be taken as true."), *cert. denied,* 123 S.Ct. 1908 (2003).
I review the complaint to determine whether it " 'contains
enough facts to state a claim to relief that is plausible on
its face.' " *Ridge at Red Hawk, L.L.C. v. Schneider,* 493
F.3d 1174, 1177 (10th Cir.2007) (quoting *Bell Atlantic
Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1969,
1974, 167 L.Ed.2d 929 (2007)). "Thus, the mere metaphysical
possibility that *some* plaintiff could prove *some* set of facts
in support of the pleaded claims is insufficient; the complaint
must give the court reason to believe that *this* plaintiff has
a reasonable likelihood of mustering factual support for *these*
claims." *Id.* (emphases in original).[1]

[1]    Until recently, the standard of review for a 12(b)
(6) motion was whether " 'it appear[ed] beyond
a doubt that the plaintiff can prove no set of
facts in support of his claim which would entitle
him to relief.' " *Beedle v. Wilson,* 422 F.3d
1059, 1063 (10th Cir.2005) (quoting *Conley v.
Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102,
2 L.Ed.2d 80 (1957)). The Tenth Circuit has
noted that the relationship between the standard
announced in *Bell Atlantic Corp.* and the Supreme
Court's contemporaneous decision in *Erickson
v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200,
167 L.Ed.2d 1081 (2007), which upheld the
notice pleading standards of Rule 8(a)(2), is not entirely
clear. *See Alvarado v. KOB–TV, L.L.C.,* 493 F.3d
1210, 1215 n. 2 (10th Cir.2007). Nevertheless, my
decision with respect to plaintiff's motion would be
the same under either the *Conley v. Gibson* "no set
of facts" standard or the *Bell Atlantic Corp./Ridge
at Red Hawk* plausibility standard. *See id.*

## III. ANALYSIS

In 2003, plaintiff purchased Qwik Tax Service from defendant Linda Mitchell. Following the sale, Mitchell and defendant Hamidou Diarra continued to work for Qwik Tax Service as tax preparers. Both signed employment agreements containing non-compete, non-solicitation, and non-disclosure clauses that operated both during the term of their employment and for three years after their employment with plaintiff ended.

In January, 2007, Mitchell and Diarra were hired by defendant Kerry Dyles as the principal tax preparers for Kwik Tax Service, a newly established business operating directly across the street from plaintiff's Qwik Tax Service. Mitchell then allegedly began to solicit Qwik Tax Service's customers, using its proprietary and confidential customer list, and falsely telling those customers that Qwik Tax Service had moved to Kwik Tax Service's address. Plaintiff has sued defendants for breach of contract, misappropriation of trade secrets, tortious interference with existing and prospective business relationships, and civil conspiracy.

The present motion is addressed to the three counterclaims filed by Dyles against plaintiff. The first alleges tortious interference with existing and prospective business relationships. This counterclaim is premised on the notion that plaintiff's filing of this allegedly groundless lawsuit has negatively impacted Dyles's relationships with existing and prospective customers. In order to sustain such a claim, Dyles must establish, *inter alia,* that plaintiff "improperly" induced third parties either not to honor existing contracts or not to enter into contracts with Dyles. *See Seidl v. Greentree Mortgage Co.,* 30 F.Supp.2d 1292, 1302 (D.Colo.1998) (citing *Amoco Oil Co. v. Ervin,* 908 P.2d 493, 500 (Colo.1995)).

**\*2** The institution of a lawsuit may be improper, and, thus, satisfy this element of a tortious interference claim, " 'if the actor has no belief in the merit of the litigation or if, though having some belief in its merit, he nevertheless institutes or threatens to institute the litigation in bad faith, intending only to harass the third parties and not to bring his claim to definitive adjudication.' " *Employment Television Enterprises, LLC v. Barocas,* 100 P.3d 37, 46 (Colo.App.2004) (quoting RESTATEMENT (SECOND) OF TORTS § 767, cmt c). Yet apart from the mere recitation of

this standard, Dyles's counterclaim alleges no facts suggesting that plaintiff had no belief in the merit of this litigation or that it instituted the lawsuit solely to harass Dyles. Bare-bones, conclusory allegations such as pled here are insufficient to withstand a motion to dismiss, even under the older, arguably more lenient "no set of facts" standard of review. *See Erikson v. Pawnee County Board of County Commissioners,* 263 F.3d 1151, 1154 (10th Cir.2001), *cert. denied,* 122 S.Ct. 1438 (2002). They are clearly insufficient under the more recent plausibility standard. *See Ridge at Red Hawk, L.L.C.,* 493 F.3d at 1177. Plaintiff's motion as to this counterclaim therefore will be granted.

Dyles's second counterclaim is styled as "unfair competition and predatory pricing." Although plaintiff analyzes the claim under section 2 of the Sherman Antitrust Act, plaintiff insists he intended to and has pled a viable cause of action under section 1 of the Act. To prove either type of claim, Dyles must allege facts which show "a contract, combination or conspiracy that unreasonably restrains trade in the relevant market." *TV Communications Network, Inc. v. Turner Network Television, Inc.,* 964 F.2d 1022, 1027 (10th Cir.), *cert. denied,* 113 S.Ct. 601 (1992). Dyles's counterclaim contains no allegation sufficient to make out this element of an antitrust claim.

Dyles argues that his allegation that plaintiff instituted a lawsuit for the purpose of damaging him by causing waste of corporate funds is sufficient. I am not persuaded. In the case on which Dyles's relies, *Atlantic Heel Co. v. Allied Heel Co.,* 284 F.2d 879 (1st Cir.1960), the pertinent allegation was but one of ten separate enumerated acts claimed to constitute a violation of the antitrust laws. [2] Other than listing this allegation as one of the many stated in the complaint, the court did not specifically address its viability as a separate basis for liability under the Sherman Act. Moreover, that allegation contained the vital contention, absent in this case, that the defendants conspired among themselves to bring the allegedly spurious suit. *Id.* at 880. Indeed, the holding of the case recognizes that a conspiracy is the *sine qua non* of an antitrust claim. *Id.* at 883–84. [3] For these reasons, plaintiff's motion to dismiss for failure to state a claim should be granted with respect to this second counterclaim as well.

[2]     Indeed, the First Circuit itself has essentially confined the holding of *Atlantic Heel* to its facts.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   2

*See* *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 508 F.2d 547, 561–62 (1st Cir.1974), *cert. denied,* 95 S.Ct. 2407 (1975).

3      Dyles further suggests that he has stated a claim under section 15 of the Sherman Act. Section 15, however, is not a substantive provision, but rather merely describes damages available thereunder. The case on which plaintiff relies for this proposition, *Grip–Pak, Inc. v. Illinois Tool Works, Inc.,* 694 F.2d 466 (7th Cir.1982), *cert. denied,* 103 S.Ct. 2430 (1983), actually involved alleged violations of the Clayton Act. One of the sections analyzed there addresses price fixing, 15 U.S.C. § 14, which Dyles insists is not the gravamen of his counterclaim (*see* Dyles's Resp. Br. at 4), and the other speaks to monopolization, 15 U.S.C. § 18, an issue clearly not implicated by Dyles's pleadings.

**\*3**  Dyles's final counterclaim alleges abuse of process, which he styles as narrowly focused on plaintiff's request for a preliminary injunction, and the expedited discovery that attended it. An abuse of process claim under Colorado law requires proof, *inter alia,* of "willful actions by a party in the use of the process which are not proper in the regular conduct of a civil action." *American Express Financial Advisors, Inc. v. Topel,* 38 F.Supp.2d 1233, 1242 (D.Colo.1999) (citing *Moothart v. Bell,* 21 F.3d 1499, 1508 (10th Cir.1994)). As with his tortious interference counterclaim, however, Dyles has pled no facts suggesting that plaintiff's actions in requesting the preliminary injunction were "not proper in the regular conduct of a civil action." His conclusory allegations merely parroting the elements of an abuse of process claim are insufficient to withstand plaintiff's motion to dismiss.

THEREFORE, IT IS ORDERED as follows:

1. That plaintiff's Motion To Dismiss Defendant Kerry Dyles ' Counterclaims [# 35], filed March 29, 2007, is GRANTED; and

2. That the First, Second, and Third Counterclaims for Relief set forth in Defendant Kerry Dyles' Answer, Affirmative Defenses, Counterclaims, and Cross Claims to Plaintiff's Complaint and Jury Demand at 14–16, ¶¶ 97–114[# 33], filed March 9, 2007, are DISMISSED for failure to state claims on which relief may be granted.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 4522472

---

2009 WL 701010
Only the Westlaw citation is currently available.
United States District Court,
W.D. Michigan,
Southern Division.

WOLVERINE WORLD WIDE,
INC., Plaintiff/Counter–Defendant,
v.
CAMS, INC., d/b/a Boot Connection, a
Wisconsin corporation, and Brian Campbell,
in his individual capacity, and Scott Campbell
in his individual capacity, Defendants,
and
Cams, Inc., d/b/a Boot Connection, a
Wisconsin corporation, Defendant/
Counter–Plaintiff Third–Party Plaintiff,
v.
Harley–Davidson, Inc., Third–Party Defendant.

No. 1:07–cv–1229.
|
March 13, 2009.

**Attorneys and Law Firms**

William J. Leeder, III, Daniel R. Gravelyn, Barnes &
Thornburg LLP, Grand Rapids, MI, for Plaintiff/Counter–
defendant.

Michael H. Perry, Toni L. Harris, Fraser Trebilcock Davis
& Dunlap PC, Lansing, MI, George P. Kersten, Kersten
& McKinnon SC, Mequon, WI, for Defendant/Counter–
Plaintiff Third–Party Plaintiff.

Thomas G. Cardelli, Cardelli Lanfear & Buikema PC,
Cardelli Lanfear & Buikema PC, Anthony F. Caffrey, III,
Cardelli Lanfear & Buikema PC, Grand Rapids, MI, for
Counter–defendant.

*OPINION AND ORDER GRANTING HARLEY–
DAVIDSON'S MOTION FOR SUMMARY JUDGMENT*

PAUL L. MALONEY, Chief Judge.

**\*1** This matter comes before the Court on Third–Party
Defendant Harley–Davidson's motion (Dkt. No. 82) for
summary judgment. Third–Party Plaintiff CAMS, Inc. filed

a response. (Dkt. No. 89.) Third–Party Defendant Harley–
Davidson filed a reply. (Dkt. No. 94.) Having read the third-
party complaint, the motion, briefs, exhibits, attachments and
relevant legal authority, the Court finds no need for oral
argument to resolve the disputed issues. *See* W.D. MICH.
L.CIV. R. 7.2(d).

**I. BACKGROUND**
Third–Party Defendant Harley–Davidson (Harley–Davidson)
manufactures motorcycles and owns the Harley–Davidson
brand and insignia. In March 1998, Harley–Davidson
entered a licensing agreement with Plaintiff Wolverine
World Wide (Wolverine) to manufacture and sell footwear
using the Harley–Davidson brand and insignia. In
September 1998, Defendant/Counter–Plaintiff CAMS, Inc.
d/b/a Boot Connection (CAMS) executed a New Account
Form through which Wolverine authorized CAMS to
sell Wolverine manufactured Harley–Davidson branded
footwear. Defendants Brian and Scott Campbell co-own
CAMS. CAMS sold Harley–Davidson branded footwear
out of its store in Milwaukee, Wisconsin and at various
motorcycle rallies around the country.

In the summer of 2006, CAMS began preparing for the
Harley–Davidson 105 th Anniversary Rally, which would
occur in the summer of 2008. Scott Campbell offered the
owner of property in Milwaukee, Wisconsin $40,000.00 to
lease a parking lot for the ten days during which the rally
would occur. (S. Campbell Affidavit ¶ 9–CAMS Exhibit 1.)
The parking lot was next to a Harley–Davidson dealership,
Milwaukee Harley–Davidson. (*Id.*) As a result, the owner
of Milwaukee Harley–Davidson, Mr. Bob Michel, was very
upset. (John Schaller Deposition at 14–CAMS Exhibit 8.)

In January 2007, Harley–Davidson expressed concern to
Wolverine about some of Wolverine's retail accounts.
(Harley–Davidson Exhibit D.) Mr. Hobie Burgnon,
vice president of sales for Wolverine, states that
Wolverine received a fax from Harley–Davidson expressing
dissatisfaction with the way various retailers were distributing
Harley–Davidson products. (Burgnon Deposition at 36–
37–Harley–Davidson Exhibit H, CAMS Exhibit 13.) On
the fax, under the heading "Problem Distribution–Must
go away," Harley–Davidson listed five retail outlets:
Leatherup-com, Meijer, Fleet and Farm, Blain Supply,
Inc., and Boot Connection. (Exhibit D.) After Boot
Connection, the document stated "no sales outside of Bricks
and Mortar store-no trucks to rallies-no internet sales-
www.bootconnection.com." (*Id.*) As a result of the fax,

a meeting was held at Wolverine where "the discussion was, these are the accounts that have been requested to be closed." (Burgnon Deposition at 40.) Those instructions, if enforced, would have prevented CAMS from selling Harley–Davidson branded footwear at rallies from tents located near Harley–Davidson dealers. (McPherson Deposition at 93–94–Harley–Davidson Exhibit B, CAMS Exhibit 10.) At the time, CAMS was not informed about Harley–Davidson's instructions to Wolverine. (B. Campbell Deposition at 34—Harley–Davidson Exhibit F, CAMS Exhibit 7; S. Campbell Deposition at 132—Harley–Davidson Exhibit E, CAMS Exhibit 6.) Wolverine decided to phase out the CAMS account rather than shut it down immediately and decided to stop accepting purchase orders from CAMS at midyear. (Burgnon Deposition at 42–43.)

**\*2** In the spring of 2007, preparing for the Harley–Davidson 105th Anniversary Rally, CAMS was also negotiating to lease property close to Hal's Harley–Davidson, another dealer in Milwaukee. (B. Campbell Deposition at 28–29.) The owner of Hal's Harley–Davidson, Mr. Kirk Topel, was upset that CAMS was able to secure a right of first refusal on the property for the rally. (Topel Deposition at 26–28–CAMS Exhibit 11.)

On June 10, 2007, Scott Campbell received a telephone call from Mr. Burgnon. (S. Campbell Deposition at 49.) Scott Campbell states Mr. Burgnon told him that the Harley–Davidson people had been at Wolverine that week and had insisted that CAMS' account be taken away. (*Id.* at 50.) Mr. Burgnon testified that "we were told by Harley–Davidson Corp. that these are the accounts that needed to be closed." (Burgnon Deposition at 44.) Ms. Susan McPherson, a licensing manager for Harley–Davidson and designated spokesperson for the company in this litigation, testified the decision to terminate the CAMS account was made by Wolverine, not Harley–Davidson. (McPherson Deposition at 41, 104, and 116.)

In November 2007, Wolverine filed suit against CAMS in the Kent County Circuit Court in Michigan. CAMS removed the action to federal court. CAMS later filed a third-party complaint against Harley–Davidson. The current amended third-party complaint includes two counts. The first count alleges tortious interference with advantageous business relationships and expectancy. The second count alleges a violation of Wisconsin's Fair Dealership Law.

## II. LEGAL FRAMEWORK

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *Tucker v. Tennessee,* 539 F.3d 526, 531 (6th Cir.2008). The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. *Bennett v. City of Eastpointe,* 410 F.3d 810, 817 (6th Cir.2005) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The facts, and the inferences drawn from them, must be viewed in a light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting *Matsushita Elec. Indust. Co. v. Zenith Radio Corp. .,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Once the moving party has carried its burden, the nonmoving party must set forth specific facts showing there is a genuine issue for trial. FED. R. CIV. P. 56(e); *Matsushita,* 475 U.S. at 574. The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–252.

## III. ANALYSIS

### A. COUNT I–TORTIOUS INTERFERENCE

**\*3** CAMS alleges Harley–Davidson, on behalf of the individual dealerships in Milwaukee who were upset that CAMS had rented space next to the dealerships, directed Wolverine to terminate its relationship with CAMS. (Amended Third–Party Complaint ¶¶ 24–25 .)

Federal courts in a diversity action apply the choice of law provisions of the forum state. *Gass v. Marriott Hotel Servs., Inc. .,* 558 F.3d 419, 2009 WL 510724 \*4 (6th Cir. Mar.3, 2009) (citing *NILAC Int'l Mktg. Group v. Ameritech Servs., Inc.,* 362 F.3d 354, 358 (6th Cir.2004)); *Amerisure Mut. Ins. Co. v. Carey Transp., Inc.,* 578 F.Supp.2d 888, 897 (W.D.Mich.2008) (Maloney, J.). A tort claim filed in a court in Michigan will be governed by Michigan law, unless a rational reason exists to use the law of some other forum. *Gass,* 2009 WL 510724 \* 4 (citing *Watkins & Son Pet*

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works. 2

*Supplies v. Iams Co.,* 254 F.3d 607, 611 (6th Cir.2001)). In order to determine whether a rational reason exists to use the law of some other forum, Michigan courts perform a two step inquiry. 🚩 *Sutherland v. Kennington Truck Serv. Ltd.,* 454 Mich. 274, 562 N.W.2d 466, 471 (Mich.1997). *See also Williams v. Toys "R" Us,* 138 F.App'x 798, 803 (6th Cir.2005) (explaining the choice of law analysis outlined by the Michigan Supreme Court in *Southerland* ).

> First, we must determine if any foreign state has an interest in having its law applied. If no state has such an interest, the presumption that Michigan law will apply cannot be overcome. If a foreign state does have an interest in having its law applied, we must then determine if Michigan's interests mandate that Michigan law be applied, despite the foreign interest.

*Id.* (quoting 🚩 *Southerland,* 562 N.W.2d at 471). Michigan courts apply another state's law where the other state has a significant interest and Michigan has only a minimal interest in the matter. 🚩 *Hall v. Gen. Motors Corp.,* 229 Mich.App. 580, 582 N.W.2d 866, 868 (Mich.App.1998).

Michigan's interest in the amended third-party complaint is minimal, while Wisconsin has a more significant interest in having its law applied. "While Michigan, a state where the injury occurred, has an interest in conduct within its borders, the interest in the litigation is minimal when none of the parties is a Michigan resident." *Frydrych v. Wentland,* 252 Mich.App. 360, 652 N.W.2d 483, 486 (Mich.App.2002). The parties to the amended third-party complaint both have a Wisconsin residence. CAMS is a Wisconsin corporation whose principle place of business is Wisconsin. (Amended Third–Party Complaint ¶ 1.) Harley–Davidson is also a Wisconsin corporation whose principle place of business is Wisconsin. (*Id.* ¶ 2, 652 N.W.2d 483.)[1] Wisconsin certainly has an interest in protecting its corporations. The conduct giving rise to the alleged tort occurred in Michigan when Harley–Davidson allegedly instructed Wolverine to terminate its distribution agreement with CAMS. However, Michigan abandoned the doctrine of *lex loci delicit,* the application of the law of the place of the wrong, in 1982.

🚩 *Southerland,* 562 N.W.2d at 470–471; *Frydrych,* 652 N.W.2d at 486 (citing *Southerland* ). The contract allegedly interfered with is governed by Michigan law.[2] The third-party amended complaint, however, does not raise a claim under contract law and Harley–Davidson is not a party to that contract.[3] Accordingly, Wisconsin law governs the third-party complaint.

[1] Curiously, Harley–Davidson's answer to this allegation states "neither admitted nor denied for Defendants are without knowledge or information sufficient to form a belief as to the truth of this allegation." (Harley–Davidson's Answer to Amended Third Party Complaint ¶ 2.) For the purpose of this motion, the Court will assume this assertion of fact most favorable to the non-moving party.

[2] Wolverine's New Account Form signed by Brian Campbell on behalf of Boot Connection includes a list of standard terms and conditions. Under the heading "Applicable Law," it states the agreement is considered to have been made in Michigan and shall be governed by and interpreted according to Michigan law. (New Account Form—CAMS' Response Exhibit 4.)

[3] Federal courts, faced with contract and tort claims in a single action, have been willing to apply two sets of state laws to different claims at issue. *See e.g., Iwasiuk v. Teleflex Automotive Group,* No. 05–60268, 2006 WL 2583118 * (E.D.Mich. Sept.6, 2006) (O'Meara, J.) (applying Michigan tort law to the tort claims and Pennsylvania law to the contract claims because the agreement between the parties specified that Pennsylvania law would apply to their agreement).

**\*4** Under Wisconsin law, a claim for tortious interference with a contract requires a plaintiff to establish five elements: (1) the plaintiff had a current or prospective contractual relationship with a third party, (2) the defendant interfered with that contractual relationship, (3) the interference was intentional, (4) a causal connection exists between the defendant's interference and the plaintiff's damages, and (5) the defendant was not justified or privileged to interfere. 🚩 *Burbank Grease Servs., LLC v. Sokolowski,* 294 Wis.2d 274, 717 N.W.2d 781, 796 (Wis.2006) (citing *Hoey Outdoor Adver., Inc. v. Ricci,* 256 Wis.2d 347, 653 N.W.2d 763, 770

(Wis.Ct.App.2002)). Wisconsin has adopted the Restatement (Second) of Torts, sec. 766 (1979) with regard to the tort of intentional interference with performance of a contract. 🚩 *Briesemeister v. Lehner,* 295 Wis.2d 429, 720 N.W.2d 531, 543 n. 8 (Wis.Ct.App.2006) (citing 🚩 *Hale v. Stoughton Hosp. Ass'n, Inc.,* 126 Wis.2d 267, 376 N.W.2d 89 (Wis.Ct.App.1985)[4] ); 🚩 *Liebe v. City Fin. Co.,* 98 Wis.2d 10, 295 N.W.2d 16, 18–19 (Wis.Ct.App.1980) (citing *Carolias Breeding Ranches, Ltd. v. FPC Sec. Corp.,* 90 Wis.2d 97, 279 N.W.2d 493 (Wis.Ct.App.1979)). *See also* 🚩 *Magnum Radio, Inc. v. Brieske,* 217 Wis.2d 130, 577 N.W.2d 377, 379 (Wis.Ct.App.1998) ("Wisconsin has long adhered to the basic interference-with-contract rule of RESTATEMENT (SECOND) OF TORTS § 766 (1979)."). Under section 766, one who "intentionally and improperly interferes with the performance of a contract" may be liable.

🚩 *Briesemeister,* 720 N.W.2d at 543 n. 8 (quoting *Hale);* 🚩 *Liebe,* 295 N.W.2d at 19 n. 4 (quoting *Restatement (Second) of Torts* (1979). *See also Westphal v. Smelser,* 756 N.W.2d 809, 2008 WL 2609698 (Wis.Ct.App. July 3, 2008) (unpublished opinion) ("interference alone, however, does not establish the tort; the interference must be improper" (quoting 🚩 *Mackenzie v. Miller Brewing Co.,* 234 Wis.2d 1, 608 N.W.2d 331 (Wis.Ct.App.2000)).

[4]    The Wisconsin Court of Appeals noted *Hale* was abrogated on other grounds. 🚩 *Briemeister,* 720 N.W.2d at 543 n. 8 (citing 🚩 *Fittshur v. Village of Menomonee Falls,* 31 F.3d 1401, 1406 (7th Cir.1994) (explaining the decision in 🚩 *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) foreclosed the possibility that the language of the bylaw at issue in *Hale* could create a property interest protected by the Federal Constitution).

The issue presented Harley–Davidson's motion is whether its conduct was proper.[5] The defendant bears the burden of establishing a justification or privilege and that its conduct was proper, as a defense to a claim for tortious interference with a contract. 🚩 *Briesemeister,* 720 N.W.2d at 543; *Wisconsin Seafood Co., Inc. v. Fisher,* 662 N.W.2d 679, 2003 WL 12271201 * 3 (Wis.Ct.App. Mar. 18, 2003) (unpublished table opinion) (per curiam). When determining whether conduct was justified or privileged, the trier of fact must

consider the totality of the circumstances. 🚩 *Briesemeister,* 720 N.W.2d at 543. As part of that determination, the trier of fact should consider the "nature, type, duration and timing of the conduct, whether the interference is driven by an improper motive or self-interest, and whether the conduct, even though intentional, was fair and reasonable under the circumstances." *Id. See* 🚩 *Mackenzie,* 608 N.W.2d at 350 ("Determining whether interference is 'improper,' we consider: (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the other with which the actor's conduct interferes; (d) the interest sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interest of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties.").

[5]    Harley–Davidson argued in its motion that CAMS could not establish its claim under Michigan law. CAMS asserted in its response that Wisconsin law governed and that there were genuine issues of material fact sufficient to go to trial under both Michigan and Wisconsin law. In its reply, Harley–Davidson continues to assert that Michigan law applies, but also argues that the claim fails under both Michigan and Wisconsin law.

**\*5**  Harley–Davidson has established that its conduct was justified and proper. First, Harley–Davidson attempts to create and maintain a certain brand image. (Harley–Davidson Exhibit A–License Agreement ¶ 5a; McPherson Deposition at 21). The license agreement between Harley–Davidson and Wolverine outlined Harley–Davidson's brand image and directed Wolverine to distribute goods consistent with that image.

> Licensee [Wolverine] shall develop a marketing plan for the distribution and sale of Licensed Articles in the Territory including information on each country in which Licensed Articles will be sold and such marketing plans shall be subject to Licensor's reasonable approval.... Licensee shall sell, distribute, supply, advertise, and promote Licensed Articles during the Term through such means as are consistent with

the overall brand image established by Owner and Licensor concerning Licensed Properties. Licensee shall position the Licensed Product in the mid to upper tier of the footwear market and, unless otherwise agreed to in the marketing plan, Licensee shall sell Licensed Articles only to retailers in such channels and shall communicate such positioning requirements to its Distributors and may sell Licensed Articles through catalogs consistent with the image of the Licensee's other channels of distribution, ...

(Exhibit A ¶ 5a.) Second, Harley–Davidson's directive to Wolverine in 2007 was consistent with its brand image philosophy. In a 2003 meeting with Wolverine, Harley–Davidson included the following under the heading "What do we want": "royalties in line with smaller volume business. No distribution in discount, farm stores or gypsy trucks. Shoes must be sold where shoe salespeople fit customers." (Harley–Davidson Exhibit C; McPherson Deposition at 64—66.) These directions promote Harley–Davidson's desired image. The document sent from Harley–Davidson to Wolverine in 2007 indicated Harley–Davidson wished to limit CAMS to selling its branded footwear at CAMS' retail store and not out of a truck at motorcycle rallies. That directive is consistent with the distribution and marketing strategy identified in both Harley–Davidson's licensing agreement with Wolverine and with the information shared by Harley–Davidson with Wolverine in 2003.

Third, Harley–Davidson's 2007 directive did not single out CAMS, but rather targeted several distributors who were conducting business in a manner inconsistent with Harley–Davidson's marketing strategy. (Harley–Davidson Exhibit D; Burgnon Deposition at 29–31.) Harley–Davidson had concerns with the distribution of Harley–Davidson branded footwear by Leather–Up, Meijer, Farm and Fleet and Farm and Blain's Supply, in addition to CAMS. (Exhibit D; McPherson Deposition at 86–87; Burgnon Deposition at 31–36.) Harley–Davidson thought that sale of its branded footwear at those stores undermined the brand image it sought to create. (McPherson Deposition at 86–87.) Similarly, Harley–Davidson did not like the manner in which CAMS sold branded footwear out of tents at rallies. (McPherson

Deposition at 92–93, 101, 103; Burgnon Deposition at 37–38.)

**\*6** CAMS' evidence that other distributors continue to sell Harley–Davidson products out of tents and trucks does not create a genuine issue of material fact. Mr. Burgnon, who works for Wolverine not Harley–Davidson, admits seeing another distributor selling Harley–Davidson footwear from tables at motorcycle rallies. (Burgnon Deposition at 63–64.) Scott Campbell avers he has seen numerous individuals selling Harley–Davidson footwear out of tents at motorcycle rallies. (Scott Campbell Affidavit ¶ 16). Scott Campbell also avers he was told by Mr. Peter Pinacle that individuals at Wolverine directed a truck to Sturgis, South Dakota for a motorcycle rally and sell footwear at the rally. (*Id.* ¶ 14, 608 N.W.2d 331.) Harley–Davidson dealers have also sold Harley–Davidson boots out of tents at motorcycle rallies.[6] (John Schaller Deposition at 17–18—CAMS Exhibit 8; Topel Deposition at 29–30; Sharon Greer Deposition at 26–27—CAMS Exhibit 12.) No testimony establishes that Harley–Davidson was aware of these problems. Additionally, the testimony does not establish that Harley–Davidson singled out CAMS and improperly interfered. Harley–Davidson has attempted to manage its brand image for years. The fact that it has not successfully prevented all distributors from selling its footwear from tables and tents does not undermine the conclusion that its efforts to restrict such distribution is justifiable. CAMS also asserts Harley–Davidson sold logoed items out of tents at the August 2008 rally. (*Id.* ¶ 21, 608 N.W.2d 331; Charles Hastings Deposition at 9—CAMS Exhibit 22; Barbara Ann Krinn Deposition at 8–9—CAMS Exhibit 15) Assuming this assertion to be true, CAMS has still not created a genuine issue of material fact. The licensing agreement, the 2003 document, and the 2007 document are specific to the distribution and placement of Harley–Davidson branded footwear, not t-shirts, hats and other logoed items.

[6]
From the deposition testimony cited by CAMS, it appears the dealers were setting up tents in front of their own stores during Harley–Davidson motorcycle rallies. As a temporary extension of the dealers' bricks and mortar stores, that situation is critically factually distinct from the tents erected by CAMS.

Fourth, CAMS cannot support its assertion that independent Harley–Davidson dealers complained to Harley–Davidson

Case 2:22-cv-00317-WED Filed 06/03/22 Page 23 of 26 Document 35-2

about CAMS. Some of the individuals deposed recounted rumors and speculation that the dealers had caused Harley–Davidson to close the CAMS account. (Hebreard Deposition at 25—CAMS Exhibit 16; S. Campbell Deposition at 86–90; B. Campbell Deposition at 26–29.) Both Brian and Scott Campbell conceded, as of the time of their depositions, *they had no first hand knowledge of such complaints.* (S. Campbell Deposition at 70–71, 105, 115, 117–118; B. Campbell Deposition at 33–34.) As a result, CAMS has *no evidence* to support its assertion that Harley–Davidson was motivated to restrict CAMS' distribution of Harley–Davidson footwear by any reason other than Harley–Davidson's desire to maintain its brand image. CAMS has presented evidence that two of the dealers in the Milwaukee area were upset with CAMS, but that evidence does not establish that those dealers requested some action on the part of Harley–Davidson. CAMS has presented evidence that the dealers and Harley–Davidson generally had contact with each other. (Krinn Deposition at 12–13.) However, that fact leads only to speculation that the dealers informed Harley–Davidson of any problem they had with CAMS.

**\*7** CAMS' evidence that Harley–Davidson itself was upset about CAMS' decision to rent property close to the new Harley–Davidson museum in Milwaukee does not create a genuine issue of material fact. Brian Campbell concedes that the lease to rent the property close to the museum was not signed until February 2008, more than one year after Harley–Davidson directed Wolverine to review CAMS' distribution of footwear. [7] (B. Campbell Deposition at 23–24.)

[7] The third-party complaint alleges an agreement was reached on or about June 2007 to rent this property. (Third–Party Complaint ¶ 22c.) While an agreement may have been reached in June 2007, the lease for the property was not signed by CAMS until February 2008. There is no evidence presented that Harley–Davidson was aware of any unsigned agreement prior to January 2007.

Finally, CAMS is correct that there is a question of fact whether Harley–Davidson directed Wolverine to terminate CAMS' ability to distribute its footwear or whether Wolverine made the decision on its own. *Compare* Burgnon Deposition at 36–28 *with* McPherson Deposition at 39–41. *See also* Michael Hebreard Deposition at 20–CAMS Exhibit 16 ("Q. But it was your understanding from the conversation that Harley–Davidson had informed Wolverine that they should not sell to Boot Connection; is that correct? A. No, not

necessarily. I don't know if it was a Wolverine or a Harley decision."). This factual dispute does not create a genuine issue of material fact sufficient for CAMS to get the issue before a jury. If Wolverine and not Harley–Davidson made the final decision to terminate all of CAMS' rights to distribution, CAMS has no claim against Harley–Davidson. If Harley–Davidson made the final decision, CAMS still needs to establish the decision was not justifiable or was improper. As has already been explained, CAMS has not done so.

From the evidence presented, viewed in a light most favorable to CAMS as the non-moving party, Harley–Davidson was justified in asking Wolverine to restrict CAMS' ability to sell Harley–Davidson branded footwear from trucks at rallies. [8]

[8] This conclusion may well render the previous discussion regarding the choice of law moot. Under Michigan law, a party alleging "tortious interference with a contract or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Badiee v. Brighton Area Sch.,* 265 Mich.App. 343, 695 N.W.2d 521, (Mich.App.2005) (quoting *CMI Int'l, Inc. v. Interment Int'l Corp.,* 251 Mich.App. 125, 649 N.W.2d 808, 812 (Mich.App.2002) (quoting *Feldman v. Green,* 138 Mich.App. 360, 360 N.W.2d 881, 886 (Mich.App.1984))). CAMS has not alleged any per se wrongful act by Harley–Davidson. CAMS has not established Harley–Davidson acted with any malice when it directed Wolverine to limit CAMS' ability to distribute Harley–Davidson branded footwear. Accordingly, CAMS could not maintain its tort action under either Wisconsin or Michigan law.

## B. VIOLATION OF WISCONSIN'S FAIR DEALERSHIP LAW

In CAMS' response to Harley–Davidson's motion for summary judgment, CAMS indicates it was contemporaneously filing a motion to amend the third-party complaint to substitute parallel claims for common law and statutory conspiracy in place of the claim for a violation of the Fair Dealership Law. As a result, CAMS opted not to argue the Fair Dealership Law claim in its response. CAMS' motion to amend its third-party complaint was denied without prejudice

(Dkt. No. 100) pending the outcome of the pending motion for summary judgment. Because the first amended complaint still governs the suit, CAMS still has alleged the claim.

CAMS alleges Harley–Davidson, through Wolverine, terminated CAMS' dealership agreement without good cause. (Amended Third–Party Complaint ¶¶ 33–40.) Furthermore, CAMS was not given the required 90 days written prior notice of the termination and cancellation of the dealership. (*Id.* ¶ 41.)

The Wisconsin Fair Dealership Law (WFDL), Wis. Stat. § 135.01 *et seq.,* seeks to protect dealers from unfair treatment by the grantors of dealerships who have inherently superior bargaining power. Wis. Stat. § 135.025(2)(b); *May v. Wheelabrator Corp.,* 811 F.Supp. 416, 418 (E.D.Wis.1993). The WFDL defines "dealership" as

> **\*8** (a) A contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

Wis. Stat. § 135.02(3)(a). The act defines "grantor" as the person who grants a dealership, Wis. Stat. § 135.02(5), and "dealer" as the person who is a grantee of a dealership, Wis. Stat. § 135.02(2). The WFDL prohibits grantors, directly or through any officer, agent or employee, from terminating a dealership without good cause. Wis. Stat. § 135.03. The grantor must also give a dealer at least 90 days' prior written notice of termination or cancellation and the written notice must state the reasons for such termination or cancellation. Wis. Stat. § 135.04.

The Seventh Circuit Court of Appeals has held the WFDL cannot be violated when the plaintiff does not have a contract with the defendant. *Praefke Auto Elec. & Battery Co., Inc. v. Tecumseh Prods. Co., Inc.,* 255 F.3d 460, 463 (7th Cir.2001). In *Praefke,* the defendant Tecumseh manufactured small

engines. *Id.* at 461. Tecumseh contracted with Industrial Engine so that Industrial Engine became a warehouse distributor for Tecumseh. *Id* . at 462. Industrial Engine then contracted with the plaintiff, Praefke, so that Praefke became an Authorized Service Distributor, or wholesaler. *Id.* Tecumseh provided form contracts to its warehouse distributors for use in contracting with Authorized Service Dealers. *Id.* The form contracts gave Tecumseh the right to approve each Authorized Service Dealer or wholesaler, but also stated that Tecumseh was not a party to the contract. *Id.* The form contracts further stated when the contract between Tecumseh and the warehouse distributor terminated, the contract between the warehouse distributor and the Authorized Service Dealer would also terminate. *Id.* After Tecumseh terminated its contract with Industrial Engine resulting in the contract between Industrial Engine and Praefke terminating, Praefke sued Tecumseh under the WFDL.

The court concluded Tecumseh did not violate the WFDL. *Id.* at 463. The court reasoned Praefke was not a dealer under the WFDL because there was no contract between Tecumseh and Praefke. *Id.* The court acknowledged the statute allows for a dealership to be inferred, but found no evidence of any intention by either party to enter into a contract with each other. *Id.* Furthermore, the court reasoned it could find no set of facts upon which Praefke could have sued Tecumseh for breach of contract. *Id.*

The Seventh Circuit's reasoning is persuasive and is adopted here. The statute regulates the behavior of a grantor of a dealership. The statute specifies the manner and circumstances a grantor may terminate a dealership. In order for the dealer to receive the benefits of the protections in the statute, the dealer must be the recipient of the dealership created by the grantor. The facts in *Praefke* are sufficiently similar to the facts here. Harley–Davidson and Wolverine have a contract. Wolverine and CAMS are parties to a contract. No evidence has been presented to establish that Harley–Davidson and CAMS ever reached any agreement that might constitute the basis for a dealership. To the extent that Harley–Davidson is a grantor and CAMS is a dealer, Harley–Davidson is not the grantor of CAMS' dealership. Without a contract creating the grantor-dealer relationship, CAMS does not have a claim against Harley–Davidson under the WFDL.

## IV. CONCLUSION

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**\*9** Harley–Davidson is entitled to summary judgment on the two claims included in the First Amended Third–Party Complaint. Harley–Davidson has established its conduct was proper and that its actions were justified. Harley–Davidson has an interest in maintaining a brand image. Harley–Davidson instructed Wolverine to restrict CAMS' distribution of Harley–Davidson branded footwear to means a consistent with that brand image. CAMS has not put forth sufficient evidence to create a genuine issue of material fact that Harley–Davidson's conduct was improper. The evidence CAMS has presented does not support an inference that Harley–Davidson's conduct was motivated by complaints from its dealers about CAMS' conduct. In addition, CAMS cannot maintain an action against Harley–Davidson under the Wisconsin Fair Dealership Law because it has no contract with Harley–Davidson.

*ORDER*

Third–Party Defendant Harley Davidson's motion (Dkt. No. 82) for summary judgment is **GRANTED. IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 701010

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:22-cv-00317-WED   Filed 06/03/22   Page 26 of 26   Document 35-2