# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

KOREA ADVANCED INSTITUTE OF
SCIENCE AND TECHNOLOGY,

             Plaintiff,

                                Case No. 2022-CV-00317

v.

KIP CO., LTD. f/k/a KAIST IP Co., Ltd.;
P&IB CO., LTD.; IN GYOO KANG;
KIPB LLC f/k/a KAIST IP US LLC;
PAULINA FUNDINGCO, LLC; and
U.S. BANK NATIONAL ASSOCIATION,

             Defendants.

---

### KAIST'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS KIP CO., LTD., P&IB CO., LTD., IN GYOO KANG, AND KIPB LLC'S MOTION TO DISMISS

---

       The Court should deny the KIP defendants' motion to dismiss because (1) the KIP defendants rely on arbitration clauses that are not mandatory, and (2) KAIST's first and second causes of action state claims based on the plain reading of the agreements at issue.

## FACTUAL BACKGROUND

### I.    KAIST coordinates with affiliates to generate revenue from FinFET technology.

       Plaintiff Korea Advanced Institute for Science and Technology ("KAIST") is a national research university in the Republic of Korea. (ECF No. 30 ("FAC") ¶ 5.) KAIST owns a Korean patent for the fin field-effect transistor ("FinFET"), a component used by companies such as Apple and Samsung to manufacture their products. (*Id.* ¶¶ 16–17.)

In 2012, P&IB (a Korean corporation) and KAIST formed KIP (f/k/a KAIST-IP), a Korean corporation, to generate revenue using intellectual property to which KAIST has rights. (FAC ¶¶ 19–20.) Defendant In Gyoo Kang is the CEO of P&IB. (*Id.* ¶ 8.)

In 2016, KIP organized subsidiary KIPB, a Texas LLC, which KIP wholly owns. (FAC ¶ 24.) The owner of the U.S. FinFET patent, Jong-Ho Lee, assigned his rights associated with the U.S. FinFET patent to KIPB. (*Id.*) KIPB proceeded to sue several Samsung corporate entities, Global Foundries U.S. Inc., and Qualcomm Inc. in the U.S. District Court for the Eastern District of Texas for infringement of the U.S. patent (the "Infringement Lawsuit"). (FAC ¶ 25.) After a jury trial and post-judgment motions, the court entered a $203,003,416 judgment for KIPB on February 19, 2020. (*Id.* ¶¶ 26–28.)

## II. KAIST enters agreements to formalize revenue sharing from Korean and U.S. FinFET patents.

Over the years, KAIST entered three Korean-language agreements with various of the KIP defendants in relation to KAIST's intellectual property (the "Agreements"). (*Id.* ¶¶ 20, 30–31, 37.) The KIP defendants filed and served copies of the Agreements along with certified translations as exhibits A, B, and C to the brief in support of their motion. (ECF Nos. 39-1, 39-2, 39-3.) KAIST obtained its own certified translations before commencing this action. True and correct copies of such translations are attached to this brief as **Exhibits A, B, and C**. We refer to KAIST's and KIP's translations as "KAIST trans." and "KIP trans."

### a. KAIST enters the Business Agreement with KIP.

On July 2, 2012, KAIST and KIP (then known as KAIST-IP CO., Ltd.) executed a Business Agreement pursuant to which KIP was obliged to "actively utilize the grant of

2

exclusive license or assignment of rights from KAIST to focus the efforts on generating the maximum revenue possible" from intellectual property owned by KAIST. (*Id.* ¶ 20; Ex. A § 2.2.C.) (KIP trans.: "shall do its best to generate maximum profits by actively utilizing the exclusive licenses granted or rights transferred by KAIST." (ECF No. 39-1.))

Article 6 of the Business Agreement (titled "Fiduciary Duty" in KAIST trans. and "Performance in Good Faith" in KIP trans.) required KIP to "perform in good faith on each task[] defined in this agreement, and focus the efforts on completing the tasks as quickly as possible." (FAC ¶ 21; Ex. A § 6.) (KIP trans.: "do their best to faithfully perform their respective tasks prescribed in this Agreement as soon as possible" (ECF No. 39-1)).

In Article 9 (titled "Discussions" in KAIST trans. and "Consultation" in KIP trans.), KIP and KAIST agreed that "[m]atters not stated in this agreement shall be discussed mutually by KAIST and [KIP] under the intention of accomplishing the purpose of this agreement to find the solution". (FAC ¶ 22; Ex. A § 9.) (KIP trans.: "For matters not stipulated in this Agreement, KAIST and [KIP] shall consult with each other to seek a solution in order to achieve the purpose of this Agreement." (ECF No. 39-1.))

The Business Agreement also contains a clause requiring that arbitral rules apply to dispute resolution:

> **Article 14 (Settlement of Disputes)**
> In the case of occurring with disputes on the provisions of this agreement, final settlement shall be performed according to the arbitration rules of the Korean Commercial Arbitration Board.

(Ex. A, KAIST trans.)

3

> **Article 14 (Settlement of Dispute)**
> In the event of a dispute over the contents of this Agreement, it shall be finally resolved by arbitration in accordance with the arbitration rules of the Korea Commercial Arbitration Board.

(ECF No. 39-1: 6, KIP trans.)

      **b.**      **KAIST enters into the Management Agreement with KIP and P&IB.**

      KAIST, KIP, and P&IB formalized how they would share revenue from the use of FinFET technology through two separate agreements executed on October 2, 2019. (*Id.* ¶¶ 29–30.)

      First, KAIST and P&IB entered a "Basic Agreement for the Management of KIP Co. Ltd." (the "Management Agreement") under which KIP was required to consult KAIST before sharing revenue generated using KAIST's intellectual property. (*Id.* ¶ 31, 32.) (KAIST trans.: "Revenue sharing . . . detailed method shall be determined through agreement with KAIST" (Ex. B § 5.4); KIP trans.: "Profit . . . distribut[ion] . . . detailed procedures shall be carried out based on mutual agreement with KAIST." (ECF No. 39-2.)) Expenses to generate revenue "shall be recognized of its details only when there is evidence for generating the revenue." (FAC ¶ 33; Ex. B § 5.3) (KIP trans.: "shall be accepted only if there is evidence to prove that the expenses were incurred to generate profit." (ECF No. 39-2.)) Revenue sharing was to take place immediately upon profit generation. (FAC ¶ 34; Ex. B § 5.4) (KAIST trans.: "shall be performed immediately for each case"; KIP trans.: "shall be distributed without delay as soon as profit is generated." (ECF No. 39-2.))

      Under Article 6 (KAIST trans.: "Preliminary Notice and Approval Procedure"; KIP trans.: "Advanced Notification and Approval Procedures") KIP was to obtain, without being prompted or requested to do so, KAIST's informed consent and approval before proceeding

4

with any revenue generating activity. (FAC ¶ 35; Ex. B § 6.; ECF No. 39-2.) Two subsections

of Article 6 read:

> 2. KAIST shall review the existence of existing contract, possibility of winning the lawsuit and any obstacles immediately after receiving the notification as stated in the previous Paragraph, and approval shall be notified to KIP.
> 3. KIP shall not be able to perform the task on generating revenue when KAIST did not receive the prior approval document.

(KAIST trans.)

> 2. As soon as being notified as described in Article 6.1 above, KAIST shall review whether there are any existing contracts, probability of winning the litigation, obstacles, and so on, and shall notify KIP regarding KIP's approval or disapproval.
> 3. KIP shall not start profit generating activities unless obtaining KAIST's prior written approval.

(KIP trans.)

The Management Agreement also contains a dispute resolution clause:

> **Article 11 (Settlement of Disputes)**
> In the case of occurring with disputes between the both parties related to the implementation and violation on the provisions of this agreement, they shall be settled primarily through amicable discussion between the both parties, but the issues not settled through discussion, final settlement shall be enabled through the arbitral award by the Korean Commercial Arbitration Board.

(Ex. B, KAIST trans.)

> **Article 11 (Resolution of Disputes)**
> In the event that any dispute arises between the parties to the agreement related to the performance of the duties stipulated under this agreement, violation of this agreement, and so on, the parties shall try to resolve such a dispute smoothly based on mutual agreement first, and any issues that still remain to be resolved shall be resolved based on the arbitration of Korea Commercial Arbitration Board.

(ECF No. 39-2: 10, KIP trans.)

### c. KAIST enters into the Revenue Sharing Agreement with KIP and KIPB.

The Management Agreement provided for the execution of a "separate agreement" addressing "the Fin-FET patent litigation currently in progress." (FAC ¶¶ 36–38; Ex. B § 10.) (KIP trans.: "separate profit distribution agreement related to the Fin-FET patent litigation in progress." (ECF No. 39-2.)) KAIST, KIP, and KIPB executed such separate agreement (the "Revenue Sharing Agreement") which required KIP and KIPB (referred to together in the Revenue Sharing Agreement as "KIP") to "deposit in cash on the amount for revenue sharing to KAIST through the KAIST bank account . . . within thirty (30) days from receiving the revenue amount from the licensee." (FAC ¶ 39; Ex. C § 1.C.(2).) (KIP trans.: "KIP shall deposit the amount to be distributed to KAIST in cash into the bank account of [KAIST] . . . within thirty (30) days after receiving the revenue from the licensee." (ECF No. 39-2.))

The Revenue Sharing Agreement does not contain any clause addressing arbitration, jurisdiction, or venue. (Ex. C; ECF No. 39-3.)

## III. Without consulting KAIST, KIP enters a litigation funding agreement that leads to a fiasco.

In late 2020, KAIST learned that KIP had signed a litigation finance agreement with Paulina FundingCo LLC (the "Purchase Agreement") without consulting KAIST. (FAC ¶¶ 43–44.) KAIST further learned that KIP had already paid Paulina millions of dollars under the Purchase Agreement without consulting KAIST. (*Id.* ¶¶ 48–50.) KAIST also learned that Paulina had filed an arbitration demand against KIP, KIPB, Jong-Ho Lee, and P&IB with the International Centre for Dispute Resolution, claiming KIP breached the

6

Purchase Agreement (the "Paulina Arbitration"). (*Id.* ¶ 45.) The Paulina Arbitration is still pending. (*Id.* ¶ 51.)

An emergency arbitrator ordered on September 8, 2020 that KIP place money in a trust account pending the end of the Paulina Arbitration; the parties to the arbitration chose a Milwaukee branch of U.S. Bank National Association to create and manage the Trust Account, and at the time of the filing of the FAC, more than 20 million dollars were in the Trust Account. (*Id.* ¶¶ 47–49.) KAIST alleges the KIP defendants' interactions with Paulina, payments to Paulina, and failure to consult with KAIST regarding those interactions and payments were and are in breach of the three Agreements and related duties. (*Id.* ¶¶ 56–83.)

## IV.   KAIST sues, the Action is removed, and the KIP defendants move to dismiss.

After KAIST filed this Action in the Circuit Court for Milwaukee County, Paulina removed the Action to this Court under 9 U.S.C. § 203. (ECF No. 1.) Although KAIST did not move to remand, KAIST did not waive and did specifically preserve all arguments as to the existence and/or enforceability of alleged arbitration clauses upon which Paulina relied to remove. (FAC ¶ 15.) No party has disputed that this Court has jurisdiction over this action.

The KIP defendants, relying on the residual *forum non conveniens* doctrine, moved to dismiss KAIST's First through Fifth Causes of Action, apparently without prejudice. (*See* ECF No. 39: 9 ("The residual *forum non conveniens* doctrine 'is procedural; instead of a direct transfer from another court in the federal system, the case is dismissed and (presumably) refiled in the correct forum.'" (citation omitted)). The KIP defendants also moved to dismiss KAIST's First and Second Causes of Action for failure to state a claim.

7

## ARGUMENT

The Court must deny KIP's motion because none of the Agreements contains a mandatory arbitration clause, dismissal does not serve private interests or the public interest, and KAIST states claims upon which relief can be granted in its First and Second Causes of Action.

## I.     Legal standard

The KIP defendants rely on the residual doctrine of *forum non conveniens* when moving the Court to dismiss the First through Fifth Causes of Action. This Court may dismiss a case under the *forum non conveniens* doctrine if it has "strong reasons [to] believe[e] it should be litigated in the courts of another . . . jurisdiction." *Fischer v. Magyar Allamvasutak Zrt.*, 777 F.3d 847, 866 (7th Cir. 2015) (citation omitted). The doctrine of *forum non conveniens* applies when a clause points to one specific federal forum. *Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 894 (7th Cir. 2018). While 28 U.S.C. § 1404(a) codified the doctrine of *forum non conveniens*, courts follow a different doctrine when the transfer is to a nonfederal forum: the residual doctrine of *forum non conveniens*. *Id.* The analysis under the doctrine, residual or not, is the same. *Id.* When there is no forum-selection clause, the court, to decide whether to dismiss a case, must consider private interests (i.e., convenience of the parties) and the public interest. *Id.* When there is a forum selection clause, the court need only consider the public interest. *Id.*

To survive a Rule 12(b)(6) motion, a plaintiff need only allege "enough facts to state a claim to relief that is plausible on its face." *Chicago Studio Rental, Inc. v. Illinois Dep't of Com.*, 940 F.3d 971, 977 (7th Cir. 2019) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

8

(2007)). Thus the plaintiff need only "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Even after *Twombly,* courts must "constru[e] the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in [the plaintiff's] favor." *Odogba v. Wisconsin Dep't of Just.*, 22 F. Supp. 3d 895, 901 (E.D. Wis. 2014) (citing *Tamayo v. Blagojevich,* 526 F.3d 1074, 1081 (7th Cir. 2008)).

## II. This Court should not dismiss this action based on the residual doctrine of *forum non conveniens.*

None of the three Agreements contains a mandatory arbitration clause, so the KIP defendants' *forum non conveniens* arguments fail. In the absence of mandatory clauses, the Court, considering the parties' private interests and the public interest, should deny the KIP defendants' motion.

### a. The Arbitration Clauses are not mandatory.

The Arbitration Clauses[1] are not mandatory because they do not specify venue or forum. In fact, KIP concedes that the clauses do not "specifically designate a location of the arbitration." (ECF No. 39: 14.) Parties may contractually bind themselves to submit to arbitration, but, without such a contract, no party can require another to arbitrate. *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 662 (7th Cir. 2002) (citation omitted). "An agreement to arbitrate is a type of forum selection clause." *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 773 (7th Cir. 2014). Contractual jurisdiction, venue, and forum clauses can be

---

[1] We refer to the dispute resolution clauses in the Business Agreement (Article 14) and Management Agreement (Article 11) together as "Arbitration Clauses" for ease of reading, but, as will be detailed below, both Arbitration Clauses are permissive rather than mandatory.

mandatory (exclusive) or permissive (nonexclusive). *Kochert v. Adagen Med. Int'l, Inc.*, 491 F.3d 674, 679 (7th Cir. 2007). "[W]here venue is specified with mandatory or obligatory language, the clause will be enforced; where only jurisdiction is specified, the clause will generally not be enforced unless there is some further language indicating the parties' intent to make venue exclusive." *Muzumdar v. Wellness Int'l Network*, Ltd., 438 F.3d 759, 762 (7th Cir. 2006) (citing *Paper Express, Ltd. v. Pfankuch Maschinen GmbH,* 972 F.2d 753 (7th Cir. 1992)); *see also* CHARLES ALAN WRIGHT, ET AL., 14D FEDERAL PRACTICE AND PROCEDURE § 3803.1 (4th ed. Nov. 2018 update) ("Permissive forum selection clauses, often described as 'consent to jurisdiction' clauses, authorize jurisdiction and venue in a designated forum, but do not prohibit litigation elsewhere.") (cited in *Brilliant DPI, Inc. v. Konica Minolta Bus. Sols., U.S.A., Inc.*, No. 18-CV-799, 2019 WL 1376017, at *3 (E.D. Wis. Mar. 26, 2019) (unreported)).

Here, neither Arbitration Clause specifies venue and when jurisdiction is arguably specified, it is not exclusive.

KAIST's and KIP's respective translations of the permissive Arbitration Clauses are substantially similar. For the Court's convenience, because KAIST is responding to KIP and KIP used its own translations, KAIST will rely on the translations provided by KIP.

### i.  The Management Agreement's Arbitration Clause is permissive.

Article 11 of the Management Agreement reads in relevant part:

> In the event that any dispute arises . . ., the parties shall try to resolve such a dispute smoothly based on mutual agreement first, and any issues that still remain to be resolved shall be resolved based on the arbitration of Korea Commercial Arbitration Board.

(ECF No. 39-2: 10).

Under Article 11, the parties do not consent to the exclusive venue or jurisdiction of the Korea(n) Commercial Arbitration Board ("KCAB"). Article 11 does not contain exclusive language, which is necessary for this Court to find a clause mandatory. *Paper Express,* 972 F.2d at 757. In *K & V Sci. Co. v. Bayerische Motoren Werke Aktiengesellschaft ("BMW")*, 314 F.3d 494, 496 (10th Cir. 2002), the court examined the clause "Jurisdiction for all and any disputes arising out of or in connection with this agreement is Munich." The court, quoting *Paper Express*, 972 F.2d at 757, looked for "further language indicating the parties' intent to make venue exclusive." *Id.* at 499. Noting that the clause did not use exclusive terms such as "exclusive," "sole," or "only," the court held that the clause was permissive. *Id.* at 500.

Like the clause in *BMW*, Article 11 does not contain exclusive terms and is therefore permissive. The presence of "shall" in the clause does not make it mandatory without more, and courts regularly find arbitration clauses that include the word "shall" to be permissive. *E.g., John Boutari & Son, Wines & Spirits, S.A. v. Attiki Importers & Distributors Inc.*, 22 F.3d 51, 52 (2d Cir. 1994) (finding "[a]ny dispute arising between the parties hereunder shall come within the jurisdiction of the competent Greek Courts, specifically of the Thessaloniki Courts" to be permissive); *Pace Properties, LLC v. Excelsior Const., Inc.*, No. 3:08CV345, 2008 WL 4938412, at *1 (N.D. Fla. Nov. 18, 2008) (unreported) (finding "[a]ny and all disputes arising from these contract documents shall be subject to litigation in state court in Escambia County, Pensacola, Florida" to be permissive); *Beckley v. Auto Profit Masters, L.L.C.*, 266 F. Supp. 2d 1001, 1003 (S.D. Iowa 2003) (finding "[t]his agreement shall be interpreted

and bound by the laws and jurisdiction of the State of Colorado and the district of the City of Denver" to be permissive).

In Article 11, "any issues that still remain . . . shall be resolved based on the arbitration of [KCAB]"—language that closely matches, "any dispute . . . shall come within the jurisdiction of the competent Greek Courts" in *Boutari* or "[a]ny and all disputes . . . shall be subject to litigation in state court in Escambia County . . . ." in *Pace Properties*. Therefore, KCAB has jurisdiction but not exclusive jurisdiction.

Article 11 is not mandatory, and it may not be enforced as if it were.

### ii.    The Business Agreement's Arbitration Clause is permissive.

Article 14 of Business Agreement reads in relevant part:

> In the event of a dispute over the contents of this Agreement, it shall be finally resolved by arbitration in accordance with the arbitration rules of [KCAB].

(ECF No. 39-1: 6).

Under Article 14, the parties do not consent to any forum's jurisdiction or any particular venue (let alone to any *exclusive* jurisdiction or exclusive venue). "[A]rbitration in accordance with the arbitration rules" of the KCAB means consent to the use of the rules: it does not mean the KCAB itself will facilitate the arbitration. The KCAB recognizes that parties may arbitrate in one institution according to another institutions' different rules. Yun Jae Baek et al., *International Arbitration 2021: Trends and Development Global Practice Guides* (2021), CHAMBERS AND PARTNERS, https://practiceguides.chambers.com/practice-guides/international-arbitration-2021/south-korea/trends-and-developments (last visited July 12, 2022) (Trends and Development Tab). For example, the KCAB itself conducts arbitrations following the rules of other institutions such as the International Chamber of

12

Commerce or the London Court of International Arbitration. *Id.* Therefore the KCAB itself would agree that a clause that refers only to the KCAB's rules of arbitration does not necessarily confer jurisdiction to the KCAB. Here, Article 14 does not confer jurisdiction to the KCAB: the clause only states that arbitration will be "in accordance" with the KCAB's rules.

Even if the clause showed the parties consented to jurisdiction, such jurisdiction would not be mandatory. Like Article 11, Article 14 contains no mandatory language, and, as explained above, the word "shall" does not make the clause mandatory. *See supra* at 11-12. This Court found an arbitration clause with identical key language permissive. The clause at issue was, "This Agreement and the rights of the parties *shall* be governed by and construed and enforced *in accordance* with the laws of the state of Minnesota. . . ." *Adgate v. Chip Shoppe, Inc.*, No. 13-C-163, 2013 WL 6981451, at *8 (E.D. Wis. May 10, 2013) (unreported) (emphasis added). Relying on *Paper Express*, this Court observed that the clause did not contain language pointing to an exclusive forum to resolve disputes. *Id.* The clause did not use "exclusive," "only," "must" (even though it used "shall") or other words "that might suggest exclusivity." *Id.* Here Article 14 states disputes over the agreement "*shall* be finally resolved by arbitration *in accordance* with the arbitration rules of [KCAB]" (emphasis added).

Article 14 is at most a permissive arbitration clause and cannot serve as a basis to dismiss any of KAIST's claims.

### iii. Extrinsic sources cannot and do not transform the permissive Arbitration Clauses into mandatory forum-selection clauses.

A court does not turn to extrinsic evidence to construe an arbitration clause unless the language is ambiguous. *Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 13 F.3d 330, 332

13

(10th Cir. 1993). The KIP defendants do not argue that the Arbitration Clauses are ambiguous, yet the KIP defendants turn to Korean statutes to supplement the Arbitration Clauses and make them to KIP's liking.[2] (ECF No. 39: 14.) The Court should reject this convoluted attempt to salvage an unconvincing argument.

Even if the Court could rely on Korean statutes to interpret the clauses (and the KIP defendants' paraphrasing of the statutes were satisfactory), the Court would find that the clauses are not mandatory forum-selection clauses.

The KIP defendants' explanation eats its own tail. They argue that there is a forum clause, therefore under Korean law the KCAB can decide what the forum is, therefore the forum is in Korea, therefore there is a forum clause. (*See* ECF No. 39 at 14.) This reasoning is circular, but even if it were not, there would not be a *forum* selection clause anyway. An entire country is not a forum, so, under the KIP defendants' analysis, there would still be no exclusive forum.

So, even with the help of foreign legal materials, the KIP defendants cannot show that either of the Arbitration Clauses is mandatory.

**b.     The Revenue Sharing Agreement does not contain an arbitration clause.**

There is no arbitration clause in the Revenue Sharing Agreement, and the Management Agreement's Arbitration Clause does not extend to the Revenue Sharing

---

[2] The KIP defendants cite to Korean authorities without filing or serving copies of such authorities, let alone translations. Under Fed. R. Civ. P. 44.1, the KIP defendants had to (1) raise the issue that Korean law applies and (2) prove foreign law to help the Court apply it. *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 469 (E.D. Pa. 2010) (citing *Whirlpool Fin. Corp. v. Sevaux*, 96 F.3d 216, 221 (7th Cir. 1996)). The KIP defendants did neither, so the Court may disregard their citations to Korean law.

14

Agreement. Therefore, even if the Management Agreement's Arbitration Clause were mandatory, which it is not, the clause would not extend to the Revenue Sharing Agreement.

The KIP defendants cite to *Shriner v. Signal Fin. Co.*, 92 F. App'x 322 (7th Cir. 2003) (unreported) to support the argument that the Revenue Sharing Agreement is incorporated into the Management Agreement. *Shriner* is neither binding nor persuasive authority (the KIP defendants cited it in violation of Civil L.R. 7(j)(1) and Seventh Circuit Rule 32.1) but even if it were, it would not support the argument. The KIP defendants rely on *Shiner* for the proposition that "when reference is made to another writing in a contract for a particularly designated purpose, the other writing becomes a part of the contract for the purpose specified." (ECF No. 39: 11.) In fact, the *Shriner* court, narrowly interpreting incorporation "*only for the purpose specified,*" found that, in that case, one writing incorporated another but the incorporation did not extend to the arbitration clause. *Shriner*, 92 F. App'x 322 at *5. Similarly, here the Revenue Sharing Agreement's specified purpose ("separate profit distribution agreement related to the Fin-FET patent litigation in progress") does not include the Management Agreement's arbitration clause.

In fact, a dispute born under one contract may be litigated in court despite a mandatory arbitration provision in a second contract, even when the two contracts are "closely intertwined." *Indus. Elecs. Corp. of Wisconsin v. iPower Distribution Grp., Inc.*, 215 F.3d 677, 681 (7th Cir. 2000). In cases where two contracts are intertwined, a party may be forced to arbitrate in only two situations. *Rosenblum*, 299 F.3d at 662 (7th Cir. 2002). First, when the arbitration provision is itself "broad enough" to include disputes under the second contract. *Id.* Second, when the first contract incorporates the second by reference. *Id.* Before

considering either possibility, a court should examine the two contracts to determine their relationship. *Id.* at 663.

The Revenue Sharing Agreement and Management Agreement here are related but separate agreements. In *Rosenblum*, the court observed that the two contracts were not sections of the same agreement, that each agreement contained similar provisions, that there were no missing terms in a contract that borrowed from the other, and that one contract related to an ongoing relationship while the other was more specific. *Id.* The same applies here: the two agreements are not part of the same contract, they each contain a provision on revenue distribution, no contract is missing terms supplied by the other, and while the Management Agreement governs an ongoing relationship as to intellectual property generally, the Revenue Sharing Agreement is specific to FinFET patent litigation. (Exs. B, C.) The Revenue Sharing Agreement also adds KIPB as a party; KIPB is not a party to the Management Agreement. (*See id.*)

The Court should turn, first, to whether the Management Agreement's Arbitration Clause is broad enough to include disputes under the Revenue Sharing Agreement. In *Rosenblum*, the provision applied to "any matter in dispute under or relating to *this* Agreement." 299 F.3d at 664 (emphasis in original). The court found the clause was not broad enough to include disputes under the second agreement. *Id.* Here, the Management Agreement's provision applies to "any dispute [that] arises between the parties to the agreement related to the performance of the duties stipulated under *this* agreement." (ECF No. 39-2: 10 (emphasis added).) As in *Rosenblum*, the permissive arbitration clause is restricted to the Management Agreement.

16

Second, the Court should examine whether the first contract incorporates the other. Mere reference to a second agreement is not enough to incorporate its terms into the first agreement. *Rosenbum*, 299 F.3d at 666. The writing must show "an express intent to incorporate." *Id.* Here there is no such writing to be seen.

Even if the Management Agreement contained a mandatory arbitration clause, the Revenue Sharing Agreement would not be subject to it.

### c. Private-interest factors show this case should remain in this Court.

KIP did not address convenience factors under the doctrine of *forum non conveniens* and thus waived any argument as to their applicability. Regardless, convenience (or private interest) factors considered in a motion to dismiss are:

(1) relative ease of access to sources of proof;

(2) availability of compulsory process and costs for attendance of witnesses;

(3) possibility of view of premises, if appropriate; and

(4) other practical issues, including ease of enforcement of any ultimate judgment.

*In re Factor VIII or IX Concentrate Blood Prod. Litig.*, 484 F.3d 951, 958 (7th Cir. 2007).

Here, access to evidence is easy. There is no building to visit or bodily injury to inspect but only documents that the sophisticated parties, which all hired sophisticated law firms, can share at the click of a mouse. Attendance of witnesses is convenient as all witnesses may appear by Zoom and would probably appear by Zoom even if the proceedings were in Korea. As to language, proceedings in English are more appropriate here. The Korean agreements at issue are short and well translated. By contrast, the Infringement Lawsuit was all in English, the Purchase Agreement is in English, and the

17

Paulina/KIP arbitration proceedings are in English. Thus, all aspects of the breaches of agreements and related duties relate to transactions in the English language. The Court may take judicial notice that American English-language contracts are typically much longer than the Agreements at issue here (four, three, and two pages)—especially where the contracts create LLCs for sophisticated parties (including state universities) or govern commercial relationships related to intellectual property worth hundreds of millions of dollars. Additionally, the KIP defendants have experience litigating in English language, including (1) in a Texas federal court for the Infringement Lawsuit, and (2) in the International Centre for Dispute Resolution for the Paulina Arbitration. Finally, the KIP defendants are relying in this case on American attorneys with whom they have been working for years. And enforcement in Korea of a judgment by this Court is no concern. Ji Yun Seok & Woo Young Choi. *Enforcement of Foreign Judgments in South Korea* (2019), LEXOLOGY, https://www.lexology.com/ library/detail.aspx? g=8102a26a -e629-4ab2-b00f-3570fb938577 (accessed July 19, 2022). ("Korea has its own principle to recognise and enforce foreign judgments in the law and court precedents, and Korean courts are generous in recognising and enforcing foreign judgments based on the principle of reciprocity.")

Private interest factors make this Court the best forum for this case.

### d.    Public-interest factors show this Action should remain in this Court.

Courts analyze the following public interest factors when evaluating a *forum non conveniens* motion:

> (1) the administrative difficulties stemming from court congestion;
>
> (2) the local interest in having localized disputes decided at home;

> (3) the interest in having the trial of a diversity case in a forum
> that is at home with the law that must govern the action;
>
> (4) the avoidance of unnecessary problems in conflicts of laws
> or in the application of foreign law; and
>
> (5) the unfairness of burdening citizens in an unrelated forum
> with jury duty.

*Instituto Mexicano del Seguro Soc. v. Zimmer Biomet Holdings, Inc.*, 29 F.4th 351, 360 (7th Cir. 2022).

The KIP defendants reviewed only the second factor to make the case that Korea has a strong local interest, but Wisconsin has a stronger local interest in having this case decided by this Court: the acts constituting breaches of three contracts and underlying related causes of action took place in the United States, and funds disputed in relation to the breaches and other claims are held in trust by U.S. Bank in Milwaukee.

As to the other factors, which KIP did not address and therefore lost its opportunity to argue, they weigh in favor of KAIST. As to the first factor (on congestion), a recent industry publication stated that "KCAB has seen a remarkable spike in its caseload in recent years." Baek, *supra* (Trends and Development Tab). The third factor (on local law) is irrelevant here because this Court is not sitting in diversity. As to the fourth factor (on issues with foreign law), the Korean contracts are short and well translated, while the papers and laws that triggered KAIST's causes of action are in English and governed by law in the English language, from the Purchase Agreement to the Trust Account's escrow agreement to court and arbitration papers and materials. As to the fifth factor (burden on citizen-jurors), it is because of U.S. Bank's and Milwaukee's reputations that the defendants placed substantial funds in trust on Wisconsin Avenue. Local citizens benefit from the vibrancy of their community in the business world; they also have a duty to serve as jurors to decide disputes

19

that inevitably come with business growth, and it is not unfair to ask them to perform that duty.

## III. This Court should not dismiss KAIST's First and Second Causes of Action because KAIST states cognizable claims upon which relief may be granted.

KAIST states a claim under its First and Second Causes of Action. To attempt to show otherwise, the KIP defendants simply ignore passages from the FAC and from the Agreements.

### a. KAIST's First Cause of Action (Breach of Business Agreement) states a claim against KIP.

KAIST alleges that KIP breached its obligations under the Business Agreement by failing to discuss with KAIST funding for the Infringement Litigation and the Paulina agreement. The KIP defendants incorrectly argue that KIP did not owe such obligations to KAIST because the Infringement Litigation related only to the U.S. FinFET patent, which KAIST does not own. This myopic argument ignores the obvious relationship between the Korean patent license fee, the Infringement Lawsuit, and the Paulina contract, all of which are intertwined. The lawsuit led to the settlement that included the Korean patent license fee, which was then misappropriated under the auspices of the Paulina agreement.

The KIP defendants recognize that the Business Agreement imposes duties related to "intellectual property rights held by KAIST" (ECF No. 39-1 § 2.A.), but they then irrationally argue that those property rights are not implicated by the Infringement Lawsuit or the Purchase Agreement. This argument is not rational because, as KAIST has alleged, the Paulina contract and the Infringement Lawsuit had an obvious and significant impact on KAIST's rights with regard to the Korean patent and on KAIST's rights under the Business Agreement. KAIST alleges that KIP misdirected to Paulina most of a $30 million payment

20

from Samsung that was designated as a license fee for the Korean patent. (FAC ¶ 74, ECF No. 30.) This was inconsistent with the revenue-maximization goal of the Business Agreement, as was entering into the borderline-usurious contract with Paulina in the first place. Yet at no time did KIP discuss any matters related to Paulina or litigation financing with KAIST.

Perhaps the most egregious breach of the Business Agreement was KIP's failure to discuss its plan to use funds from the Korean patent license fee to pay amounts allegedly owed to Paulina. KAIST alleges that "KIP's failure to discuss litigation funding with KAIST and failure to disclose the Paulina agreement were breaches of the Business Agreement" (FAC ¶ 60), and never was this more evident and impactful than immediately prior to KIP's decision to misdirect the Korean patent license fee. KIP's choice to use funds that rightfully belong to KAIST as owner of the Korean patent to pay Paulina drew a direct line between the Infringement Lawsuit, the Purchase Agreement, and KAIST's intellectual property rights.

The KIP defendants' argument that there is no connection is absurd. KIP had the obligation to discuss the Infringement Lawsuit and the Paulina agreement with KAIST both before and after it received the Korean patent license fee, since KIP would have known for some time that the Korean patent was to be involved in the settlement agreement with Samsung. Having failed to do so, KIP breached the Business Agreement and prevented KAIST from taking steps to avoid the improper conversion of the Korean patent license fee into funds for loan repayment. KAIST properly alleged facts showing this misdirection of funds and that KIP's failure to consult with KAIST on litigation funding matters related to

the misdirection constituted a breach of the Business Agreement, so KAIST's First Cause of Action states a claim upon which relief may be granted.

      **b.**    **KAIST's second cause of action (Breach of Management Agreement) states a claim against P&IB.**

KAIST alleges that P&IB breached the Management Agreement because it directed "KIP to distribute settlement proceeds to Paulina and to engage in settlement negotiations . . . without informing KAIST . . ." (FAC ¶ 65.) The KIP defendants claim the Management Agreement did not impose any contractual obligation on P&IB to supervise KIP or direct KIP to act in any particular manner. (ECF No. 24: 65.) But in fact, Article 4 of the Management Agreement reads "The board of directors shall be composed by P&IB, *which is responsible for managing KIP*, and KAIST shall have the right to recommend auditors." (ECF No. 39-2) (emphasis added).) The definition of "manage" in fact is "to handle or *direct* with a degree of skill: such as . . . to exercise executive, administrative, and *supervisory direction* of" (emphasis added). *Manage*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/manage (last visited July 10, 2022). If any inference were needed, it would be in KAIST's favor, but here the definition on its face squarely contradicts the KIP defendants. *Odogba*, 22 F. Supp. 3d at 901 (inference in plaintiff's favor); *First Bank & Tr. v. Firstar Info. Servs., Corp.*, 276 F.3d 317, 323 (7th Cir. 2001) (observing that a court interpreting a contract may turn to a dictionary to determine the ordinary meaning of undefined terms). The only reason the KIP defendants argue that KAIST's Second Cause of Action should fail is that P&IB had no responsibility to supervise or direct KIP to act in any particular manner. P&IB does have such a responsibility under the plain reading of the Management

Agreement, and thus KAIST states a claim against P&IB for breach of the Management Agreement.

## CONCLUSION

For the above reasons, the Court should deny in its entirety the KIP defendants' motion to dismiss the FAC and this case should proceed into discovery.

Dated this 25th day of July 2022.

GASS TUREK LLC

*s/Daniel A. Manna*
Daniel A. Manna, SBN 1071827
Jerome C. Mohsen, SBN 1097525
241 N. Broadway, Suite 300
Milwaukee, Wisconsin 53202
Tel: 414-223-3300
Fax: 414-224-6116
manna@gassturek.com
mohsen@gassturek.com

*Attorneys for Plaintiff Korea Advanced Institute of Science and Technology*

23