# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

KOREA ADVANCED INSTITUTE OF
SCIENCE AND TECHNOLOGY,

        Plaintiff,

                                  Case No. 2022-CV-00317

v.

KIP CO., LTD. f/k/a KAIST IP Co., Ltd.;
P&IB CO., LTD.; IN GYOO KANG;
KIPB LLC f/k/a KAIST IP US LLC;
PAULINA FUNDINGCO, LLC; and
U.S. BANK NATIONAL ASSOCIATION,

        Defendants.

## KAIST'S BRIEF IN OPPOSITION TO DEFENDANTS KIP CO., LTD., P&IB CO., LTD., IN GYOO KANG, AND KIPB LLC'S MOTION FOR SANCTIONS

# TABLE OF CONTENTS

FACTUAL BACKGROUND ................................................................. 4

ARGUMENT ................................................................................ 5

PART ONE: THE LETTER ............................................................... 5

I.    The Court should deny the Motion because it is not strictly compliant with Rule 11 procedural requirements ........................ 5

II.    The Court should deny the Motion because KIP did not substantially comply with Rule 11 procedural requirements. ...... 8

    a.  KIP did not serve the Letter ........................................... 9

    b.  The Letter did not describe the specific conduct that allegedly violated Rule 11(b) ........................................ 10

    c.  The Letter is not a warning shot because it made three arguments in support of sanctions, but the actual Motion contained only one ........................................................ 11

    d.  The structure and "substance" of the Letter show how careless, cavalier, and inconsiderate KIP was with its Motion .. 12

        i.  KIP left two untenable arguments behind ........................... 12

        ii.  A surprise witness with no foundation cannot justify sanctions ................................................................................. 13

        iii.  Little is left after one disregards the Letter's irrelevant paragraphs ................................................. 16

III.    The only two paragraphs of "substance" in the Letter provide no ground for sanctions. ................................................. 17

    a.  KIP relies on its own paraphrase of unidentified translations of key contracts to seek sanctions .............................. 17

    b.  KIPS's barebones argument is woefully insufficient to warn of sanctions ....................................................... 18

Case 2:22-cv-00317-WED   Filed 10/04/22   Page 2 of 26   Document 54

PART TWO: THE MOTION ........................................................................ 19

    I.     KIP improperly filed the Motion to get further briefing on
          its motion to dismiss without leave of court ............................. 20

    II.    Mr. Choi returns, with a new title and little else ........................ 21

    III.   KIP rehashes its false claim that the Infringement
          Lawsuit was not related to KAIST's rights ................................. 23

    IV.   KIP should pay KAIST's attorney fees incurred responding
          to KIP's frivolous sanctions motion .............................................. 24

CONCLUSION .................................................................................................. 26

3

KIP's Motion for Sanctions is a waste of the Court's and the parties' time and resources because KIP did not follow basic procedural requirements and for that reason alone, the Motion should be denied. The Motion is also an egregious attempt by KIP to bolster its motion to dismiss through a third brief without leave of court. But even if this Motion were not procedurally improper, denial would still be appropriate because the Motion easily fails on the merits. KAIST thus asks that the Court deny KIP's Motion and award KAIST its attorney fees associated with responding to KIP's baseless accusations.

## FACTUAL BACKGROUND

Plaintiff Korea Advanced Institute of Science and Technology ("KAIST") filed this Action in Wisconsin state court on March 2, 2022. The Action was removed, and the defendants filed motions to dismiss on March 30. KAIST filed a First Amended Complaint ("FAC") on April 20, 2022. (ECF No. 30.) On May 27, counsel for Defendants KIP Co. Ltd., P&IB Co., Ltd., In Gyoo Kang, and KIPB LLC (together "KIP") sent a letter to KAIST counsel (Manna Decl. Ex. B) (the "Letter") as an attachment to an email message (*Id.* Ex. A). KAIST counsel advised KIP counsel via email that the Letter, self-described as "informal," was not sufficient to start the 21-day safe-harbor period under Rule 11. (*Id.* Ex. C.) KIP counsel disagreed. (*Id.* Ex. D.)

On June 3, KIP filed a motion to dismiss (ECF No. 38); on July 25, KAIST responded (ECF No. 42); and on August 15, KIP replied (ECF No. 50).

On September 13, KIP filed this Motion for Sanctions.

4

**ARGUMENT**

**PART ONE: THE LETTER**

**I.    The Court should deny the Motion because it is not strictly compliant with Rule 11 procedural requirements.**

The Rule 11 standard is well-known: one who files a pleading or motion with the court is certifying that the filing is not being used for any improper purpose; that the claims, defenses, and legal contentions are warranted by law; and that the factual contentions have or will have evidentiary support. Fed. R. Civ. P. 11(b). If after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose sanctions under Rule 11(c). The movant must serve the motion under Rule 5, but not file it until 21 days after service of the motion. Fed. R. Civ. P. 11(c)(2). This "safe harbor" provision gives the nonmovant an opportunity to withdraw or correct the allegedly violative pleading. *Id.*

The Court should dismiss KIP's Motion because the Letter was not strictly compliant with Rule 11 and therefore did not serve as an effective safe-harbor notice. The Seventh Circuit once held that substantial compliance with Rule 11 was sufficient for a letter to serve as a safe-harbor notice. *Nisenbaum v. Milwaukee Cty.*, 333 F.3d 804, 808 (7th Cir. 2003). But this Court is not bound by the substantial compliance doctrine because the Seventh Circuit is almost certain to repudiate it at the first opportunity. In *Olson v. Paine, Webber, Jackson & Curtis, Inc.*, the Seventh Circuit explained that a district court is not bound by doctrinal precedent likely to be abandoned:

> Ordinarily a lower court has no authority to reject a doctrine developed by a higher one. If, however, events subsequent to the last decision by the higher court approving the doctrine—

5

especially later decisions by that court, or statutory changes—
make it *almost certain* that the higher court would repudiate the
doctrine *if given a chance to do so*, the lower court is not required
to adhere to the doctrine.

806 F.2d 731, 734 (7th Cir. 1986) (emphasis added) (citations omitted)

Here the Court can be almost certain that the Seventh Circuit will abrogate the
doctrine of substantial compliance at the first opportunity.

The Seventh Circuit is the only federal circuit to have adopted the doctrine of
substantial compliance, but recent decisions strongly suggest the Seventh Circuit will join the
eight circuits that have explicitly rejected the doctrine. *See N. Ill. Telecom, Inc. v. PNC Bank,
N.A.*, 850 F.3d 880, 882, 887 (7th Cir. 2017) (citing *Nisenbaum*, 333 F.3d at 808). In *Northern
Illinois Telecom*, decided 14 years after *Nisenbaum*, Judge Hamilton (joined by then-Chief Judge
Wood) made clear that the court is ready to be rid of this problematic doctrine. Despite
finding a lack of substantial compliance and thus having no need to address the wisdom of
*Nisenbaum*, the court still wrote at length about the history of amendments to Rule 11 in
order to criticize the substantial compliance doctrine. *N. Ill. Telecom*, 850 F.3d at 885–87. The
court explained that "the substantial compliance theory we adopted in *Nisenbaum* stands
alone and is difficult to reconcile with the explicit requirements of the Rule and the clear
explanation from the Advisory Committee." *Id.* at 887. The court listed each of the circuits
to have rejected the theory and noted that those courts "have been highly critical of the terse
treatment of the issue in *Nisenbaum*." *N. Ill. Telecom*, 850 F.3d at 887.

The court went on to explain why *Nisenbaum* has attracted such scorn. To begin with,
Rule 11 requires a service of a "motion," and an informal warning goes against the language
and the purpose of the Rule. *Id.* The Advisory Committee suggested that an informal

6

warning should precede the service of a Rule 11 motion, which would then start the 21-day safe-harbor period. *N. Ill. Telecom*, 850 F.3d at 888. If an informal warning can also start the 21-day clock, a recipient may be unclear upon receiving an informal warning as to whether the opposing party is serious and in fact started the clock. *N. Ill. Telecom*, 850 F.3d at 888. The court cited two other circuits' decisions that pointed out that "*Nisenbaum* did not address the language of Rule 11, the Advisory Committee notes, or other Rule 11 jurisprudence." *Id.* at 887 (citing *Cadle Co. v. Pratt* (*In re Pratt*), 524 F.3d 580, 587–88 (5th Cir. 2008) and *Roth v. Green*, 466 F.3d 1179, 1193 (10th Cir. 2006)). The court concluded its opinion with a gratuitous reference to the strict compliance doctrine, finding that the defendant's "posturing did not amount even to substantial compliance with the warning-shot/safe-harbor provision, let alone to the actual compliance that other circuits demand." *Id.* at 888–89. And, to leave no doubt about its desire to overturn *Nisenbaum*, the court warned in a footnote that "[p]arties and district courts that rely on a theory of substantial compliance should understand that, at least in the present landscape, they are inviting possible *en banc* and/or Supreme Court review of the question." *N. Ill. Telecom*, 850 F.3d at 888, n.5.

The "present landscape" of the Seventh Circuit is plainly hostile to the substantial compliance doctrine. Two years after deciding *Northern Illinois Telecom.*, the court again noted criticism of the doctrine in dicta in *McGreal v. Village of Orland Park*, 928 F.3d 556, 559 (7th Cir. 2019). In *McGreal* the court observed again that the Seventh Circuit was the only circuit to adopt the doctrine and that other circuits characterized the analysis in *Nisenbaum* as "cursory and atextual." *Id.* The court also hinted that recent Supreme Court precedent may require the reversal of *Niesenbaum*, citing *Manrique v. United States*, 197 L. Ed. 2d 599, 137 S.

7

Ct. 1266, 1269 (2017), for the proposition that "if raised properly, mandatory claim-processing rules are 'unalterable.'" *McGreal*, 928 F.3d at 559. Ultimately, since neither party argued for abandoning the substantial compliance doctrine, the court left "reconsideration of *Nisenbaum* for another day." *Id.*

This Court has observed that the substantial compliance doctrine "is unpopular, even among judges of this Circuit." *Novoselsky v. Zvunca*, 324 F.R.D. 197, 203 (E.D. Wis. 2017) (citing *N. Ill. Telecom*, 850 F.3d at 887). As *McGreal* shows, that unpopularity has only grown since *Northern Illinois Telecom*, to the point where it is all but certain the Seventh Circuit would overrule *Nisenbaum* if given the opportunity. Thus, as discussed in *Olson*, this Court is not bound by *Nisenbaum* and should require strict compliance with the plain language of Rule 11.

Under the strict language of Rule 11, the Court can dispose of KIP's Motion expeditiously. The Letter was not and did not enclose the Motion, so it was not a safe-harbor notice and did not start the 21-day clock. *See Penn, LLC v. Prosper Bus. Dev. Corp.*, 773 F.3d 764, 767 (6th Cir. 2014) (finding that Rule 11 "specifically requires formal service of a motion" and affirming the denial of sanctions because the safe-harbor notice was a letter). As discussed in greater detail below, the Letter did not contain anything that resembles a motion for sanctions and contained frivolous arguments that did not end up in the Motion. Additionally, KAIST's arguments below addressing KIP's failure to meet the substantial compliance standard apply even more powerfully if strict compliance is required.

## II. The Court should deny the Motion because KIP did not substantially comply with Rule 11 procedural requirements.

Even if the court unnecessarily follows *Niesenbaum* and adheres to the substantial compliance theory, KIP still failed to do enough to satisfy Rule 11. KIP failed to properly

8

serve the Letter on either KAIST or the other parties, failed to describe the specific conduct that violated Rule 11, and made radical alterations to its Letter's arguments when preparing the Motion. Any one of these three shortcomings is enough to find a lack of substantial compliance with Rule 11; all three show that KIP barely made an effort to follow the Rule.

This Court will not "grant sanctions on a whim, nor should a party move for sanctions without scrupulously following the procedures for such a request." *Brown v. Pierce Mfg., Inc.*, 169 F.R.D. 118, 119 (E.D. Wis. 1996). Even if substantial compliance with Rule 11(c)(1) is sufficient to seek sanctions in this Court, a movant must still fire a "warning shot" sufficient for the nonmovant to be on notice. *Novoselsky*, 324 F.R.D. at 203 (citing *N. Ill. Telecom*, 850 F.3d at 887). KIP's poor effort to substantially comply with Rule 11 was insufficient to send a proper warning shot.

### a.     KIP did not serve the Letter.

A motion for sanctions "must be served under Rule 5" but not filed for 21 days to give time for corrective action. Fed. R. Civ. P. 11(c)(2). By sending the motion only by electronic mail, KIP did not serve KAIST. Electronic service of a paper under Rule 5 may be accomplished by (1) "filing it through the court's electronic-filing system" if the recipient is a registered user or (2) "other electronic means" only if the recipient agreed to those means in writing. Fed. R. Civ. P. 11(b)(2)(E). KIP sent the Letter to KAIST only by email, explicitly specifying the mode of delivery of the Letter "VIA EMAIL." (Manna Decl. Ex. B.) KAIST counsel has not received the Letter by any means other than email. (Manna Decl. ¶ 10.) KIP did not serve the Letter via electronic filing nor did KAIST consent to service via email. (*Id.* ¶ 13.) Therefore, KIP did not serve the Letter on KAIST under Rule 5.

Even if KAIST had agreed to service by email, service of the Letter was not effective under Rule 5 because KIP did not serve the Letter on all parties in the Action. A motion for sanctions "must be served on every party." Fed. R. Civ. P. 5(a)(1)(D). Here, the four corners of the Letter contain no indication that it was copied to any other party. (Manna Decl. Ex. B.) The email by which KIP counsel sent the Letter was not copied to any other party either. (*Id.* Ex. A.) KIP counsel has never otherwise stated the Letter was served on any other party. (Manna Decl. ¶ 11.) KAIST counsel later learned that another party's counsel did not receive the Letter, (*id.* ¶ 12), suggesting KIP did not email the Letter to anyone but KAIST.

Even if KIP had served the Letter on all the other parties (without so stating, let alone showing), KAIST would be hard-pressed to know *when* the critical 21-day countdown (if there is one) started running because KAIST never knew when other parties were served, i.e., when service was effective.

KAIST cannot be bound by an unknown deadline, so KIP's service deficiencies foreclose any argument that the Letter served as a substantially compliant warning shot.

**b.    The Letter did not describe the specific conduct that allegedly violated Rule 11(b).**

Under the substantial compliance analysis, a safe-harbor letter must "at a minimum" identify the type of Rule 11(b) violation alleged. *Novoselsky*, 324 F.R.D. at 204. In *Novoselsky*, the movant in a safe-harbor letter quoted Rule 11(b)(2) to assert a violation. *Id.* at 203. Movant then moved for sanctions based on violations of Rule11(b)(1) and (2). *Id.* at 202. The Court found the letter served as a safe-harbor letter *only* as to Rule 11(b)(2). *Id.* at 204.

10

KIP's Letter does not identify any subsection of Rule 11(b) KAIST allegedly violated. The Letter discusses generally "a Rule 11 basis" and gives KAIST "an informal Rule 11 assertion." (Letter at 1 and 3.) Is the Letter about an improper purpose, frivolous arguments, factual contentions, or denials of factual contentions? The Letter does not say, and KAIST was never on notice. The Motion fails as a matter of law because the Letter did not actually or substantially comply with the requirement to identify the nature of the alleged violation.

### c. The Letter is not a warning shot because it made three arguments in support of sanctions, but the actual Motion contained only one.

Under the substantial compliance doctrine, "the grounds raised must match from letter to motion." *Novoselsky*, 324 F.R.D. at 204. Here, the Letter discussed three arguments, two of which did not make it into the actual Motion. (Discussed further below.) The Letter was required to describe the specific conduct that allegedly violated Rule 11(b), but, on top of not identifying which subsection was violated, the Letter contained conduct that (as KIP itself presumably realized too late) did not in fact violate Rule 11(b). The substantial compliance theory "allow[s] a party to obtain sanctions if he has reasonably put the offending party on notice that his filing is being challenged as violative of Rule 11(b), *including the general reasons therefor*." *Novoselsky*, 324 F.R.D. at 204 (citing *N. Ill. Telecom*, 850 F.3d at 887) (emphasis added). Here KIP threw arguments at the wall in the Letter: only one stuck and made it into the Motion. This Court should not allow litigants to send a safe-harbor letter that is a laundry list of alleged violations of Rule 11 from which the movant can pick and choose later. A party is not on notice of a motion for sanctions if it must figure out which part of a safe-harbor letter is serious and which part is frivolous. The Letter here

11

was not substantially compliant because its content was deceiving as to what the Motion would be.

**d.  The structure and "substance" of the Letter show how careless, cavalier, and inconsiderate KIP was with its Motion.**

The eleven-paragraph Letter, devoid of any case law, citation to the record, or citation to new unsubstantiated facts, led to a nine-page Motion. The structure of the Letter helps understand how it fails as a Rule 11 safe-harbor notice:

- ¶ 1: General request for corrective action.

- ¶ 2: Statement that Mr. Choi Seong-yul testified to the Korean National Assembly during a hearing on a candidacy of Lee Jong-ho for minister.

- ¶¶ 3–4: Arguments based on allegations already known before Choi's testimony.

- ¶¶ 5–6: Allegation that Choi in his testimony agreed with Paragraphs 3 and 4, and he expressed concerns about this Action.

- ¶¶ 7–8: Argument that KAIST's translation "is fatally incorrect" and thus a claim has no "basis in fact or law."

- ¶ 9: Argument that KAIST's causes of action are not "based in fact or law" because of arbitration clauses that have been "fully briefed."

- ¶¶ 10–11: Invitation to act.

### i. KIP left two untenable arguments behind.

Again, KIP decided to knock out two of the Letter's arguments and not include them in the Motion. First, Paragraphs 7 and 8 center on KIP's allegation that KAIST's translation is "fatally incorrect." But the challenged "flawed translation" is in fact the translation that KIP itself submitted to the Court in support of its first motion to dismiss. (ECF No. 29-3

12

at 6.) KIP mistakenly challenged its own translation in the Letter. Whether KIP decided the argument was weak or KIP realized it was attacking its own translation, KIP abandoned the argument. Paragraphs 7 and 8 would not have existed and consumed the parties' time if KIP had verified its factual contentions had evidentiary support.

Second, Paragraph 9 declares in one sentence that arguments fully briefed in front of this Court (about arbitration clauses that do not contain mandatory language) are in fact so clear cut that KAIST should lose and be sanctioned. At the time of the Letter, the only briefing on the matter was in the memorandum in support of KIP's motion to dismiss the original complaint, to which KAIST had not responded because KAIST filed an amended complaint. Thus, KIP intended "fully briefed" to mean "briefed by one party only." It is unclear to KAIST how this two-sentence because-I-said-so paragraph belongs in a safe-harbor letter. KIP ultimately realized the folly of this ipse dixit argument and abandoned the argument in its Motion.

### ii.  A surprise witness with no foundation cannot justify sanctions.

KIP's biased interpretation of an incomplete excerpt from testimony by a KAIST employee is no basis for sanctions. After KIP left three paragraphs and two arguments behind, the Court is left for substance with two paragraphs about contractual language (with no direct or indirect reference to Rule 11, and no legal authority) and three paragraphs about Mr. Choi.

KIP tells us: (1) Choi is president of KAIST Technology Creation Institute (presumably a subdivision of KAIST); (2) he gave testimony under oath to the Korean National Assembly; and (3) the testimony was part of a televised hearing on Mr. Lee

Jong-ho's candidacy for Minister of Science and ICT in South Korea. KIP did not provide with its Letter an audio or video recording of any part of the hearing, or a transcript—let alone an English translation thereof.

On June 10, KAIST requested from KIP the transcript of the hearing and its certified translation. (Manna Decl. Ex. E.). On June 13, seventeen days after KIP's purported 21-day notice, KIP provided only selected portions of the transcript with their translations (the "Excerpts") via email. (*Id.* Exs. E, F.) The document was identical to the document submitted by KIP to the Court in support of its Motion, (*see id.* Ex. F; ECF No. 53-1), which shows that KIP either doesn't have the full transcript or is deliberately withholding it.

The Excerpts were of no use to KAIST and are of no use to the Court.

First, the Excerpts present twelve minutes of combined portions of a hearing that lasted at least five hours and fifty minutes. The Excerpts do not identify who is speaking next to the words spoken, and even with the best intentions and inferences, it is often impossible to know with certainty who is speaking at a given moment. Some speakers are never identified.

Second, KIP has not indicated whether any other portion of the hearing is related to this Action. It may have been the case: for example, it seems that, at 05:44:42 of the Excerpts, Paulina (a defendant in this Action) is a name familiar to the hearing's attendees, so one may infer that Paulina was mentioned before. But what was said? What else was said in relation to this Action? KIP doesn't say, or show. KIP did not submit a declaration that no other part of the hearing relates to the Action and it is impossible to know without the full transcript.

Third, KIP tells us in the Letter that Choi was under oath but omits the part of the hearing where this allegedly happened. The transcript says: "The witnesses did not show up today, so we will go directly to interrogate the witnesses without taking oaths of the witnesses," (Excerpts at 05:13:31), suggesting KIP is incorrect. It appears Choi was not under any oath, let alone testifying under penalty of perjury under the laws of the United States of America. There is no indication KIP attempted to get a 28 U.S. Code § 1746 statement from Choi to supplement off-the-cuff remarks in a hearing on an unrelated topic, even though the hearing took place on May 3 and KIP sent the Letter on May 27. The Excerpts do not contain any date for the hearing. KIP represents in the Letter that it was May 3. In fact, the certified translators do not identify what they are translating but simply provide a translation of "requested content of the provided Korean video." (Manna Decl. Ex. F. at 1.)

In view of these facts, there is no reasonable foundation for the Court to even consider the Excerpts. But even if there were, the Court should not give the Excerpts any weight because there is no evidence Choi was speaking on behalf of KAIST.

KIP could not and thus did not state directly that Choi spoke on behalf of KAIST, which should end the Court's inquiry. KIP suggested an agency relationship but failed to submit the bare minimum of evidence in support of the suggestion. The most KIP could allege in its Letter is that Choi is "the president of KAIST Technology Creation Institute" (p. 1) and "one of KAIST's highest ranking officers" (p. 2). Neither is sufficient to establish or even infer agency.

15

Additionally, Choi's testimony, even taken at face value, would bring only confusion. Choi's testimony is that KAIST now has multiple personalities: it took legal action "without KAIST knowing it." (Letter at 2.) Choi belongs to the one personality of KAIST that did not know about the Action, but according to KIP, Choi is also speaking on behalf of KAIST as a whole. In other words, KIP portrays alleged dissension within KAIST and states that one of the factions speaks for the whole to support KIP's argument. KIP cannot have its cake and eat it.

The Excerpts are so lacking in foundation, completeness, and coherence that they could not reasonably serve as notice to KAIST that its allegations were incorrect, let alone sanctionable.

### iii. Little is left after one disregards the Letter's irrelevant paragraphs.

A simplified map of the arguments in the Letter shows how bereft of meaningful content it was:

  

More than half the body of the Letter comprised arguments that were so flimsy that KIP did not include them in the Motion, in violation of the substantial compliance doctrine.

16

Half of the remainder is about the irrelevant, unauthenticated, contextless, unsworn testimony of a KAIST employee who did not speak on behalf of KAIST. What is left is two paragraphs about contractual language without any citation to legal authorities or evidentiary support. In these paragraphs, KIP argues for the dismissal of Claims I, II, IV, and V based on contractual language. In the brief in support of its motion to dismiss, KIP argued for the dismissal only of Claims I and II based on contractual language. In the Motion, Claims IV and V were back. KIP somehow decided its arguments as to Claims IV and V were insufficient to support its request for dismissal but nonetheless sufficient to obtain sanctions. This makes no sense and shows that KAIST was not on notice as to what the arguments on contractual language were going to be.

### III. The only two paragraphs of "substance" in the Letter provide no ground for sanctions.

#### a. KIP relies on its own paraphrase of unidentified translations of key contracts to seek sanctions.

The only two argument paragraphs to survive KIP's post-Letter culling are so poorly supported and internally inconsistent that there was no way they could have put KAIST on notice of a legitimate threat of sanctions. This Action arises from disputes about performance under three Korean language agreements. In briefing for and against KIP's motion to dismiss, KIP and KAIST provided separate sets of certified translations for each agreement. (KIP's are the exhibits to ECF No. 39; KAIST's are the exhibits to ECF No. 42.) Although there are two translations for each agreement at issue, KIP paraphrases the agreements in a conclusory way in one paragraph on page 2 of the Letter. Later, KIP argues by mistake (pp. 2–3) that KIP's own certified translation is "fatally incorrect" and that the mistake is "material," and KIP concludes that KAIST's allegations based on the mistake are

17

"unreasonable." So in one paragraph, KIP authoritatively paraphrases the three agreements without stating whether KIP is relying on one set of translations, the other, or both. And in a later paragraph, KIP criticizes its own translation of one agreement as materially flawed. KIP shows that the two translations are not harmonious, though it is unclear which translations it considers correct.

With only the Letter to guide it, KAIST would be at a loss to understand what conduct of KAIST is alleged to violate Rule 11. Was KIP relying on its own translation that was flawed? Was KAIST expected to guess which contractual language KIP relied upon and how it came up with its paraphrases?

A paragraph-long because-I-said-so argument based on the interpretation of unidentified contractual language is not notice of an argument for sanctions. Rather than aim a warning shot across KAIST's bow, KIP fired a blunderbuss into the air. Neither the Court nor KAIST should have to expend resources analyzing the pellet pattern to determine what KIP was aiming at.

### b. KIP's barebones argument is woefully insufficient to warn of sanctions.

Even if one took KIP's self-serving paraphrases at face value, the Letter fails to show that there was no evidentiary support for KAIST's First Amended Complaint. (Or is it no frivolous argument? Or an improper purpose? KIP does not say.)

KIP argues that the Business Agreement and the Management Agreement "limit themselves by express language to KAIST-owned intellectual property, and profit maximization thereunder." (Letter at 2.) Again, KIP does not cite to either translation of the contract. KIP paraphrases the FAC by saying that the Infringement Lawsuit at issue was

18

"solely under KIPB's United States FinFet patent (to which KAIST never, at any time, held any ownership interest)." But KAIST knew when receiving the Letter that the Infringement Lawsuit affected KAIST's Korean patent rights because funds misdirected to Paulina in relation to the Infringement Lawsuit were designated as a license fee for the Korean patent, as KAIST later argued in response to KIP's motion to dismiss. (ECF No. 42: 20–21 citing ECF No. 30 ¶ 74.) KIP was spending Korean patent funds in relation to the U.S. Patent lawsuit. (ECF No. 42: 21.) This explanation, which KAIST knew was sufficient to ignore KIP's Letter, is more fully developed where it actually belongs, i.e., in KAIST's response to KIP's motion to dismiss. (ECF No. 42: 20–22.)

The Letter threatened sanctions based on "facts" and "interpretations" derived from unsubstantiated paraphrases of unidentified translations of agreements which, even if taken at face value, were contradicted on their face by the FAC.

KAIST was fully aware of KIP's procedural failures and its untenable (and thereafter abandoned) arguments about arbitration clauses and translation mistakes. Thus, KAIST reasonably believed KIP's remaining flimsy argument on contractual language would not justify dismissal of any of KAIST's claims. Therefore, KAIST did not withdraw its FAC. But KIP still filed the Motion.

## PART TWO: THE MOTION

Even if KIP had strictly or substantially complied with Rule 11's safe harbor requirements, the Motion still fails because (1) it was filed for an improper purpose, (2) it relies on testimony that is still without foundation and irrelevant, and (3) KIP's allegations as to sanctionable statements have no merit. Rule 11 requires counsel to certify that each filing

19

advances arguments warranted by law or a nonfrivolous argument for modifying existing law. *McGreal*, 928 F.3d at 558 (citing Rule 11(b)(2)). Factual contentions also must have or be likely to have evidentiary support after further investigation. *Id.* at 558–59 (citing Rule 11(b)(3)). Both provisions are evaluated objectively. *See Thornton v. Wahl*, 787 F.2d 1151, 1154 (7th Cir. 1986). An attorney who fails to comply with these requirements may be sanctioned. *See* Rule 11(c). This Court has sound discretion to impose sanctions because their purpose is to deter baseless filings in the Court. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990); *Foreman v. Wadsworth*, 844 F.3d 620, 627 (7th Cir. 2016). Not only does KIP fail to show that KAIST failed to satisfy these standards, but the paucity of support for KIP's argument shows that KIP itself has engaged in sanctionable conduct by filing the Motion.

Additionally, this Motion does not comply with this Court's rules. Motions "must be accompanied by . . . when necessary, affidavits, declarations, or other papers." CivilL. R. 7(a)(1). For a motion for sanctions where, as here, the movant relies heavily on facts not in the record, an affidavit or declaration is necessary. KIP did not comply with this crucial requirement. This is still more sanctionable conduct from KIP, this time under the authority of the Local Rules. *See* General L. R. 83(f).

I.  **KIP improperly filed the Motion to get further briefing on its motion to dismiss without leave of court.**

The weakness of KIP's sanctions arguments shows that KIP's goal is not actually a sanctions award, but rather to improperly bolster its motion to dismiss with new facts (Choi's testimony, which turns out to be irrelevant) and new arguments that KIP did not make and should have developed in its briefing.

20

The arguments addressed and not addressed in briefing on KIP's motion to dismiss are important. Among other arguments, KIP argued that there was no breach of the Business Agreement and the Management Agreement in its opening brief. (ECF No. 39 at 16–19.) KAIST responded to each of KIP's arguments, including the argument about the Business and Management Agreements. (ECF No. 42 at 20–23.) In its reply, KIP conspicuously did not address KAIST's response regarding the breaches of the Business and Management Agreements.

KIP could have replied to KAIST's arguments about the Business and Management Agreements. KIP chose not to. Now, in a brief on a completely different motion, KIP brings back a modified and expanded version of the argument (which was hardly developed in the Letter) to get a second shot and maybe this time seize the chance to reply to KAIST's counterarguments. In its brief in support of its Motion for Sanctions, KIP does not acknowledge or address the arguments made by KAIST in its opposition to the motion to dismiss. Evidently regretful of missing its opportunity to respond to KAIST's arguments in the proper course, KIP is again teeing up the breach issue so that KAIST must again respond, giving KIP a *fourth* opportunity to address the issue in reply.

This perversion of the sanctions process in order to further brief a motion to dismiss is completely inappropriate and must not be permitted.

## II.    Mr. Choi returns, with a new title and not much else.

In the Letter KIP argued that Choi's admissions to members of the National Assembly of Korea provided grounds to seek sanctions. KAIST set forth above all the reasons why the Court should not consider Choi's testimony: it is irrelevant, unauthenticated,

unauthorized, contextless, and unsworn. All these reasons remain true with the Motion, except for one detail: while KIP vaguely suggested Choi spoke on behalf of KAIST in the Letter, in the Motion, KIP gives Choi a new title: "principal." First, KIP alleges that Choi is "the foreign principal" of KAIST. (ECF No. 53: 1.) Second, KIP describes Choi as "Plaintiff's principal," clearly meaning that KAIST has only one principal. (*Id.* 4.) What KIP means by this term is unclear. KIP uses the vague term "principal" to suggest Choi spoke on behalf KAIST, but KIP never states as much or explains what it means to be the "principal" of a state university. KIP further vaguely suggests that KAIST is "under management" of Choi. Again, no job title or any other evidence suggests as much. While Choi was an employee of KAIST at the time of the hearing, there is no evidence that he was authorized to speak on behalf of KAIST. The Excerpts do not suggest he was speaking on behalf of KAIST nor did he state at any point that he was speaking for KAIST. Nor is there any evidence that KAIST was under Choi's management, which is completely inconsistent with KIP's assertion in the Letter that Choi was merely president of KAIST's "Technology Creation Institute," not the entire university. (Letter at 1.) Finally, KIP itself undermines the Choi's credibility by stating he was "feigning shock" in front of the assembly. (ECF No. 53 at 4.)

If the Court considers Choi's testimony at all and KIP's argument based upon that testimony, it should only be as proof of the lack of seriousness of KIP's Motion. The Motion is so tethered to Choi's irrelevant and inadmissible testimony that there is no reasonable basis upon which the Motion can succeed.

III.    **KIP rehashes its false claim that the Infringement Lawsuit was not related to KAIST's rights.**

KIP's core argument is that KAIST does not own the U.S. Patent and therefore KIP Co., Ltd. did not have an obligation to discuss the Infringement Lawsuit with KAIST because the suit related to the U.S. Patent. Further blurring the lines between motion to dismiss and motion for sanctions, KIP cites not to the record or to the FAC but rather to KIP's own brief in support of its motion to dismiss to state the "purpose of the Business Agreement" and the fact that it imposes "no whatsoever [sic] obligations on KIP . . ." (ECF No. 53 at 5 citing to ECF No. 39 at 18.)

KIP first alleges that KIP Co., Ltd. could not have breached the Business Agreement because the Business Agreement applies only to profit generation through intellectual property owned by KAIST, and KAIST does not own the U.S. Patent. KIP knows very well that KAIST explained in its opposition to KIP's motion to dismiss that its rights to the Korean Patent are affected by KIP Co., Ltd.'s conduct in breach of the Business Agreement. KIP Co., Ltd. misdirected Korean Patent-generated profits in connection with the U.S. Patent-related Infringement Lawsuit, creating a clear nexus between the Infringement Lawsuit and the Business Agreement. (ECF No. 42 at 20–22.) KIP had a chance to dispute this assertion in its reply but decided not to. KIP now hopes to correct its mistake through unauthorized, supplemental briefing. KIP has lost all credibility by engaging in this procedural stunt.

KIP's second allegation is new in that it did not appear in KIP's briefing on the motion to dismiss. KIP alleges KIPB could not have breached the Management Agreement because the Management Agreement applies only to profit generation through intellectual

23

property owned by KAIST, and KAIST does not own the U.S. Patent. Here, KIP claims that KIP Co., Ltd. or P&IB must seek KAIST's approval before "specific activities to generate profit *such as* transferring technologies based on the intellectual properties owned by KAIST *such as* its parents . . . ." (quoting KIP's translation of the agreement) (emphasis added). The use of "such as" twice means that KAIST-owned patents are but one example of transferring technology which itself is but one example of "specific activities to generate profits." Yet KIP claims that there can be no obligation in connection with a patent KAIST does not own, simply contradicting the language of the contract under which a KAIST-owned patent is but an example of an example of relevant activity. Moreover, KIP is again ignoring that KAIST's profits generated by its Korean Patent are affected by the litigation related to the U.S. Patent.

KIP did not make this specific argument as to the Management Agreement at all in briefing its motion to dismiss but for some reason thinks it appropriate to raise it in a motion for sanctions. There are no extenuating circumstances—no newly discovered facts or changes in the law—that would justify KIP raising a new dismissal argument after briefing on its motion to dismiss is complete. KIP's omission of this argument from its original dismissal arguments shows that the argument neither supports dismissal nor sanctions.

## IV. KIP should pay KAIST's attorney fees incurred responding to KIP's frivolous sanctions motion.

Given that KIP's Motion is both procedurally deficient and lacks any reasonable basis for an award of sanctions, KAIST strongly considered serving a Rule 11(c) motion on KIP in response. KIP has wasted KAIST's time and money after already engaging in the misconduct described in the First Amended Complaint, and now KIP is wasting the Court's

limited time ruling on the Motion. Rather than burden the Court with yet another motion and more briefing, however, KAIST simply asks to be reimbursed for the cost of responding to the Motion under Rule 11(c)(2).

Rule 11(c)(2) states that "[i]f warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion." Fed. R. Civ. P. 11(c)(2). This provision obviates the need for another Rule 11 motion based on the first; as the Advisory Committee has explained, "service of a cross motion under Rule 11 should rarely be needed since under the [1993] revision the court may award to the person who prevails on a motion under Rule 11—whether the movant or the target of the motion— reasonable expenses, including attorney's fees, incurred in presenting or opposing the motion." Fed. R. Civ. P. 11 advisory committee's note.

As discussed above, KIP's Motion is a thinly veiled third brief in support of its motion to dismiss, which violates Rule 11's prohibition on filings submitted for an improper purpose. *See* Fed. R. Civ. P. 11(b)(1). KIP's sole factual support for its Motion is a nearly unintelligible, incomplete transcript to which KIP ascribes significance unwarranted by the testimony therein. KIP makes up titles for Choi and argues as if he were speaking for KAIST, when there is no evidence to suggest he was testifying on anyone's behalf but his own. We do not have Choi's full testimony, but even the cherry-picked portions submitted by KIP do not remotely justify sanctions. As with its poor effort to follow Rule 11 procedure, KIP's failure to support its Motion with meaningful evidence shows how unserious KIP is about the sanctions process. KIP's disregard for the gravity of a sanctions request and for the Court's and KAIST's time warrants an award of fees and costs.

25

## CONCLUSION

It is disappointing that KIP has forced KAIST and the Court to waste time on this Motion. Beginning with a letter in which it criticized its own translation and concluding with a meritless motion, KIP has failed at every step to make even a prima facie case for sanctions. Accordingly, KAIST respectfully requests that the Court deny KIP's Motion and award KAIST its fees and costs associated with responding.

Dated this 4th day of October 2022.

GASS TUREK LLC

*s/Daniel A. Manna*
Daniel A. Manna, SBN 1071827
Jerome C. Mohsen, SBN 1097525
241 N. Broadway, Suite 300
Milwaukee, Wisconsin 53202
Tel: 414-223-3300
Fax: 414-224-6116
manna@gassturek.com
mohsen@gassturek.com

*Attorneys for Plaintiff Korea Advanced Institute*
*Of Science and Technology*

26