# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**KOREA ADVANCED INSTITUTE OF
SCIENCE AND TECHNOLOGY,**

           **Plaintiff,**

      **v.**                           **Case No. 22-CV-317**

**KIP CO., LTD.,
P&IB CO., LTD.,
IN GYOO KANG,
KIPB LLC,
PAULINA FUNDINGCO, LLC, AND
U.S. BANK NATIONAL ASSOCIATION,**

           **Defendants.**

---

# DECISION AND ORDER

---

       Plaintiff Korea Advanced Institute of Science and Technology (KAIST) originally filed this lawsuit in Wisconsin state court against defendants KIP Co., Ltd. (KIP), P&IB Co., Ltd. (P&IB), P&IB's Chief Executive Officer, In Gyoo Kang (Kang), KIPB LLC (KIPB), Paulina FundingCo, LLC (Paulina), and U.S. Bank National Association (U.S. Bank). (ECF No. 1-1.) Defendant Paulina removed the action to this court (ECF No. 1) and, shortly thereafter, Paulina and U.S. Bank filed a joint motion to dismiss pursuant to Federal Rule

of Civil Procedure 12(b)(6) (ECF No. 26). On the same day, defendants KIP, P&IB, Kang, and KIPB (collectively, "KIP defendants" or "KIP") filed their own joint motion to dismiss under the doctrine of *forum non conveniens* and Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (ECF No. 28.)

KAIST responded to the defendants' motions to dismiss by filing an Amended Complaint. (ECF No. 30.) The next day this court dismissed the defendants' motions to dismiss as moot. (ECF No. 31.) Approximately two months later the defendants filed motions to dismiss KAIST's Amended Complaint. (ECF Nos. 34, 36, 38.) This time around, Paulina and U.S. Bank filed separate motions to dismiss (ECF Nos. 34, 36), and the KIP defendants again filed a joint motion to dismiss (ECF No. 38). Those motions are fully briefed and ready for resolution. All parties have consented to the jurisdiction of a magistrate judge. (ECF Nos. 9, 12, 14, 18.)

## 1. Background

Because this matter is before the court on the defendants' motions to dismiss, much of the information in this section comes directly from KAIST's Amended Complaint, the allegations in which the court accepts as true. *Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir. 1995). Because several claims in KAIST's Amended Complaint center on the terms of three Korean-language contracts between the parties, some of the information comes from the parties' translations of those agreements. *See Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018) ("It is 'well-settled in this circuit that

documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim.'" (quoting *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002))).

KAIST is a national research university whose campus and principal place of business is in the Republic of Korea. (ECF No. 30 at 2, ¶ 5.) KAIST owns a Korean patent for a fin field-effect transistor (FinFET), a piece of technology relied on by large tech companies for manufacturing their consumer electronic products. (ECF No. 30 at 4, ¶¶ 16-17.) In 2012 Defendant P&IB, a Korean corporation, and KAIST formed KIP, also a Korean corporation, with the intention of generating revenue through KAIST's intellectual property. (ECF No. 30 at 4-5; ¶¶ 19-20.) Defendant In Gyoo Kang is the Chief Executive Officer of P&IB. (ECF No. 30 at 3, ¶ 8.) He also resides in the Republic of Korea. (ECF No. 30 at 3, ¶ 8.)

Between July 2012 and October 2019 KAIST entered into three Korean-language agreements with various of the KIP defendants in relation to KAIST's intellectual property. (ECF No. 30 at 5, 6, 7; ¶¶ 20, 30-31, 37.) The KIP defendants filed and served copies of the agreements along with certified translations as exhibits A, B, and C to their brief in support of their motion to dismiss. (ECF Nos. 39-1, 39-2, 39-3.) KAIST obtained its own certified translations prior to filing this lawsuit and included those translations as attachments to its brief opposing the KIP defendants' motion to dismiss. (ECF Nos. 42-1, 42-2, 42-3.)

KAIST and KIP both relied on KIP's translations of the arbitration provisions at issue, and KAIST suggests that the parties' translations of the arbitration provisions are "substantially similar." (ECF No. 42 at 10.) The parties have not pointed to any material differences in their respective translations of the other provisions, nor have they argued for use of one translation over the other. As such, where KAIST's Amended Complaint uses KAIST's translations of certain provisions, the court also uses KAIST's translations; where the parties' briefs rely on KIP's translations of certain provisions, the court relies on KIP's translations.

On July 2, 2012, KAIST and KIP entered into a Business Agreement under which KIP was to "actively utilize the grant of exclusive license or assignment of rights from KAIST to focus the efforts on generating the maximum revenue possible" from KAIST's intellectual property. (ECF Nos. 30 at 5, ¶ 20.) Article 6 of the Business Agreement required KIP to "perform in good faith on each task[] defined in this agreement, and focus the efforts on completing the tasks as quickly as possible." (ECF Nos. 30 at 5, ¶ 21.) Under Article 9 KIP and KAIST agreed that "[m]atters not stated in this agreement shall be discussed mutually by KAIST and [KIP] under the intention of accomplishing the purpose of this agreement to find the solution." (ECF Nos. 30 at 5, ¶ 22.) And Article 14 states: "In the event of a dispute over the contents of this Agreement, it shall be finally resolved by arbitration in accordance with the arbitration rules of the Korea Commercial Arbitration Board." (ECF No. 39-1 at 6, art. 14.)

4

In 2016 KIP organized subsidiary KIPB, a Texas LLC, which KIP wholly owns. (ECF No. 30 at 3, ¶ 9; 5, ¶ 24.) The owner of the U.S. FinFET patent,[1] Jong-Ho Lee, assigned his rights to the U.S. FinFET patent to KIPB. (ECF No. 30 at 5, ¶ 24.) On July 29, 2016, KIPB and Paulina executed a "Purchase Agreement" pursuant to which Paulina would provide up to $6,000,000 in funding for "Patent Litigation" and receive a 350% return on the investment ($21 million) if the Patent Litigation was successful. (ECF No. 30 at 9, ¶¶ 43-44.) KIPB proceeded to sue several Samsung corporate entities, Global Foundries U.S. Inc., and Qualcomm Inc. in the U.S. District Court for the Eastern District of Texas for infringement of the U.S. patent held by KIPB (the "Infringement Lawsuit"). (ECF No. 30 at 5, ¶ 25.) After a jury trial and post-judgment motions, the court entered a $203,003,416 judgment for KIPB on February 19, 2020. (ECF No. 30 at 6, ¶¶ 26-28.)

While the U.S. FinFET patent litigation was still pending, KAIST, KIP, and P&IB formalized how they would share revenue from the use of FinFET technology through two separate agreements, which were both executed on October 2, 2019. (ECF No. 30 at 6, ¶¶ 29, 30.) First, P&IB and KAIST entered into a "Basic Management Agreement for

---

[1] Apart from explaining that Jong-Ho Lee assigned his rights to the U.S. patent to KIPB, which subsequently sued Samsung and others for infringement of the U.S. patent in the United States District Court for the Eastern District of Texas, the Amended Complaint does not provide any further detail about the U.S. patent. KIP's brief in support of its motion to dismiss, however, provides some additional context:

> Because KAIST explicitly forwent assisting Jong-Ho Lee, the inventor of FinFET technology, in prosecuting the U.S. Patent for the technology …, Lee independently prosecuted the U.S. Patent, initially secured the ownership of it, and subsequently assigned all of the rights in the patent to KIPB…. Thus, KIPB owns the U.S. Patent.

(ECF No. 39 at 8-9.)

Management of KIP Co., Ltd." (the "Management Agreement"), which required that KIP consult KAIST before sharing revenue related to KAIST's intellectual property. (ECF No. 30 at 6, ¶¶ 31, 32.) The agreement also specified that KIP was to share revenue generated by KAIST's intellectual property as soon as profits were realized. (ECF No. 30 at 7, ¶ 34.)

Under Article 6 of the Management Agreement, KIP was to obtain, without being prompted or requested to do so, KAIST's informed consent and approval before proceeding with any revenue generating activity. (ECF No. 30 at 7, ¶ 35.) Article 11 of the Management Agreement contains the following provision:

> In the event that any dispute arises between the parties to the agreement related to the performance of the duties stipulated under this agreement, violation of this agreement, and so on, the parties shall try to resolve such a dispute smoothly based on mutual agreement first, and any issues that still remain to be resolved shall be resolved based on the arbitration of Korea Commercial Arbitration Board.

(ECF No. 39-2 at 10, art. 11.) Article 10 of the Management Agreement provided that a separate revenue sharing agreement concerning the current U.S. FinFET patent litigation would be prepared by the parties. (ECF Nos. 30 at 7-8; ¶¶ 36-38.)

The same day, KAIST, KIP, and KIPB executed a "Revenue Sharing Agreement," which required KIP and KIPB (referred to collectively in the Revenue Sharing Agreement as "KIP") to "deposit in cash on (sic) the amount for revenue sharing to KAIST through the KAIST bank account … within thirty (30) days from receiving the revenue amount from the licensee." (ECF Nos. 30 at 8, ¶ 39.) The Revenue Sharing Agreement contains no clause addressing arbitration, jurisdiction, or venue. (ECF No. 39-3.)

In late 2020 KAIST learned that KIP, through KIPB, had signed the Purchase Agreement with Paulina without consulting KAIST. (ECF No. 30 at 9, ¶¶ 43-44.) KAIST further learned that KIP had already paid Paulina millions of dollars under the Purchase Agreement without consulting KAIST (ECF No. 30 at 10, ¶¶ 48-50), and that Paulina had filed an arbitration demand against KIP, KIPB, Jong-Ho Lee, and P&IB with the International Centre for Dispute Resolution, claiming KIP breached the Purchase Agreement (the "Paulina Arbitration") (ECF No. 30 at 9, ¶ 45). The Paulina Arbitration is still pending. (ECF No. 30 at 10, ¶ 51.)

On September 8, 2020, an emergency arbitrator ordered that KIP place proceeds from the Infringement Lawsuit in a trust account pending the end of the Paulina Arbitration. (ECF No. 30 at 9, ¶ 47.) The parties to the arbitration chose a Milwaukee branch of U.S. Bank to create and manage the Trust Account. (ECF No. 30 at 10, ¶ 48.) At the time KAIST filed its Amended Complaint, more than 20 million dollars from the Infringement Lawsuit were in the Trust Account. (ECF No. 30 at 9-10; ¶¶ 47-49.) KAIST alleges that the KIP defendants' interactions with Paulina, payments to Paulina, and failure to consult with KAIST regarding those interactions and payments were and are in breach of the Business, Management, and Revenue Sharing Agreements. (ECF No. 30 at 11-15; ¶¶ 56-83.)

On April 20, 2022, KAIST filed its Amended Complaint against the Defendants. (ECF No. 30.) The Amended Complaint contains five causes of action against the KIP

defendants: Breach of Business Agreement (Count I), Breach of Management Agreement (Count II), Breach of Revenue Sharing Agreement (Count III), Breach of Duty of Good Faith and Fair Dealing (Count IV), and Breach of Fiduciary Duty (Count V). (ECF No. 30 at 11-15; ¶¶ 56-83.) In addition, the Amended Complaint contains two causes of action against Paulina: Unjust Enrichment (Count VI) and Tortious Interference with the Performance of a Contract (Count VII). (ECF No. 30 at 11-15; ¶¶ 84-98.) The Amended Complaint does not state an independent cause of action against U.S. Bank. It does, however, seek a declaration that KAIST is entitled to access and control over any Infringement Lawsuit funds in the Trust Account in U.S. Bank's Milwaukee branch, as well as a permanent injunction preventing U.S. Bank from distributing any such funds until "KAIST has collected its judgment in this action." (ECF No. 30 at 17, ¶¶ A, B.) Because its requests for declaratory relief and a permanent injunction require action or inaction from U.S. Bank, KAIST claims U.S. Bank is a proper defendant to this lawsuit. (ECF No. 44 at 1, 5.)

**2. Defendants KIP, P&IB, Kang, and KIPB's Motion to Dismiss the Amended Complaint**

Defendants KIP, P&IB, Kang, and KIPB (hereinafter "KIP") ask the court to dismiss Counts I through V of KAIST's Amended Complaint on grounds of *forum non conveniens*. KIP also asks that the court, in the alternative, dismiss Counts I and II for failure to state a claim.

### 2.1. Standard

Where a forum selection clause points to a particular federal district for dispute resolution, the proper way for a district court to enforce the clause is through a motion to transfer under 28 U.S.C. § 1404(a). *See Hupy & Abraham, S.C. v. Quintessa LLC*, No. 21-CV-577, 2021 U.S. Dist. LEXIS 223633, at *7 (E.D. Wis. Nov. 19, 2021) (citing *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W.D. of Tex.*, 571 U.S. 49, 59-60 (2013)). However, if a forum selection clause points to a particular nonfederal or foreign forum, the district court should conduct a *forum non conveniens* analysis to determine if dismissal is warranted. *See id.* at *7-8 (citing *Atl. Marine*, 571 U.S. at 60-61). An arbitration clause that specifies a particular forum for dispute resolution "is a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974).

A district court may dismiss a case on grounds of *forum non conveniens* "if there are strong reasons for believing it should be litigated in the courts of another, normally a foreign, jurisdiction." *Abad v. Bayer Corp.*, 563 F.3d 663, 665 (7th Cir. 2009) (first citing *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 429-30 (2007); and then citing *In re Factor VIII or IX Concentrate Blood Prods. Litig.*, 484 F.3d 951, 954-56 (7th Cir. 2007)). "Dismissal for *forum non conveniens* reflects a court's assessment of a range of considerations, most notably the convenience to the parties and the practical difficulties

9

that can attend the adjudication of a dispute in a certain locality." *Sinochem*, 549 U.S. at 429 (citing *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 723 (1996)).

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A claim satisfies this pleading standard when its factual allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56. The court accepts "all well-pleaded facts as true and constru[es] all inferences in favor of the plaintiffs." *Gruber v. Creditors' Prot. Serv., Inc.*, 742 F.3d 271, 274 (7th Cir. 2014).

Federal Rule of Civil Procedure 10(c) provides that "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." Fed. R. Civ. P. 10(c). In addition, "[d]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss." *Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994); *see also Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018). "This rule is a liberal one—especially where the plaintiff does not contest the validity or authenticity of the

extraneous materials." *Mueller*, 880 F.3d at 895 (citing *Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009)).

### 2.2. Analysis

KIP argues that Counts I through V of KAIST's Amended Complaint should be dismissed under the doctrine of *forum non conveniens* because those five counts are each grounded on contractual agreements with mandatory arbitration provisions designating the Korea Commercial Arbitration Board (KCAB) as the exclusive forum for dispute resolution. (ECF No. 39 at 13-21.) Acknowledging that the Revenue Sharing Agreement does not contain an arbitration clause, KIP argues that the Management Agreement incorporates the Revenue Sharing Agreement by reference (or vice versa), and thus the Management Agreement's arbitration clause also applies to disputes under the Revenue Sharing Agreement. (ECF No. 39 at 15-17.) KIP also argues that holding dispute resolutions outside of Korea would cause significant inconvenience to the Korea-based parties and that the public interest factors weigh in favor of resolving the contractual disputes in Korea, not Wisconsin. (ECF No. 39 at 19.)

In response, KAIST argues that the arbitration clauses in the Business and Management Agreements "are not mandatory because they do not specify venue or forum" and do not use exclusive language. (ECF No. 42 at 9-12.) KAIST also argues that, in the event this court finds the Management Agreement's arbitration clause mandatory, the Management Agreement does not expressly incorporate the Revenue Sharing

Agreement by reference (or vice versa), and therefore the Management Agreement's arbitration clause does not apply to disputes under the Revenue Sharing Agreement. (ECF No. 42 at 14-17.) Finally, KAIST argues that the private and public interest factors weigh in favor of keeping its case in this court. (ECF No. 42 at 17-20.)

With these arguments in mind, the court turns to the three agreements under which KAIST's claims against KIP arise.

### 2.2.1.  The Business Agreement

Count I of the Amended Complaint alleges that KIP breached certain duties owed to KAIST under the terms of their Business Agreement. (ECF No. 30 at 11, ¶¶ 56-61.) Count IV alleges that KIP and P&IB breached their duties of good faith and fair dealing owed to KAIST under the Business Agreement (as well as under the Management and Revenue Sharing Agreements). (ECF No. 30 at 14, ¶¶ 76-79.) KIP argues that, because the parties agreed to resolve any disputes arising under the Business Agreement by arbitration before the KCAB, this court should dismiss those counts under the doctrine of *forum non conveniens*. (ECF No. 39 at 14-15.) KAIST responds by arguing that the Business Agreement's arbitration clause is permissive and does not mandate dismissal of its claims arising under the Business Agreement. (ECF No. 42 at 12-13.)

"An agreement to arbitrate is a type of forum selection clause." *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 773 (7th Cir. 2014). "[W]here venue is specified [in a forum selection clause] with mandatory or obligatory language, the clause will be enforced;

where only jurisdiction is specified, the clause will generally not be enforced unless there is some further language indicating the parties' intent to make venue exclusive." *Paper Express, Ltd. v. Pfankuch Maschinen GmbH*, 972 F.2d 753, 757 (7th Cir. 1992) (citing *Docksider, Ltd. v. Sea Tech., Ltd.*, 875 F.2d 762, 764 (9th Cir. 1989)).

The Business Agreement's Article 14 reads in relevant part: "In the event of a dispute over the contents of this Agreement, it shall be finally resolved by arbitration in accordance with the arbitration rules of the Korea Commercial Arbitration Board." (ECF No. 39-1 at 6, art. 14.)

KAIST argues that the forum selection clause found permissive in *Adgate v. Chip Shoppe, Inc.*, No. 13-cv-163, 2013 WL 6981451 (E.D. Wis. May 10, 2013), uses "identical language" to the Business Agreement's Article 14. (ECF No. 42 at 13.) On that basis, it argues that this court should find that Article 14 is also permissive. (ECF No. 42 at 13.) But KAIST did not compare Article 14 to the forum selection clause from *Adgate*; KAIST compared Article 14 to the choice-of-law clause in that contract. (ECF No. 42 at 13.)

In *Adgate*, the forum selection clause read: "By entering into this Agreement, Employer/Contractor expressly agrees to the jurisdiction of federal and state courts in Minnesota to adjudicate any dispute hereunder." *Adgate*, 2013 WL 6981451, at *1. The *Adgate* court found the clause permissive because it did "not contain mandatory language indicating an intent to make Minnesota the exclusive forum," nor did it "designate a particular court within the State of Minnesota." *Id.* at *8.

Case 2:22-cv-00317-WED   Filed 10/07/22   Page 13 of 37   Document 56

There are two crucial differences between the Business Agreement's Article 14 and the forum selection clause analyzed in *Adgate*. First, unlike the clause in *Adgate*, Article 14 uses mandatory language: "In the event of a dispute over the contents of this Agreement, [the dispute] *shall* be finally resolved by arbitration …." (ECF No. 39-1 at 6, art. 14 (emphasis added).) And, second, Article 14 provides a specific venue for dispute resolution, the KCAB. (ECF No. 39-1 at 6, art. 14.)

KAIST also argues that "arbitration in accordance with the arbitration rules of the Korea Commercial Arbitration Board" (ECF No. 39-1 at 6) "means consent to the use of the rules" and "does not mean the KCAB itself will facilitate the arbitration" (ECF No. 42 at 12). This argument ignores Article 14's express requirement that disputes under the Business Agreement are to be resolved by arbitration. Even if Article 14 did not require that the arbitration be facilitated by the KCAB, it clearly requires that any disputes be resolved by arbitration, not in court.

But, in fact, the parties *did* agree to arbitrate their disputes before the KCAB. *Paper Express* is instructive on this point. The forum selection clause at issue there read in pertinent part: "Warranty: 6 months *according to the rules of VDMA and ZVEI.*" *Paper Express*, 972 F.2d at 754 (emphasis added). The court explained that "[t]he VDMA … is an association of German machine manufacturers that promulgates a set of standard commercial terms[;] [and] [a]ccording to the rules of the VDMA, the supplier's principal place of business is the forum for resolving all contractual disputes." *Id.* Interpreting the

provision's language "according to the rules of the VDMA and ZVEI," the court concluded that "[t]he only meaningful reason for including the provision … was to incorporate the VDMA rules, including the VDMA venue provision [designating the supplier's principal place of business as the forum for resolving all contractual disputes]." *Id.* at 754. Thus, in affirming the district court's dismissal of the case for improper venue, the Seventh Circuit held that the venue provision renders the forum selection clause mandatory. *Id.* at 756.

As in *Paper Express*, in Article 14 KAIST and KIP agreed to resolve disputes arising under the Business Agreement "in accordance with the arbitration rules of the K[CAB]." (ECF No. 39-1 at 6, art. 14.) And like the VDMA, the KCAB defines what agreeing to its rules means and requires. (ECF No. 50-1.) The KCAB provides several sets of arbitral rules, applicable under different circumstances. (ECF No. 50 at 7 (citing ECF No. 50-1 at 2, ¶¶ 5-6).) Under circumstances where both parties do business in Korea and they contractually agree to arbitrate their disputes in accordance with the arbitration rules of the KCAB, the domestic arbitration rules (the "DARs") apply. (ECF No. 50 at 7 (citing ECF No. 50-1 at 2, ¶¶ 6-7).) And the DARs provide that the KCAB is the required arbitral body under the KCAB's rules. (ECF No. 50 at 7-9 (citing ECF No. 50-1 at 1-2, 9-10; ¶¶ 4-6, arts. 4-5).) Thus, by consenting to resolve disputes arising under the Business Agreement "in accordance with the arbitration rules of the K[CAB]," KAIST and KIP agreed to resolve such disputes before the KCAB.

In sum, the Business Agreement's Article 14 is a mandatory arbitration clause for two reasons. First, the clause uses the mandatory "shall" when directing the parties to arbitrate disputes according to the rules of the KCAB. And the KCAB is the mandatory venue for dispute resolution under the KCAB's rules. Article 14 mandates that all disputes arising under the Business Agreement be arbitrated before the KCAB.

### 2.2.2. The Management Agreement

Count II of KAIST's First Amended Complaint alleges that P&IB breached certain duties owed to KAIST under the terms of their Management Agreement. (ECF No. 30 at 12.) Additionally, Count IV alleges that KIP and P&IB breached their duties of good faith and fair dealing owed to KAIST under the Management Agreement (as well as under the Business and Revenue Sharing Agreements). (ECF No. 30 at 14, ¶¶ 76-79.) KIP argues that, like the Business Agreement, the Management Agreement has a mandatory arbitration clause designating the KCAB as the exclusive venue for dispute resolution. Therefore, KAIST's claims arising under the Management Agreement should be dismissed under the doctrine of *forum non conveniens*. (ECF No. 39 at 14, 15-19.)

The Management Agreement's Article 11 provides:

In the event that any dispute arises between the parties to the agreement related to the performance of the duties stipulated under this agreement, violation of this agreement, and so on, the parties shall try to resolve such a dispute smoothly based on mutual agreement first, and any issues that still remain to be resolved shall be resolved based on the arbitration of Korea Commercial Arbitration Board.

(ECF No. 39-2 at 10, art. 11.).

KAIST argues that the Management Agreement's Article 11 is a permissive arbitration clause because, by its terms, "the parties do not consent to the exclusive venue or jurisdiction of the K[CAB]." (ECF No. 42 at 11.) KAIST compares Article 11 to forum selection clauses that other federal courts have found permissive. (ECF No. 42 at 11-12 (citing for comparison *K & V Sci. Co. v. Bayerische Motoren Werke Aktiengesellschaft*, 314 F.3d 494, 500 (10th Cir. 2002) (finding the forum selection clause at issue permissive because it provided that the parties consented only to a potential *jurisdiction* for dispute resolution); *John Boutouri Son, Wines & Spirits, S.A. v. Attiki Imp. & Distrib. Inc.*, 22 F.3d 51, 53 (2d Cir. 1994) (same); *Pace Props., LLC v. Excelsior Const., Inc.*, No. 08cv354, 2008 WL 4938412, at *3 (N.D. Fla. Nov. 18, 2008) (same); *Beckley v. Auto Profit Masters, L.L.C.*, 266 F. Supp. 2d 1001, 1004 (S.D. Iowa 2003) (same)).)

But the forum selection clauses in those cases provided that the parties agreed that certain jurisdictions would be appropriate for dispute resolution; they did not specify exclusive forums. *See generally* Charles Alan Wright, et al., 14D Federal Practice and Procedure § 3803.1 (4th ed. Nov. 2018 update) ("Permissive forum selection clauses, often described as 'consent to jurisdiction' clauses, authorize jurisdiction and venue in a designated forum, but do not prohibit litigation elsewhere."). The Management Agreement's Article 11 uses the mandatory "shall" in conjunction with an exclusive forum—the KCAB. In reading Article 11 as permissive, "KAIST conveniently ignores that

there exists only one KCAB, the sole arbitration institution located in Seoul, Korea." (ECF No. 50 at 10.)

Article 11's wording—that any unresolved issues shall be resolved "based on" the arbitration of the KCAB—differs from, and is less clear than, the Business Agreement's Article 14 requirement that "[issues] shall be finally resolved by arbitration … of the K[CAB]." (ECF Nos. 39-2 at 10, art. 11; 39-1 at 6, art. 14.) It appears likely that Article 11's odd phrasing is merely a byproduct of the translation process and, given that KAIST does not argue that Article 11 is ambiguous, the court understands the Management Agreement's Article 11 as intended to serve the same purpose as the Business Agreement's Article 14 despite using less clear language.

Taking Article 11's mandatory language—"shall be resolved"—together with its specified venue—"based on the arbitration of the KCAB"—the court concludes that the Management Agreement's Article 11, like the Business Agreement's Article 14, is a mandatory arbitration clause, designating the KCAB as the exclusive venue for dispute resolution.

### 2.2.3. The Revenue Sharing Agreement

Unlike the Business and Management Agreements, the Revenue Sharing Agreement does not have an arbitration clause. Nonetheless, KIP argues that the Management Agreement incorporates the Revenue Sharing Agreement by reference, and

therefore the Management Agreement's arbitration clause extends to the Revenue Sharing Agreement. (ECF No. 39 at 15-17.)

Where two contracts are intertwined, and only one contract contains an arbitration clause, a party may be forced to arbitrate disputes arising under the second contract when the second contract incorporates the first contract by reference. *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 662, 664-66 (7th Cir. 2002). "The contract must show an intent to incorporate the other document and make it part of the contract itself." *Id.* at 664 (internal citation omitted). Before determining whether the Management Agreement incorporates by reference the Revenue Sharing Agreement (or vice versa), the court must first examine the two contracts to determine their relationship. *Id.* at 663.

Article 10 of the Management Agreement—entitled "Supplementary Agreements"—provides that "[a] separate profit distribution agreement related to the Fin-FET patent litigation in progress shall be drawn up." (ECF No. 39-2 at 10, art 10.) The "separate profit distribution agreement" to which Article 10 refers is the Revenue Sharing Agreement. (ECF No. 39 at 5.) The Revenue Sharing Agreement provides that KIP and KAIST "shall agree on the revenue sharing for 'FinFET technology' related patents." (ECF No. 39-3 at 3.) The Revenue Sharing Agreement further provides that it "is a supplementary agreement concluded according to Article 10 … of the [Management Agreement]." (ECF No. 39-3 at 4.)

KIP argues that these provisions show that the parties intended that the two agreements function together as one agreement and that the Management Agreement's arbitration clause applies to both agreements. KIP points out that the Management Agreement provides that the Revenue Sharing Agreement be drawn up for a specific purpose—for "distributing profit for the patent related to the FinFET technology"—and that the Revenue Sharing Agreement "confirms that it is the agreement supplemental to the Management Agreement for the same purpose." (ECF No. 39 at 16-17.)

The Seventh Circuit explained in *Rosenblum* that, where an agreement with an arbitration clause merely references a second agreement without one, the reference alone is not enough to incorporate its terms into the second agreement; the writing must show "an express intent to incorporate." *Rosenblum*, 299 F.3d at 666. Examining two contracts, one with an arbitration clause and one without, the *Rosenblum* court observed that the two contracts were not sections of the same agreement, that each contract contained similar provisions, that neither contract borrowed missing terms from the other, and that one contract related to an ongoing relationship while the other was for a more specific purpose. *Id.* at 663. And although the contract with the arbitration clause referenced the second contract in three different provisions, the court observed that "[n]one of the three provisions … [showed an express] intention to incorporate the document and make it part of the contract." *Id.* at 664-65. Thus, the court held that there was no express intent

to incorporate, and therefore the contract with the arbitration clause did not incorporate the second contract by reference. *Id.* at 666.

KAIST argues that the same is true here: the Management and Revenue Sharing Agreements are separate and complete agreements, neither supplies missing terms for the other, each has its own revenue sharing provision, and the Management Agreement governs an ongoing relationship as to KAIST's intellectual property whereas the Revenue Sharing Agreement is specific to FinFET patent litigation. (ECF No. 42 at 16 (citing ECF Nos. 39-2, 39-3).) KAIST also points out that KIPB is included as a party to the Revenue Sharing Agreement but not the Management Agreement. (ECF No. 42 at 16 (citing ECF Nos. 39-2, 39-3).) KAIST argues further that nowhere in the Management Agreement is there an express intent to incorporate the Revenue Sharing Agreement. (ECF No. 42 at 17.)

While the Management Agreement's Article 10 does reference the creation of the Revenue Sharing Agreement for a specific purpose (ECF No. 39-2 at 10, art. 10), and Article 2(a) of the Revenue Sharing Agreement defines the agreement as "a supplementary agreement concluded according to Article 10 (Supplementary Agreement) of the [Management Agreement]" (ECF No. 39-3 at 4), these references do not amount to an "express intent to incorporate." *See Rosenblum*, 299 F.3d at 664-66.

The agreements are separate, complete on their own, and do not rely on each other to supply missing terms. The Management Agreement governs the parties' ongoing

relationship relating to KAIST's intellectual property and contains a revenue sharing provision specific to that relationship. (ECF No. 39-2 at 9, art. 5.) By contrast, the Revenue Sharing Agreement is specific to FinFET patent litigation and contains its own revenue sharing provision for litigation-generated revenue. (ECF No. 39-3 at 3, ¶¶ 1(a)-(b).) The separateness of the two agreements is emphasized in the Management Agreement's Article 10, which provides that the Revenue Sharing Agreement will be a "*separate* profit distribution agreement" specifically purposed with governing distribution of the Fin-FET litigation profits. (ECF No. 39-2 at 10, ¶ 10 (emphasis added).)

In sum, the Management Agreement's arbitration clause does not extend to disputes arising under the Revenue Sharing Agreement because neither agreement contains language signaling an express intent that one agreement incorporate the other, or that the Management Agreement's arbitration clause applies to both agreements. Thus, the court now turns to the common law doctrine of *forum non conveniens*.

### 2.2.4.  Private and Public Interest Factors

Typically, "both private and public interest factors ought to inform a court's *forum non conveniens* decision." *Clerides v. Boeing Co.*, 534 F.3d 623, 628 (7th Cir. 2008) (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09 (1947)). The private interest factors include: "(1) the relative ease of access to sources of proof; (2) availability of compulsory process and costs for attendance of witnesses; (3) possibility of view of premises, if appropriate; and (4) other practical issues, including ease of enforcement of any ultimate judgment." *In re*

22
Case 2:22-cv-00317-WED   Filed 10/07/22   Page 22 of 37   Document 56

*Factor VIII or IX Concentrate Blood Prods. Litig.*, 484 F.3d 951, 958 (7th Cir. 2007) (citing *Gulf Oil*, 330 U.S. at 508). The public interest factors include:

> [T]he administrative difficulties stemming from court congestion; the local interest in having localized disputes decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflicts of laws or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

*Clerides*, 534 F.3d at 628 (citing *Gulf Oil*, 330 U.S. at 508).

"A defendant invoking *forum non conveniens* ordinarily bears a heavy burden in opposing the plaintiff's chosen forum." *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007). "When the plaintiff's choice is not its home forum, however, the presumption in the plaintiff's favor 'applies with less force,' for the assumption that the chosen forum is appropriate is in such cases 'less reasonable.'" *Id.* (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255-56 (1981)); *see also In re Factor VIII or IX*, 484 F.3d at 956 ("[I]f the plaintiff is suing far from home, it is less reasonable to assume that the forum is a convenient one and therefore the 'presumption in the plaintiff's favor applies with less force….' Put the other way, the risk that the chosen forum really has little connection to the litigation is greater." (citing *Sinochem*, 549 U.S. at 430 (quoting *Piper Aircraft*, 454 U.S. at 266))).

But where a contract contains a binding forum selection clause, "the plaintiff's choice of forum merits no weight." *Atl. Marine*, 571 U.S. at 63. Thus, a court

should not consider arguments about the parties' private interests [because w]hen parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of litigation. A court accordingly must deem the private-interest factors to weigh entirely in favor of the preselected forum.

*Id.* at 64. Furthermore, as the party seeking to avoid the forum selection clause, the plaintiff has the "burden of showing that public-interest factors overwhelmingly disfavor" dismissal. *Id.* at 67. As such, "the practical result is that forum-selection clauses should control except in unusual cases." *Id.* at 64.

Counts I through V of KAIST's First Amended Complaint allege various breaches by P&IB, KIP, Kang, or KIPB (or some combination thereof) of the Business, Management, or Revenue Sharing Agreements (or some combination thereof). (ECF No. 30 at 11-15, ¶¶ 56-83.) The private interest factors are relevant only to the Revenue Sharing Agreement, which does not have an arbitration provision. With those facts and guiding legal principles in mind, the court turns first to the public interest factors.

For its claims arising under the Business Agreement and Management Agreement, KAIST has the burden of showing that the public interest factors overwhelmingly favor keeping those claims before this court. *See Atl. Marine*, 571 U.S. at 64-66. It has not met its burden. First, it cites to an industry publication stating that the KCAB's caseload has spiked in recent years; but it does not suggest that the KCAB is congested as a result, nor does not compare the KCAB's caseload to this court's. (ECF No. 42 at 19.) It then argues that Wisconsin's local interest in this case is stronger than Korea's because the actions

giving rise to its breach claims occurred in the United States and the resulting disputed funds are held in Milwaukee. (ECF No. 42 at 18.) While that may be true, apart from KIPB, the parties are incorporated and headquartered in Korea and their agreements, written in Korean, were written and negotiated in Korea. (ECF No. 30 at 2-3; ¶¶ 5-9.)

KAIST then suggests that the potential burden of having this court apply foreign law is not a concern because the Purchase Agreement and the Trust Account's escrow agreement are in English and are subject to U.S. law, and the Paulina Arbitration proceedings were conducted in English and are also subject to U.S. law. (ECF No. 42 at 19.) But KAIST's claims against KIP all arise out of the Korean-language contracts, and two of those contracts stipulate to dispute resolution before the KCAB under the KCAB's rules, and the KCAB operates under the Korean Arbitration Act. (ECF No. 50 at 17.)

The only connection Wisconsin has to this case's outcome is that the Infringement Lawsuit funds that KAIST claims a right to are held in an escrow account in Milwaukee. (ECF No. 30 at 8, ¶ 42.) But that, without more, is not a sufficient reason to burden Eastern District of Wisconsin residents with jury duty. Because the public interest factors do not overwhelmingly favor keeping KAIST's Business and Management Agreement-related claims in this court, those claims are dismissed under the doctrine of *forum non conveniens*.

As to KAIST's Revenue Sharing Agreement-related claims, because that agreement is not subject to an arbitration clause, KAIST does not have the same burden as with claims arising under the contracts with mandatory arbitration clauses. But because

KAIST is a Korean entity, this district is not KAIST's "home" forum and there is no "strong presumption" in favor of KAIST's choice to file claims arising under the Revenue Sharing Agreement with this court. *See In re Factor VIII or IX Concentrate Blood Prod. Litig.*, 484 F.3d 951, 955-56 (7th Cir. 2007); *cf. Clerides*, 534 F.3d at 629 ("Where … the plaintiff is a foreign citizen and resident …, his choice of the United States as a forum should be accorded less deference than if the choice is made by a United States plaintiff."). For the same reasons the public interest factors weigh in favor of dismissing KAIST's claims relating to the parties' Business and Management Agreements, those factors weigh in favor of dismissing KAIST's claims arising out of the Revenue Sharing Agreement.

Having concluded that the public interest factors warrant dismissal of KAIST's claims arising out of the Business and Management Agreements and tilt the scales in favor of dismissal of KAIST's claims under the Revenue Sharing Agreement, the court now turns to the private interest factors, which, again, are only relevant to KAIST's claims under the Revenue Sharing Agreement.

KAIST is a national research university with its campus and principal place of business in Daejon, Korea. (ECF No. 30 at 2, ¶ 5.) As such, its decision to file in this court is accorded less deference. *See Clerides*, 534 F.3d at 628. The only connection the parties' dispute has with this district is this is where KIP placed money in a trust account pending completion of the Paulina Arbitration. (ECF No. 30 at 8, ¶ 42.)

KAIST tries to downplay the impact of the language barriers, the parties' nationalities, and the location of evidence and key actors by suggesting that any associated inconveniences can be overcome by technology and "sophisticated" parties and law firms. (ECF No. 42 at 17-18.) But this argument is contradicted by the fact that "the parties offered different versions of certified translations of the three Korean agreements at issue" and that there were discrepancies in the translations. (ECF No. 50 at 15 & n.10.) KAIST implicitly acknowledges that all but one of the parties to this lawsuit reside in Korea but argues that Zoom removes the need for a forum closer to where these actors live. Of course, that assumes that this court would be willing to conduct the trial entirely by Zoom, and no basis exists for that belief.

None of KAIST's arguments persuasively detract from the obvious conclusion that, where an action is between Korean parties over alleged breaches of Korean contracts, and two of the three contracts at issue have binding arbitration clauses designating a Korean arbitral body for dispute resolution, the private interest factors weigh against a federal court in Milwaukee as being a convenient venue. It may be true that, unlike the Business and Management Agreements, the Revenue Sharing Agreement contains no stipulation to arbitrate disputes before the KCAB. However, nothing about that agreement's contents, the parties to it, or the alleged breaches of it sufficiently tilt the private-interest-factor scales in favor of proceeding in this court. Thus, the private interest

factors also weigh in favor of dismissing KAIST's claims under the Revenue Sharing Agreement.

For these reasons, the court grants KIP's motion to dismiss on grounds of *forum non conveniens*. A dismissal on *forum non conveniens* grounds is without prejudice, "mean[ing] that although the dismissal is 'final' in the sense that the plaintiffs are finished before the U.S. courts, they are still free to refile the case in another, appropriate forum." *Hunt v. Moore Brothers, Inc.*, 861 F.3d 655, 657 (7th Cir. 2017) (quoting *Manez v. Bridgestone Firestone N. Am. Tire, LLC*, 533 F.3d 578, 583-84 (7th Cir. 2008)). Because the court finds that the doctrine of *forum non conveniens* warrants dismissal, KIP's arguments for dismissing Counts I and II under Federal Rule of Civil Procedure 12(b)(6) are dismissed as moot.

### 3. Paulina's Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)[2]

Paulina argues that KAIST's Amended Complaint fails to allege certain, essential elements for both its unjust enrichment claim (Count VI) and its tortious interference with

---

[2] Paulina removed this action to this court, claiming this court had original subject matter jurisdiction pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention") (codified in Chapter 2 of the Federal Arbitration Act) because "the subject matter of this Action 'relates to an arbitration agreement or award falling under the Convention.'" (ECF No. 1 at 1, 6; ¶¶ 21-23 (first citing 9 U.S.C. § 203; and then citing *Felland v. Clifton*, No. 10-CV-664, 2013 WL 3778967, at *4 (W.D. Wis. July 18, 2013)).) Paulina cited to both its arbitration agreement with the KIP defendants as well as the arbitration clauses in the agreements between KAIST and KIP as giving rise to original subject matter jurisdiction under the Convention. (ECF No. 1 at 7-9; ¶¶ 25-35.) With KAIST's claims against KIP now dismissed, this court continues to have jurisdiction because there is now complete diversity of citizenship of the parties. 28 U.S.C. § 1332(a); *Lee v. Am. Nat'l Ins. Co.*, 260 F.3d 997, 1005 (9th Cir. 2001) (citing *Wis. Dep't of Corrs. v. Schacht*, 524 U.S. 381, 388 (1998)).

a contract claim (Count VII). Thus, Paulina argues each claim fails to meet the pleading requirements set out in Federal Rule of Civil Procedure 12(b)(6).

KAIST argues that its Amended Complaint plausibly alleges all essential elements for both of its claims against Paulina. In the event the court disagrees, KAIST contends that Paulina's interest in KAIST's prayer for declaratory and injunctive relief provides an independent basis for retaining Paulina as a defendant in this lawsuit. KAIST also asks for leave to amend its unjust enrichment and tortious interference claims if the court finds that the claims fall short of Rule 12(b)(6) pleading standard.

### 3.1. Analysis

#### 3.1.1. Tortious Interference with Performance of a Contract

Wisconsin has adopted the Restatement (Second) of Torts for claims for tortious interference with contract. *Briesemeister v. Lehner*, 2006 WI App 140, ¶ 50 n.8, 295 Wis. 2d 429, 454 n.8, 720 N.W.2d 531, 543 n.8. Under Wisconsin law, a claim for tortious interference with a contract has the following elements:

> (1) the plaintiff had a contract or a prospective contractual relationship with a third party, (2) the defendant interfered with that relationship, (3) the interference by the defendant was intentional, (4) there was a causal connection between the interference and damages, and (5) the defendant was not justified or privileged to interfere.

*Id.* at ¶ 48, 295 Wis. 2d at 452, 720 N.W.2d at 542. "To recover for interference with contract under Wisconsin law, it is essential that the defendant act intentionally. To have the requisite intent, the defendant must act with a purpose to interfere with the contract."

*Gruen Indus., Inc. v. Biller*, 608 F.2d 274, 282 (7th Cir. 1979). Interference may be found "only where 'it is apparent *at the outset* that the alleged tortfeasor acted with the intention to interfere with the [prospective contract] or acted in such a fashion and for such a purpose that he knew that the interference was certain, or substantially certain, to occur.'" *Foseid v. St. Bank of Cross Plains*, 197 Wis. 2d 772, 790 n.11, 541 N.W.2d 203, 210 n.11 (Wis. Ct. App. 1995) (quoting *Augustine v. Anti-Defamation League of B'nai B'rith*, 75 Wis. 2d 207, 221, 249 N.W.2d 547, 554 (Wis. 1997)); *see also* Wis. JI – Civil 2780, at 5 (2020).

Paulina claims that this court should dismiss KAIST's tortious interference claim because "KAIST has failed to plead facts establishing … that Paulina intentionally interfered with [KAIST's] two 2019 contracts with KIP entities." (ECF No. 35 at 13.) Paulina argues that, apart from a threadbare recitation that Paulina "is intentionally inducing KIP to breach the contracts" and that such conduct "is wrongful, unjustified, and improper," KAIST does not plead facts showing Paulina had the requisite intent to commit tortious interference. (ECF No. 35 at 14-15.)

KAIST concedes that its Amended Complaint does not allege that Paulina knew of the contractual relationship between KAIST and KIP when it entered into the 2016 Purchase Agreement with KIP or when it initiated the arbitration. (ECF No. 45 at 9-11.) But KAIST argues that whether Paulina was aware of KAIST and KIP's contractual relationship at those times is no matter because "Paulina is engaged in an *ongoing* effort to force KIP/KIPB to pay Paulina funds that are not covered by Paulina's contract with

KIPB and not subject to Paulina's alleged security interest." (ECF No. 45 at 9 (emphasis added).) KAIST claims that "Paulina is certainly aware of KAIST's contracts now and is doing everything in its power to force the KIP defendants to breach those contracts by transferring more of the Korean patent license fee to Paulina." (ECF No. 45 at 9 (citing ECF No. 30 at 13, 16; ¶¶ 74, 94).) Thus, KAIST asserts that the allegations in its Amended Complaint "are sufficient to establish that Paulina *is, at present*, intentionally interfering with KAIST's contracts in a way that is not authorized or protected by Paulina's contract with KIPB." (ECF No. 45 at 10.)

To state a cognizable claim for tortious interference with contract under Wisconsin law, KAIST was required to allege facts demonstrating that Paulina, *from the outset* of its contractual relationship with KIP, acted with the requisite intent to interfere with the contractual relationship between KAIST and KIP. *See Foseid*, 197 Wis. 2d at 790 n.11, 541 N.W.2d at 210 n.11; Wis. JI – Civil 2780, at 5 (2020); *Gruen Indus.*, 608 F.2d at 282 ("To show that a defendant had the requisite intent to interfere, it is necessary to show that he had actual knowledge or sufficient notice of the existence of a contract."). KAIST's allegations that Paulina is *now* aware of KAIST's contracts with KIP and is *presently* compelling the "KIP defendants to shirk their contractual duties" (ECF Nos. 30 at 16 at ¶ 94; 45 at 10-11) are not sufficient to state a claim for tortious interference with performance of a contract under Wisconsin law.

Because KAIST's Amended Complaint fails to allege that Paulina was aware of the contractual relationship between KAIST and KIP at the outset of its contractual relationship with KIP, let alone that Paulina intended to interfere with that contractual relationship when Paulina entered into its contract with KIP, KAIST fails to state a cognizable claim for tortious interference with contract.

### 3.1.2. Unjust Enrichment

To state a claim for unjust enrichment under Wisconsin law, a plaintiff must plausibly allege three elements: "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under circumstances that makes its retention inequitable." *See Tri-State Mech., Inc. v. Northland Coll.*, 2004 WI App 100, ¶ 14, 273 Wis. 2d 471, 479, 681 N.W.2d 302, 306 (citing *S & M Rotogravure Serv. V. Baer*, 77 Wis. 2d 454, 460, 252 N.W.2d 913, 915-16 (Wis. 1977)).

KAIST does not dispute that KIP owed $21 million dollars to Paulina pursuant to the Purchase Agreement between Paulina and KIP. In fact, KAIST acknowledges KIP's debt to Paulina throughout its Amended Complaint. (ECF No 30 at 9, 13; ¶¶ 43, 74.) Nonetheless, KAIST claims that, because KIP paid Paulina with funds that were meant for KAIST, Paulina was unjustly enriched. (ECF Nos. 30 at 13-14, ¶ 74; 45 at 7-8.) KAIST does not cite to any precedent to support such a theory of unjust enrichment. (ECF No. 45.)

But Paulina provides an array of authority in support of its proposition that the enforcement of a valid contract against a debtor cannot be grounds for an unjust enrichment claim, even if it leaves the debtor without sufficient funds to pay other creditors. (ECF No. 35 at 20-22.) For example, *Fischer v. Renner*, 348 Wis. 2d 763, 833 N.W.2d 873 (Table), 2013 WL 2319487, at *4 (Wis. Ct. App. 2013), found that a debtor's payment to a creditor, as a "contractually established" outcome, could not be grounds for an unjust enrichment claim against the creditor even though the payment made it impossible for the debtor to meet a contractual obligation to another creditor. *See also United States v. Goforth*, 465 F.3d 730, 734 (6th Cir. 2006) ("[T]he theory of unjust enrichment may not be used to allow a stranger to a loan contract or promissory note to seek funds repaid pursuant to such an agreement."); *Nat'l Am. Ins. Co. v. Ind. Lumbermens Mut. Ins. Co.*, 221 F.3d 1339 (Table), 2000 WL 975176, at * 3 (7th Cir. July 11, 2000) ("[W]here the enrichment was innocently conferred by a third party according to a contractual or legal obligation, the enrichment cannot be unjust." (internal citations omitted)).

The court finds the authority cited by Paulina persuasive to the extent it suggests that an unjust enrichment claim cannot be premised on payments made pursuant to a valid contract. And, given KAIST's failure to provide any authority to support its theory that it would be inequitable for Paulina to retain the specific funds it received from KIP,

the court finds that KAIST's allegations do not amount to a cognizable claim for unjust enrichment.

### 3.1.3. Prayer for Declaratory and Injunctive Relief

KAIST argues that, irrespective of its two claims against Paulina, Paulina is a proper defendant to this lawsuit because it claims an interest to the funds held in escrow by U.S. Bank. If the court grants KAIST's requested declaratory and/or injunctive relief, KAIST would then have control and/or access to the same funds. (ECF No. 45 at 1.) KAIST argues that it is therefore necessary to retain Paulina as a party "[t]o avoid a partial disposition of a controversy" in the event that KAIST prevails on its claims against KIP and the court grants KAIST access to or control over the funds. (ECF No. 45 at 4-5 (quoting *Diamond Shamrock Corp. v. Lumbermens Mut. Cas. Co.*, 416 F.2d 707, 710 (7th Cir. 1969).)

But KAIST's claims against KIP have been dismissed on grounds of *forum non conveniens*, and its claims against Paulina have been dismissed for failure to state a claim upon which relief may be granted. With no claims remaining before this court, the court has no basis on which to grant KAIST's untethered requests for declaratory and injunctive relief. *See Weis v. Bd. of Regents of the Univ. of Wis. Sys.*, 837 F. Supp. 2d 971, 975 (E.D. Wis. 2011) ("[I]njunctions and declarations are forms of relief or remedies, not stand-alone claims, and a plaintiff's right to any one of these remedies is dependent on proof of a cognizable claim or a legal theory entitling him to such relief. A bare claim for injunctive relief apart from the legal claim or theory which entitles one to such relief is not

cognizable." (citing *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 889 (7th Cir. 2011))). Therefore, any interest Paulina has in KAIST's requested declaratory and injunctive relief cannot be independent grounds for keeping it as a party to this lawsuit.

Having concluded that KAIST's tortious interference and unjust enrichment claims against Paulina each fail to state a claim upon which relief may be granted, and that KAIST's requested declaratory and injunctive relief does not provide an independent basis for retaining Paulina as a party, the court will grant Paulina's motion to dismiss.

### 3.1.4. Leave to Amend

"Generally, 'a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed.'" *O'Boyle v. Real Time Resolutions, Inc.*, 910 F.3d 338, 346-47 (7th Cir. 2018) (quoting *Runnion v. Girl Scouts of Greater Chi.*, 786 F.3d 510, 519 (7th Cir. 2015)).

Despite naming Paulina as a defendant, KAIST's original complaint did not state a claim against Paulina, nor did it identify any alleged wrongdoing on Paulina's part. (ECF No. 1-1.) After Paulina filed its motion to dismiss KAIST's original complaint for failure to state a claim, rather than respond to Paulina's motion to dismiss, KAIST amended its complaint to add the two claims that the court now dismisses under Rule 12(b)(6). While KAIST asks this court to grant it leave so that it can amend its claims against Paulina yet again, there is no reason to believe that the fatal defects the court has

identified can be remedied by another amendment. Because the court finds "that any amendment would be futile or otherwise unwarranted," *Barry Aviation v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004), it will dismiss KAIST's tortious interference and unjust enrichment claims against Paulina with prejudice.

**4. U.S. Bank's Motion to Dismiss**

Although KAIST admits that its Amended Complaint does not state a claim against U.S. Bank, it contends that it did not need to do so for U.S. Bank to remain a party. (ECF No. 44 at 1.) It argues that U.S. Bank is a proper defendant for two reasons: (1) U.S. Bank has an interest in the declaratory relief sought by KAIST; and (2) KAIST seeks a permanent injunction preventing U.S. Bank from distributing any funds held in the Trust Account. (ECF Nos. 44 at 4-7; 30 at 17, ¶¶ A-B.)

KAIST's prayer for declaratory relief is entirely predicated on its purported right to funds held in the U.S. Bank Trust Account stemming from its contracts with KIP. (ECF No. 30 at 17, ¶ A.) Because KAIST does not have any remaining claims before this court, its prayer for declaratory relief in this lawsuit is effectively moot. *Cf. Weis v. Bd. of Regents of the Univ. of Wis. Sys.*, 837 F. Supp. 2d 971, 975 (E.D. Wis. 2011) ("[D]eclarations are forms of relief or remedies, not stand-alone claims, and a plaintiff's right to [a declaration] is dependent on proof of a cognizable claim or a legal theory entitling him to such relief."). Therefore, it cannot be grounds for keeping U.S. Bank as a party to this lawsuit.

The same is true for its requested injunctive relief. While KAIST asks that this court prevent U.S. Bank from disbursing funds in the Trust Account without KAIST's consent (ECF No. 30 at 17, ¶ B), any claim KAIST might have to those funds depends on a favorable outcome for its claims against KIP and/or Paulina, which claims have been dismissed. *See Weis*, 837 F. Supp. 2d at 975 ("A bare claim for injunctive relief apart from the legal claim or theory which entitles one to such relief is not cognizable."). Thus, KAIST's requested injunctive relief also cannot be a basis for keeping U.S. Bank as a party.

Because U.S. Bank's purported interest in KAIST's requested declaratory and injunctive relief does not provide grounds for retaining U.S. Bank as a defendant in this lawsuit, and KAIST has not argued any other grounds exist, the court will grant U.S. Bank's motion to dismiss with prejudice.

## 5. Conclusion

For the foregoing reasons, the court grants, without prejudice, the KIP defendants' motion to dismiss on grounds of *forum non conveniens* (ECF No. 38), grants, with prejudice, Paulina's motion to dismiss for failure to state a claim under Rule 12(b)(6) (ECF No. 34), and grants, with prejudice, U.S. Bank's motion to dismiss (ECF No. 36).

**SO ORDERED**.

Dated at Milwaukee, Wisconsin this 7th day of October, 2022.

William E. Duffin

WILLIAM E. DUFFIN
U.S. Magistrate Judge